**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br><br> **Plaintiff,** <br><br> -against- <br><br> **MICHAEL CARIDI,** <br><br> **Defendant.** | **COMPLAINT** <br><br> **23 Civ. 1243** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Michael Caridi ("Caridi" or "Defendant"), alleges as follows:

## SUMMARY

1.      This action arises out of a fraudulent scheme by Caridi, the former chairman and chief executive of Tree of Knowledge International, Inc. ("TOKI"), to hide from investors that TOKI and its subsidiary, Tree of Knowledge Inc. ("TOK NV," together with TOKI, the "TOK Entities"), had failed to meet their obligations in the largest transaction in the TOK Entities' history, that Caridi had misappropriated substantial sums from that transaction, and that, due to the TOK Entities' failure in that transaction, they now faced a liability that dwarfed their assets and revenues.

2.      At the end of March 2020, at the outset of the Covid-19 pandemic, Caridi misled a third-party hospital to believe that the TOK Entities—which were unprofitable companies that operated three pain management clinics and sold hemp-based cannabidiol ("CBD") products—had a vast international network of medical equipment suppliers through which the TOK Entities could immediately procure millions of N-95 respirator masks that the hospital desperately needed to protect its employees.  The hospital paid the TOK Entities nearly $13.7 million, more

than double the total revenue TOKI had ever earned, for three million N-95 masks to be delivered within two days.

3.      Caridi and the TOK Entities ultimately procured zero N-95 masks for the hospital. Instead, Caridi paid a substantial portion of the more than $13 million received from the hospital to himself, his family, and his business associates.  When no N-95 masks were delivered and the hospital demanded repayment, Caridi promised the TOK Entities would repay the hospital in full.  They did not.  As a result, the TOK Entities were left with a massive liability owed to the hospital, and insufficient assets or revenues to make repayment.

4.      Caridi kept this scheme—the transaction, its failure, and his self-dealing—hidden from the TOK Entities' other senior management and board members.  And those material facts were not disclosed to investors.  Instead, weeks later, in May and June 2020, TOKI, with Caridi's assistance, issued two press releases touting two small transactions in which the TOK Entities had procured thermometers and medical gowns for third parties.  The press releases falsely and misleadingly portrayed the TOK Entities as having made a successful "pivot" to a new and valuable strategy of procuring personal protective medical equipment ("PPE") for hospitals and other medical purchasers, quoted Caridi as lauding the TOK Entities for overcoming obstacles to procuring PPE in the Covid-19 environment, and assured investors that no material undisclosed events had occurred at TOKI.  Neither press release said anything about the massive, failed N-95 mask transaction or the financial fallout from that failure.

5.      In truth, contrary to the press releases, the undisclosed, failed attempt by Caridi and the TOK Entities to pivot to the PPE procurement business had already resulted in the TOK Entities owing the hospital millions of dollars that they could not repay and created a massive, hidden liability for the TOK Entities that one of TOKI's board members would later describe as

"cataclysmic."  Indeed, due to the undisclosed failed transaction, a court later placed TOK NV into receivership, TOKI eventually handed over ownership of that subsidiary and its assets and claims to the hospital, and Caridi was forced to resign.

6.     By virtue of this conduct, and as alleged herein, Caridi violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], both as a primary violator and by aiding and abetting TOKI's violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder.  The Commission asks the Court to enjoin Caridi from future securities law violations, require him to disgorge ill-gotten gains together with prejudgment interest, require him to pay a civil penalty, bar him from serving as an officer or director of a public company, and bar him from dealing in penny stocks.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

7.     The Commission brings this action pursuant to the authority conferred upon it by Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

8.     The Commission seeks a final judgment (a) permanently enjoining Caridi from violating the federal securities laws alleged herein; (b) ordering Caridi to disgorge all ill-gotten gains he has received as a result of the violations alleged herein pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)] and to pay prejudgment interest thereon; (c) ordering Caridi to pay civil money penalties pursuant to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Caridi from serving as an officer or director that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 12(d)(2) [15 U.S.C. § 78u(d)(2)]; (e) permanently

prohibiting Caridi from participating in an offering of any penny stock, pursuant to Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and (f) any other and further relief the Court may deem just and appropriate.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction pursuant to Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].  Defendant, directly and indirectly, made use of the mails, or the means and instrumentalities of interstate commerce, in connection with the transactions, acts, practices, and courses of business alleged herein.

10.      Venue lies in this District under Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District.  Among other things, Caridi resides in this District and conducted business for the TOKI Entities, including conduct described herein, in and from this District.

## DEFENDANT

11.      **Michael Caridi**, age 59, is a resident of Greenwich, Connecticut.  During the relevant period, Caridi served as chairman of the TOKI Board of Directors and, until April 28, 2020, as TOKI's interim chief executive officer.  Caridi also served as the President and a director of TOK NV.  In February 2021, Caridi resigned as President and director of TOK NV and, in September 2021, resigned from TOKI's Board of Directors.  Also during the relevant period, Caridi was one of TOKI's largest shareholders, owning more than 10 million TOKI shares.  During the Commission's investigation concerning Caridi's potential securities law violations that preceded this action, including the violations alleged herein, Caridi asserted his Fifth Amendment right against self-incrimination and, on that basis, refused to provide testimony or to produce documents or other materials in response to Commission investigative subpoenas.

4

## RELEVANT NON-PARTIES

12.  **Tree of Knowledge Inc.** ("**TOK NV**") was formed in 2015 under the laws of Nevada, with its principal place of business in Spokane, Washington.  During the relevant period, TOK NV was a subsidiary of TOKI, and TOK NV produced and sold hemp-based CBD products.

13.  **Tree of Knowledge International Corp.** ("**TOKI**") was formed in 2018 under the laws of British Columbia, through a reverse merger between TOK NV and a publicly traded shell company, Courtland Capital, Inc.  TOKI has its principal place of business in Toronto, Canada, and it operates pain management clinics and produces and distributes hemp-based CBD products.  During the relevant period, TOKI's shares were publicly listed on the Canadian Securities Exchange ("CSE") under the symbol "TOKI" and they were quoted under the symbol "TOKIF" on OTC Link (formerly known as the "Pink Sheets"), an electronic interdealer quotation system in the United States operated by OTC Markets Group, Inc. ("OTC Markets").  Also during the relevant period, TOKI reported its financial results on a consolidated basis, reflecting the performance of both TOKI and its subsidiaries, including TOK NV.  After Caridi's fraudulent scheme alleged herein was revealed, TOKI changed its name to Optima Medical Innovations Corp.  At all relevant times, TOKI's stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)], and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1].

14.  **Hospital A** is a non-profit entity that is a large, specialized care hospital in Québec, Canada.

## DEFENDANT'S FRAUDULENT SCHEME

15.  Caridi engaged in a fraudulent scheme to hide from investors the TOK Entities' failure to meet their obligations in the largest transaction the companies had ever done, and that

Caridi had used payments to the TOK Entities in that transaction to enrich himself, his family, and his business associates, ultimately leaving the TOK Entities with a massive, undisclosed liability while, at the same time, assisting TOKI in making, or making himself, false and misleading public disclosures that portrayed the TOK Entities as having made a successful pivot to the PPE procurement business.

## I.  Caridi Attempts to Take Advantage of Hospital A's Urgent Need for N-95 Masks.

16.     Between 2018 and early 2020, TOKI and its subsidiaries operated three pain management clinics and sold hemp-based CBD products.  TOKI was not profitable.  For 2018 and 2019 combined, TOKI earned approximately $6 million in revenue but incurred losses of more than $33 million.  By the end of 2019, TOKI had only $63,432 in cash.

17.     By mid-March 2020, at the outset of the COVID-19 pandemic, it was widely reported that many healthcare providers faced shortages of PPE.  At that time, neither of the TOK Entities had any experience procuring PPE for sale and distribution.  Nonetheless, Caridi, who also had no experience in PPE procurement, sought to capitalize on the healthcare providers' desperate need.

18.     On or around March 18, 2020, Caridi informed one of his personal business associates ("Consultant") that he would like to enter the PPE procurement business.  On March 25, 2020, Consultant informed Caridi that a large Québec hospital, Hospital A, was looking to make an urgent PPE purchase.  That evening, on Caridi's behalf, Consultant informed Hospital A that Caridi and the TOK Entities could procure large quantities of KN-95 masks.  Hospital A responded that it would only purchase N-95 masks.

19.     N-95 masks are materially different from KN-95 masks.  For example, N-95 masks are regulated by the CDC's National Institute of Occupational Safety and Health and had

been approved for use in Canadian hospitals, but KN-95 masks are not similarly regulated and had not received similar approval for use in Canadian hospitals.

20.     The next day, March 26, 2020, Caridi offered, on behalf of the TOK Entities, to procure three million N-95 masks for Hospital A and to deliver them within two days, by March 28, in exchange for $11.9 million, plus fees and taxes.  Hospital A accepted the offer.  That evening, Caridi caused TOKI to issue two invoices to Hospital A totaling $13,693,522, inclusive of fees and Québec sales tax, for "Urgent Delivery of Masks."

21.     On March 27, 2020, Hospital A wired $13,693,522 to a U.S.-based bank account in the name of TOK NV controlled by Caridi.  Before receiving those funds, TOK NV's bank accounts held approximately $7,301, and the TOK Entities' bank accounts held approximately $200,000.

22.     Caridi's transaction with Hospital A was the largest the TOK Entities had ever done.  Indeed, the approximately $13.7 million paid by Hospital A to TOK NV was more than double the total revenue TOKI had earned since it had been in existence.

23.     Despite the size of the Hospital A transaction and the substantial importance of the deal to the TOK Entities' business, Caridi did not inform the TOK Entities' other senior management or its Board of Directors that the TOK Entities had contracted with Hospital A to procure N-95 masks or that Hospital A had transferred nearly $13.7 million to TOK NV in payment for those masks.

II.    **Caridi Fails to Procure Any N-95 Masks, But Disburses Nearly All of the Nearly $13.7 Million TOK NV Had Been Paid By Hospital A.**

24.     The TOK Entities never delivered any N-95 masks to Hospital A.  Nevertheless, Caridi disbursed nearly all funds Hospital A had paid to TOK NV—including making substantial

payments to himself and his family—leaving the TOK Entities owing an undisclosed liability to Hospital A that was so large as to put their operations at risk.

      **a.**      ***The TOK Entities Delivered Zero N-95 Masks to Hospital A and the Non-N-95 Masks They Delivered Were Unusable***

25.      On March 28, 2020, the day the TOK Entities were due to deliver three million N-95 masks to Hospital A, Caridi caused TOKI to enter a contract to procure masks. That contract, with a United States-based CBD products company that had no experience procuring PPE and that was owned by another of Caridi's personal business associates ("Company B"), provided that Company B would sell three million masks to TOKI. The contract described those masks as both KN-95 masks and N-95 masks and did not provide a time by which Company B would complete delivery. The contract stated only that an "initial shipment" of 100,000 masks from China would be initiated on March 29, 2020.

26.      The next day, March 29, 2020, Caridi sent Hospital A what appeared to be a screenshot of a shipping manifest purporting that 100,000 KN-95 masks were to be sent from China to Québec. Hospital A quickly reminded Caridi that the KN-95 masks were not the same as, and were not a suitable replacement for, the N-95 masks Hospital A had ordered and paid for.

27.      Even though Caridi knew TOKI's contract with Company B contemplated that KN-95 masks might be delivered, Caridi told Hospital A that the 100,000 masks referenced in the screenshot of the shipping manifest were, in fact, N-95 masks and that the manifest was intentionally incorrect to help the masks clear customs in China. Caridi's statement to Hospital A was false, as Caridi knew or recklessly disregarded.

28.      By April 4, 2020, a week after Hospital A had placed its order, the TOK Entities had delivered zero masks to Hospital A, and Hospital A had concluded that whatever masks the

TOK Entities had in transit were KN-95 masks.  Hospital A again stressed to Caridi that it had purchased and paid for N-95 masks and that KN-95 masks were unacceptable.

29.     Caridi knew, or recklessly disregarded, that he had failed to procure any N-95 masks.  He also knew, or recklessly disregarded, that Hospital A was poised to reject the KN-95 masks.  So, Caridi made misrepresentations to Hospital A concerning the adequacy of the KN-95 masks to attempt to pass them off as acceptable.  Caridi told Hospital A that KN-95 masks were regulated and approved by South Korea's Ministry of Food and Drug Safety.  This was not true.  Caridi also told Hospital A that KN-95 masks were now acceptable for use in Canadian hospitals and that those masks "meet or exceed" the regulatory standards applicable to N-95 masks.  Hospital A understood those statements to be false.

30.     The TOK Entities finally made their first delivery to Hospital A on April 9, 2020: 2,000 KN-95 masks.  On April 13, the TOK Entities delivered an additional 154,000 KN-95 masks.  The packaging for all KN-95 masks the TOK Entities had delivered expressly stated that the masks were for "Non medical use."

31.     Around the same time, Hospital A discovered that the TOK Entities had no Canadian tax identification number.  As such, the TOK Entities had not been entitled to collect the $1,188,022 in Québec sales tax that TOKI had invoiced to Hospital A and that Hospital A had paid to TOK NV.  Hospital A demanded that the TOK Entities refund that sales tax.  Caridi repeatedly promised Hospital A that the TOK Entities would repay the full amount of wrongly collected tax, but the TOK Entities repaid only $500,000.

32.     On April 14, 2020, Caridi informed Hospital A that between 240,000 and 400,000 additional masks would be delivered that afternoon.  In response, the Assistant Deputy Minister for Québec's Ministry of Health and Social Services e-mailed Caridi, stating that the TOK

Entities had failed to deliver what Hospital A had ordered and paid for; that, after April 14, Hospital A would not accept any deliveries "until we are able to validate the quality of the masks you've sent us"; and that Hospital A would test the quality of the KN-95 masks "to see if something could be salvaged out of this whole mess."

33.     The TOK Entities delivered no additional masks to Hospital A on or after April 14.

34.     The next week, a third-party health and safety research laboratory tested samples from the 156,000 KN-95 masks the TOK Entities had delivered to Hospital A.  In a report analyzing the KN-95 masks, the laboratory concluded that the masks were "significantly" less protective than a basic surgical mask—which, in turn, is less protective than an N-95 mask—and that the "masks are not Respiratory Protection Devices (RPD).  They cannot and should not be used as respiratory protection for medical personnel treating patients with COVID-19 or any other disease that can be spread by airborne transmission."

35.     By April 23, 2020, Hospital A believed Caridi had lied about the TOK Entities' ability to deliver N-95 masks and demanded that the TOK Entities repay it approximately $13.19 million.[1]  Caridi knew, or recklessly disregarded, that the Hospital A transaction, and his attempt to pivot the TOK Entities into the PPE procurement business, had been a failure, and he promised Hospital A he would submit a reimbursement proposal.

36.     After multiple communications with Hospital A, including with Hospital A's outside counsel, Caridi agreed, on May 1, 2020, that the TOK Entities would repay $13,193,503 to Hospital A pursuant to a payment plan (the "Repayment Agreement"): *first*, by May 2, the

---

[1] The purchase price of $13,693,522 minus the $500,000 in improperly collected taxes that the TOK Entities had repaid to Hospital A on April 13, 2020, *see supra* paragraph 31.

TOK Entities would pay "the sum of $1,000,000 USD, as partial repayment"; and, *second*, the TOK Entities would "make minimum payments of $1,000,000 USD and more if possible, every 10 calendar days starting May 4th, 2020" until the full amount was repaid.

37.     As discussed below, when Caridi agreed to the Repayment Agreement, he knew, or recklessly disregarded, that he had already caused TOK NV to disburse most of the funds Hospital A had paid and that the TOK Entities did not have sufficient assets or revenues to make repayment.

38.     Despite the TOK Entities' inability to procure PPE for Hospital A, their failure to meet their obligations in a transaction in which Caridi had bound the TOK Entities to deliver $13 million worth of goods, and the massive debt the TOK Entities now owed to Hospital A which threatened their very existence, Caridi still did not inform the TOK Entities' other senior management or board members of all material details regarding the Hospital A transaction or that he had agreed to the Repayment Agreement.

> **b.     *Caridi Caused the TOK Entities to Disburse More Than $8 Million, Including to Himself, His Family, and His Business Partners***

39.     Between March 28, 2020, when Hospital A paid $13,693,522 to TOK NV's bank account, and May 1, 2020, when Caridi agreed to the Repayment Agreement, Caridi knowingly, or with reckless disregard, caused TOK NV to transfer nearly $6 million to persons and entities other than Hospital A, including payments to himself, his family, and his business associates.

40.     For example, between April 1 and April 20, 2020, Caridi caused TOK NV to make seven payments to himself totaling $953,500.  By contrast, in the three months prior to those seven payments, TOK NV had paid Caridi a total of only $9,312.

41.     Between April 10 and April 17, 2020, Caridi also caused TOK NV to make six payments to his son totaling $26,000.

42.     During the first three weeks of April 2020, Caridi also knowingly, or with reckless disregard, caused TOK NV to make more than $4 million in payments to entities owned by Caridi's business partners in other ventures.  This included, among other payments:

  a.     $744,001 to a company owned by the Consultant, who had informed Caridi that Hospital A was looking to purchase PPE;

  b.     $920,000 to Company B, with which the TOK Entities had contracted to acquire masks;[2]

  c.     more than $1.6 million to Company C, an entity owned by an individual with whom Caridi is involved in a business venture unrelated to the TOK Entities and who is also an associate of the owner of Company B; and

  d.     $900,000 to yet another entity owned by the owner of Company C.

43.     As of May 1, 2020, when Caridi agreed to the Repayment Agreement obligating the TOK Entities to repay more than $13 million to Hospital A, the TOK Entities had approximately $5.3 million, and Caridi knew, or recklessly disregarded, that the TOK Entities did not have sufficient assets or revenues to repay Hospital A under the Repayment Agreement.

44.     Unsurprisingly, the TOK Entities quickly defaulted on the Repayment Agreement.  The TOK Entities were obligated to pay $1 million to Hospital A on May 2, 2020, and then to pay at least $1 million to Hospital A every ten days beginning on May 4, until the full approximately $13.19 million was repaid.  However, they paid only $2 million to Hospital A:  $1 million on May 4, $500,000 on May 14, and $500,000 on May 15.  Then, Caridi

---

[2] On the same day as Caridi caused TOK NV to make this $920,000 payment to Company B, Company B wired $30,000 of that payment to Caridi's personal bank account in what appears to be a kickback related to the Hospital A deal.

stopped causing the TOK Entities to make any repayment to Hospital A.  And the TOK Entities were left owing more than $11.19 million.[3]

45.    Even after Caridi agreed to the Repayment Agreement, and despite that essentially all money held by TOK NV was money it had received from Hospital A, Caridi knowingly, or with reckless disregard, continued to cause TOK NV to make substantial payments of that money to persons and entities other than Hospital A, including to himself, his family, and his business associates.

46.    Between May 1 and May 21, 2020, Caridi caused TOK NV to transfer more than $2.5 million to persons and entities other than Hospital A, including, among other payments: (a) two payments to himself totaling $169,822; (b) three payments to his son totaling $44,912; (c) a payment of $45,000 to the Consultant's company; and (d) payments of at least $1 million purportedly for TOKI's "business expenses" and to purchase medical thermometers, gloves, and gowns that the TOK Entities intended to sell to third parties other than Hospital A.

47.    By May 22, 2020, the TOK Entities had less than $2.5 million.

48.    Even then, when the TOK Entities were in default on the Repayment Agreement and lacked the ability to repay their debt to Hospital A, Caridi did not disclose to the TOK Entities' other senior management and board members all material details regarding the Hospital A deal, the Repayment Agreement, and the TOK Entities' liability from their failure to make repayment to Hospital A.  Instead, he attempted to cover up his failure, and to put off the

---

[3] In connection with the Repayment Agreement, Caridi also told Hospital A that the TOKI Entities would provide a sample of N-97 masks that the TOKI Entities had procured and that, if acceptable to Hospital A, they would deliver some number of those masks to Hospital A to offset a portion of the debt owed.  The TOKI Entities never provided any sample of N-97 masks.

day of reckoning, by causing TOKI to make multiple misrepresentations to investors about the state of its business.

### III.   Caridi Makes, and Assists TOKI in Making, Materially Misleading Statements Regarding the TOK Entities' Business and Financial Condition.

49.     Between mid-May and early June 2020, TOKI, under Caridi's direction, issued two press releases ("TOKI Press Releases") through a business newswire service, on its own website, and on the websites for the CSE and OTC Markets, that touted the TOK Entities' supposed success in pivoting to the PPE procurement business and overcoming the difficulties of obtaining PPE in the Covid-19 environment, and that assured investors of TOKI's purported stable financial condition.  The TOKI Press Releases were false and misleading.

50.     Moreover, neither of the TOKI Press Releases said anything about the Hospital A deal; that the TOK Entities had failed to procure PPE in the largest transaction in the companies' history; that, due to their failure to procure PPE for Hospital A and, subsequently, to make repayment to Hospital A, they now owed Hospital A more than $11 million; that they lacked funds to make repayment; or that, due to the debt owed to Hospital A, the TOK Entities might not continue as a going concern—events that another TOKI board member would later describe as "cataclysmic."  Nor did either of the TOKI Press Releases disclose that Caridi had personally profited from the Hospital A deal.

51.     As TOKI's chairman, Caridi was a member of TOKI's informal corporate disclosure committee and was involved in all aspects of TOKI's public disclosures.  This included preparing, reviewing, editing, and approving TOKI's press releases, particularly where, as with the TOKI Press Releases, the disclosures concerned information about TOKI's operations.  Caridi also provided quotes for each of the TOKI Press Releases.

52.     Rather than using his role in TOKI's disclosure process to ensure that investors were made aware of all material details of the most important contract and most significant failure in the TOK Entities' history, which could be ruinous to TOKI, Caridi knowingly, or recklessly, used the TOKI Press Releases as an opportunity to mislead investors with lies about how TOKI was thriving in the face of the Covid-19 pandemic with new business deals and enduring financial stability.

a.     *TOKI's First False and Misleading Press Release*

53.     In early May 2020, Caridi caused the TOK Entities to contract to procure thermometers for a purchaser in the United States.  The TOK Entities' sales invoices for the thermometer transaction were less than ten percent of the Hospital A deal.  TOKI issued a press release touting the thermometer transaction as evidence of TOKI's successful pivot into a new and valuable PPE procurement business, signaling that TOKI had effected a winning strategy to capitalize on the demands of the Covid-19 pandemic (the "First Press Release").

54.     With Caridi's assistance, TOKI issued the First Press Release on the morning of May 22, 2020.  Consistent with Caridi's role in TOKI's disclosure process, the First Press Release was provided to Caridi in draft form before its publication.

55.     The First Press Release announced "the completion of an order of 23,000 thermometers to a healthcare distributor in Chicago, IL, facilitated by TOKI management.  This marks the Company's first medical equipment supply transaction into the United States." The First Press release then quoted Caridi as saying, "TOKI is proud to be on the forefront of this fight against COVID-19.  We will continue to leverage our network to provide the US and Canada the critical PPE supply necessary during these trying times."

56.    Next, the First Press Release stated,

> The Company's US division, [TOK NV], has made a pivot during these uncertain times to leverage its medical contacts and international relationships to procure medical equipment and personal protective equipment (PPE) to governments, municipalities, and healthcare distributors in Canada and the US.

This was false and misleading.  In the context of the First Press Release—which touted the TOK Entities' procurement of thermometers—it portrays TOK NV to investors as having made a successful "pivot" to the business of procuring PPE in the face of the Covid-19 pandemic.  This was not true, as Caridi well knew, or which he recklessly disregarded.  Rather, the TOK Entities had attempted to make a pivot to the business of procuring PPE but had already failed spectacularly.

57.    The truth, which Caridi and TOKI knowingly, or recklessly, hid from investors, was that the TOK Entities were unable to leverage any supposed medical contacts or purported international relationships to obtain N-95 masks for Hospital A, failing to fulfill their obligations in the largest deal the companies had ever had.  No successful "pivot" had occurred.  Rather, the failed attempt at a pivot had resulted in the TOK Entities owing Hospital A more than $11 million that they could not repay, creating a massive liability for the TOK Entities.

58.    The First Press Release also stated that TOKI intended to buy back up to five percent of its outstanding common shares because TOKI "believes that, from time to time, the market price of its Shares may not reflect the underlying value of the Company's business and future prospects."  This, too, was false and misleading, as Caridi also knew or which he recklessly disregarded.

59.    TOKI's assertion about its purported stock buyback plan created the false impression that TOKI's shares were, or could be, undervalued given TOKI's supposed successful pivot to its new business of procuring and distributing PPE.  However, at the time of

the statement, TOKI had just incurred an undisclosed debt to Hospital A of more than $11

million due to its inability to procure PPE, had defaulted on its Repayment Plan with Hospital A

to repay that debt, and had no viable path to repaying Hospital A an amount that vastly exceeded

all revenue TOKI had ever earned.  In light of the failed Hospital A deal and TOKI's default on

the Repayment Plan, neither TOKI nor Caridi had any basis to believe that the market price for

TOKI's shares did not reflect the incremental value of TOKI's PPE procurement business.  In

fact, the opposite was true:  the market did not yet reflect the detrimental effect of TOKI's

massive PPE procurement failure related to Hospital A because Caridi had prevented TOKI from

disclosing that fact.  Caridi likewise prevented TOKI from disclosing that he, and his family and

associates, had profited from the Hospital A deal.

  60. The market viewed the First Press Release as a positive development, causing a

spike in TOKI's trading volume and share price in both the United States and Canada.

  61. On OTC Link, in the United States, in the two weeks before the publication of the

First Press Release, TOKI shares had an average daily trading volume of 35,761 shares.  On the

day of the First Press Release, 204,285 shares traded on OTC Link—more than five times the

average of the prior two weeks.  Additionally, on the day before the First Press Release, OTC

Link quoted TOKI's closing share price as $0.018 per share.  On the day of the First Press

Release, TOKI's share price quoted on OTC Link increased by 36% to $0.0242 per share and,

the following day, increased by another 34% to $.0325.

  62. A similar effect happened on the CSE.  In the two weeks before the First Press

Release, approximately 315,000 TOKI shares traded each day on the CSE, but on the two trading

days after the First Press Release, a total of nearly 3.8 million TOKI shares traded.  During that

same time, TOKI's share price on the CSE increased from $0.10, on the day before the First Press Release, to $0.25, on the day after the First Press Release.

      **b.**    ***TOKI's Second False and Misleading Press Release and Caridi's False and Misleading Statement***

63.     On or around May 14, 2020, Caridi caused the TOK Entities to contract to procure medical gowns for a purchaser in Canada.  The TOK Entities' sales invoices for the gown transaction were less than ten percent of the Hospital A deal.  With Caridi's assistance, TOKI issued a press release touting the medical gown transaction as further evidence of TOKI's profitable new PPE business (the "Second Press Release").

64.     As with the First Press Release, the Second Press Release promoted the false impression that TOKI had executed a successful strategy to procure and distribute PPE to capitalize on the demands of the Covid-19 pandemic.  The Second Press Release also stated that no undisclosed material events had occurred at TOKI in the prior six months.  Neither the impression of TOKI's success nor the statement that TOKI had not had an undisclosed material event was true.

65.     TOKI issued the Second Press Release on the morning of June 1, 2020. Consistent with Caridi's role in TOKI's disclosure process, a draft of the Second Press Release was provided to Caridi before publication.

66.     The Second Press Release "announce[d] the completion of an order of 100,000 medical gowns to a hospital in Canada facilitated by TOKI management."  TOKI again touted its supposed successful pivot into the PPE procurement space, saying,

> The Company's US division, [TOK NV], has developed a strategic focus during these uncertain times to leverage its medical contacts and international relationships to procure medical equipment and personal protective equipment (PPE) to [*sic*] governments, municipalities, and healthcare distributors in Canada and the US.

This statement was false and misleading.  In the context of the Second Press Release—which touted TOKI's procurement of medical gowns—it suggests to investors that TOK NV had crafted and enacted an effective plan to procure PPE in the face of the Covid-19 pandemic.[4]

67.     Caridi knew, or recklessly disregarded that, this was false.  To the extent TOK NV was purporting to leverage supposed medical contacts or purported international relationships to procure PPE, it had already failed and had caused the TOK Entities to incur a more than $11 million liability that dwarfed any other prospects the companies might have. Simultaneously, Caridi had siphoned off profits for himself.  Nowhere is any of this disclosed in the Second Press Release.

68.     The Second Press Release then quotes Caridi as saying,

> TOKI is pleased to offer life saving personal protective equipment to hospitals and municipalities in need.  We will continue to push forward and expedite the procurement of products in this ongoing fight against COVID-19.  There are a lot of difficulties in procuring PPE and medical equipment that we have overcome and are [*sic*] confident in our ability to provide PPE and medical devices for the foreseeable future.

69.     This statement was also false and misleading, as Caridi well knew or recklessly disregarded.  While touting the TOK Entities' purported success in having already "overcome" difficulties in procuring PPE and medical equipment in the Covid-19 pandemic, Caridi's statement conspicuously omits that the TOK Entities were unable to overcome those exact difficulties only weeks earlier in the most significant transaction in the companies' history and had failed to obtain the 3 million N-95 masks for which Hospital A had paid more than $13 million.

---

[4] Notably, one week after the Second Press Release, the Canadian entity that had purchased the gowns from TOKI informed Caridi that the gowns provided were unacceptable and the purchaser demanded to return them.

70.     Finally, the Second Press Release stated that the Ontario Securities Commission had issued a new rule temporarily permitting companies to delay the filing of their annual audited financial statements and announced that TOKI would use this rule to delay disclosure of its annual financial statements for 2019.  The Second Press Release then assured TOKI's investors that TOKI had already disclosed all material events that had occurred since its prior annual financial statements were filed in November 2019.

71.     In particular, the Second Press Release said,

> Other than as previously disclosed by the Company and herein with this press release, the Company confirms that there have been no material business developments since the date of its third-quarter interim financial statements that were filed on November 21, 2019, other than as a result of the impact of the restatement disclosed above.

72.     Caridi knew, or recklessly disregarded, that this was false and misleading. Contrary to the representation that "no material business developments" had occurred within TOKI since November 21, 2019 that TOKI had not already disclosed, TOKI's failed deal with Hospital A and the resulting liability of more than $11 million had occurred during that period and had not been disclosed.  Among other things, this false and misleading statement suggested to investors that TOKI was a stable company with no material changes in its financial condition in the past six months despite the Covid-19 pandemic.  This was far from true.

73.     Immediately following the Second Press Release, both the daily average trading volume and share price for TOKI shares on the CSE and quoted on OTC Link remained elevated as compared to the trading volume and share price for TOKI shares in the weeks before the First Press Release.

74.     Read together, the TOKI Press Releases created an impression of TOKI's business and condition that is inconsistent with the truth of what was happening within the TOK Entities.  The TOKI Press Releases conveyed to investors that, beginning in May 2020, TOKI

added a new and successful business line of procuring PPE, had overcome the difficulties in

obtaining PPE in the pandemic, and that the pivot and change in strategy had resulted in the TOK

Entities completing two successful business transactions.  What was not disclosed to investors,

however, is that weeks before the First Press Release, the TOK Entities had failed to procure

$13 million worth of PPE; that Caridi had enriched himself, his family, and his business

associates with proceeds from that transaction; and that the TOK Entities were left owing

Hospital A millions of dollars that they had neither the assets nor the revenue to repay.

## IV.    Caridi Attempts to Cover Up the Failed Hospital A Transaction and His Self-Dealing, Which Are Revealed When Hospital A Sues the TOK Entities

75.     Beginning in March 2020, Caridi repeatedly lied to the TOK Entities' other senior

management and board members about the Hospital A transaction.  This deception allowed

Caridi to misappropriate funds paid by Hospital A to TOK NV for himself and his family.  It also

prevented certain TOKI personnel from understanding the full scope of Caridi's scheme,

ensuring that TOKI's disclosures would not reveal the failed Hospital A deal or the fallout from

that failure.

76.     During a meeting of TOKI's Board of Directors on April 4, 2020—when Caridi

had already agreed that the TOK Entities would deliver three million N-95 masks to Hospital A

and Hospital A had already paid more than $13 million—Caridi told TOKI's other board

members that his personal consulting company was engaging in international PPE procurement

deals and that "there might be an opportunity for [TOKI] to participate in such opportunities" in

the future.  TOKI's Board of Directors agreed that Caridi would "provide details of any firm

proposals to the Board for consideration with respect to potential involvement by TOKI."  Caridi

knowingly, or recklessly, did not disclose that it was the TOK Entities, and not his personal

consulting company, that had already engaged in a substantial PPE deal with Hospital A, had

already received payment for that deal (portions of which Caridi had paid to himself), and had

already failed to meet their obligations in that deal.

77.     Thereafter, Caridi continued to withhold information about the Hospital A deal

from other senior management and board members.  During an April 27, 2020, meeting of

TOKI's Board of Directors, the possibility of the TOK Entities' participation in PPE

procurement deals was raised again.  Caridi told the other board members that his personal

consulting company was in the process of negotiating a potential PPE transaction in Québec.

Caridi promised that "he would consider including TOKI in any revenue received from certain of

these transactions" and that "he would not enter into any PPE transactions with any counterparty

without the prior consent of the Board."  Caridi knowingly, or recklessly, did not disclose that

the Hospital A deal had already happened or that he was, at that time in late April 2020,

negotiating a plan to repay to Hospital A the more than $13 million the TOK Entities owed.

78.     TOKI's Board of Directors held another meeting on July 26, 2020, at which

Caridi again obfuscated.  By that time, Caridi had agreed to the Repayment Agreement and then

caused the TOK Entities to default on that agreement.  Also by that time, Hospital A had retained

outside counsel which had sent demand letters to Caridi threatening to sue the TOK Entities if

repayment was not swiftly made, and Caridi was in the process of retaining counsel to represent

him in response to Hospital A's threatened action.  Still, Caridi knowingly, or recklessly, did not

tell the TOK Entities' other senior management and board members about critical aspects of the

discussions with Hospital A, the Repayment Agreement, the default on the Repayment

Agreement, or the threatened lawsuit.

79.     On or around August 6, 2020, TOKI's senior management and Board of Directors

learned of Caridi's failures and lies when Hospital A filed a lawsuit in the Ontario Superior

Court of Justice alleging fraud by TOKI, TOK NV, Caridi, the Consultant, and the Consultant's company.  Hospital A's lawsuit demanded repayment of more than $11.19 million and asked the Ontario Superior Court to impose a receiver over the TOK Entities and the other defendants and their assets.

80.     On September 2, 2020, TOKI publicly filed its annual audited financial statements for 2019.  In those financial statements, TOKI publicly disclosed, for the first time, that a lawsuit had been filed against it "related to a contract by TOK NV" and that the plaintiff sought "damages in the amount of $11,200,000 as well as punitive damages of CAD$500,000 and other relief including an order appointing a receiver/manager over all the assets, undertaking, and property of TOKI."  TOKI's annual financial statements warned investors that TOKI may not continue as a going concern due to, among other things, this litigation against it.

81.     On September 22, 2020, TOKI filed interim financial statements for the three months ended March 31, 2020.  In the interim financial statements, TOKI disclosed, for the first time, that it had incurred a "contract liability" of more than $12 million.  This reflected the TOK Entities' unpaid debt to Hospital A.  TOKI's interim financial statements also disclosed that TOKI had earned no revenue from the Hospital A deal.

82.     On December 16, 2020, the Ontario Superior Court granted Hospital A's request for an injunction and appointed a receiver over TOK NV's business.  The receiver later determined that all masks the TOK Entities had purchased with funds from Hospital A had a value of approximately $200,000.

83.     On March 25, 2021, TOKI reached a settlement with Hospital A pursuant to which TOKI agreed to, among other things, assign to Hospital A all of its rights, title, and interest in TOK NV and its claims against Caridi, Consultant, and Company B.

### FIRST CLAIM FOR RELIEF
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

84.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 83.

85.     Defendant, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly (a) employed one or more devices, schemes, or artifices to defraud, (b) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (c) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

86.     By reason of the foregoing, Defendant, directly or indirectly, has violated and, unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### SECOND CLAIM FOR RELIEF
**Aiding and Abetting Violations of**
**Exchange Act Section 10(b) and Rule 10b-5(b) Thereunder**

87.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 83.

88.     As alleged above, TOKI violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder, by, directly or indirectly, in connection with the purchase or sale of securities, and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly making one or more untrue statements of a material fact or omitting to state one or

more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

89.     Defendant knowingly or recklessly provided substantial assistance to TOKI with respect to its violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5b] thereunder.

90.     By reason of the foregoing, Defendant is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting TOKI's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)] thereunder and, unless enjoined, Defendant will again aid and abet these violations.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Finding that Defendant committed the violations alleged in this Complaint;

### II.

Permanently enjoining Defendant from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5;

### III.

Ordering Defendant to disgorge all ill-gotten gains and/or unjust enrichment received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

**IV.**

Ordering Defendant to pay civil monetary penalties under Section 21(d)(3) of the

Exchange Act [15 U.S.C. § 78u(d)(3)];

**V.**

Permanently prohibiting Defendant from acting as an officer or director of a public

company pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

**VI.**

Permanently prohibiting Defendant from participating in any offering of any penny stock

pursuant to Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)]; and

**VII.**

Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

The Commission demands trial by jury.

Dated: New York, New York
September 22, 2023

> /s Antonia M. Apps
> ANTONIA M. APPS
> REGIONAL DIRECTOR
> Thomas P. Smith, Jr.
> Adam S. Grace
> Christopher M. Colorado
> Rhonda Jung
> Brian A. Kudon
> Attorneys for Plaintiff
> SECURITIES AND EXCHANGE COMMISSION
> New York Regional Office
> 100 Pearl Street, Suite 20-100
> New York, New York 10004-2616
> (212) 336-9143 (Colorado)
> ColoradoCh@sec.gov