UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

--------------------------------------------------.

SECURITIES AND EXCHANGE

COMMISSION,

        Plaintiff,                  23 Civ 1243 (SVN)

v.

MICHAEL CARIDI,

        Defendant.

--------------------------------------------------.


# MEMORANDUM OF LAW IN SUPPORT OF MICHAEL CARIDI'S MOTION TO DISMISS


Michael Caridi
32 Cutler Road
Greenwich, CT 06831
Mcaridi1225@gmail.com
Tel: 1.917.295.1374

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................... 1

The Complaint and the Relevant Factual Background................................ 5

ARGUMENT....................................................................................... 12

A.    The great majority of the allegations of the Complaint do not allege fraud "in connection with" the purchase or sale of any security........................ 12

B.    The Press Releases contained accurate information along with cautionary statements disclaimers.............................. 13

C.    There is no scienter alleged other than on a conclusory basis............ 18

D.    TOKI did not violate Rule 10b-5 and, therefore, Mr. Caridi could not have abetted TOKI........... 23

E.    Mr. Caridi received nothing from the alleged securities fraud and no investor suffered pecuniary harm, and, therefore, there is nothing for him to disgorge. ...... 23

F.    Section 10(b) only applies to securities listed on domestic exchanges.. 24

CONCLUSION.................................................................... 25

# TABLE OF AUTHORITIES

Aaron v. SEC, 446 U.S. 680 (1980)                                          12

ACA Fin. Guar. Corp. v Advest, Inc., 512 F. 3d 46 (1st Cir. 2008).          12

Basic Inc. v. Levinson, 485 U.S. 224 (1988)                             15, 17

Brennan v. Zafgen, 853 F. 3d 606 (1st Cir. 2007)                          6, 22

City of Philadelphia v. Fleming Cos., 264 F 3d 1245 (10th Cir 2001)         21

Coates v. SEC, 394 U.S. 976 (1969)                                         15

In re Vivendi, S.A. Sec. Litig, 838 F. 3d 223 (2d Cir.2016)                 14

In re Biogen Inc., Sec. Litig., 193 F. Supp. 3d, 53-55 (D. Mass. 2016)      22

In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549 (S.D.N.Y. 2004)   6

In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367 (S.D.N.Y. 2004)      15

In re GLG Life Tech Corp. Sec. Litig., 2014 WL 464762, at *6-7 (S.D.N.Y. Feb. 3,
2014)....                                                                  21

In re Pretium Res. Inc. Sec. Litig., 256 F. Supp. 3d 459 (S.D.N.Y. 2017)....   21

In re Sanofi Sec. Litig., 87 F. Supp. 3d 510, 529 (S.D.N.Y. 2015).           17

SEC v. Govil, No. 22-1658, 2023 WL 7137291 (2d Cir. October 31, 2023)   3, 23

SEC v. Texas Gulf Sulfur, 401 F.2d 833 (2d Cir. 1968)................   13, 15

SEC v. Zandford, 535 U.S. 813 (2002)............................   13

Teamsters Local 445 Pension v. Dynes Capital, Inc., 531 F.3d 190 (2d Cir 2008).

23

Tellabs Inc. Makor Issues & Rights, Ltd. 551 U.S. 308 (2007)...........   6, 18

TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438 (1976)..................   15

Section 10(b) of the Securities Exchange Act of 1934.   1, 3, 4, 12, 17, 24

Rule 10b-5 ............................................................   1, 3, 12, 13, 23

Rule 12(b)(6) of the Federal Rules of Civil Procedure.............................   1

This Memorandum of Law is respectfully submitted on behalf of the Defendant, Michael Caridi, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Complaint charging Mr. Caridi with a violation of Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 thereunder, as a principal, and also charging Mr. Caridi as an aider and abettor of a Rule 10b-5 violation committed by Tree of Knowledge International Corp., ("TOKI"), a Canadian public company whose shares were traded on the Canadian Stock Exchange, with de minimis trading OTC in the United States. The SEC seeks disgorgement, penalties, injunctive relief, and a prohibition from acting as an officer or director of a public company.

## PRELIMINARY STATEMENT

This is a case of business setbacks, not securities fraud. The SEC has strung together hyperbole and totally irrelevant allegations of common law fraud, which, even if true (which they are not), relate to a scheme to defraud a Montreal hospital, CHU,[1] and have nothing to do with the sale or purchase of securities, an essential element of a Rule 10b-5 claim. These common law fraud claims were made by CHU against Mr. Caridi in Canada and are currently being litigated in that country. But the SEC seeks to relitigate them in this case as well.

---

[1] The SEC Complaint ("Comp.") identifies CHU as "Hospital A".

TOKI was a public entity for which Mr. Caridi worked as Chief Executive Officer and a member of the Board of Directors.  Prior to Covid its business was primarily pain management and distribution of hemp-based CBD products. (Comp. ¶ 13). During the outbreak of Covid, in March 2020, Mr. Caridi negotiated a contract to sell 3 million N-95 face masks to CHU in return for $13,693,000.  However, after TOKI received this money, and paid whom it believed was a reputable supplier for the masks, Athletix LLC, and its partner, Eastone Equities, or their designees, approximately $7.9 million, the supplier was unable to produce the masks for which it contracted.

TOKI and Mr. Caridi had failed to predict just how chaotic and uncertain the Personal Protective Equipment ("PPE") business was during the outbreak of covid, and how unprepared and irresponsible its supposed supplier was.  TOKI was thus unable to furnish the masks to CHU in the time period it had promised. As a result, TOKI agreed, if it could not produce the masks, to refund the money it received to CHU (Comp. ¶35-36). However, it was thwarted in refunding money when its supplier did not refund to TOKI all of the money provided to it. Still, TOKI was able to refund $2.5 million to CHU (Comp. ¶36) with the reasonable belief it would ultimately satisfy its entire debt.

The large majority of the Complaint alleges false statements by Mr. Caridi in order to obtain the contract, and self-dealing with the money received from CHU. But this alleged fraudulent scheme amounted to a common law fraud and had nothing to do with

the "purchase or sale" of securities. The allegations that Mr. Caridi defrauded CHU are irrelevant to this case and have been baked into this Complaint to prejudice Mr. Caridi.

The only relevant allegations in the Complaint are that TOKI failed in its duty to disclose in two press releases, which announced new, unrelated PPE contracts acquired by TOKI, that it owed approximately $11 million to CHU, which, given TOKI's precarious financial position, needed to be disclosed, according to the SEC. But TOKI was not required to make this disclosure in its unrelated press releases. Rather, the obligation was to disclose this debt, if it existed, in its regulatory filings, which is exactly what TOKI did a few months after the press releases, as conceded by the SEC (Comp. ¶80). Moreover, the Complaint makes no allegation that there were victims who suffered pecuniary harm as a result of the alleged securities fraud, and, therefore, there is nothing for Mr. Caridi to disgorge in any event. See SEC v. Govil, No. 22-1658, 2023 WL 7137291 (2d Cir. October 31, 2023). Thus, the claim for disgorgement should be stricken from the Complaint.

The SEC claim that TOKI violated Section 10(b) and Rule 10b-5 with respect to its two press releases issued on May 22, 2020 and June 1, 2020, is misguided for the following reasons, as is shown in detail below: (1) TOKI had never disclosed to investors the existence of the contract with CHU in the first place, and, therefore, made no attempt to exploit it; (2) the press releases did not refer to TOKI's liabilities at all and certainly

3

did not contradict the debt to CHU; (3) a company has no duty to disclose to the public

on a daily basis the ups and downs of its business, especially if no lawsuit has been filed

against it or insolvency proceedings initiated; (4) no reasonable investor would have

believed that TOKI was required to reveal its day to day assets and liabilities in press

releases, as opposed to certified financial statements included in regulatory filings; (5)

TOKI had previously disclosed to the Government of Quebec, which oversaw the

activities of CHU, that it had suffered "irreparable harm" from the fallout from its breach

of contract, and, therefore, could certainly not have developed an intent to conceal from

investors the same thing; (6) the statement in one of the press releases about TOKI's

intent to buy back its own shares, of which the SEC complains, were forward looking and

the press release included cautionary warnings and a disclaimer provision about these and

other forward looking statements; (7) the press releases were not written by Mr. Caridi,

but by others on whom Mr. Caridi relied, including the General Counsel of TOKI, and

only presented to Mr. Caridi after they had been drafted, as the SEC concedes. (Comp

¶54); (8) Mr. Caridi did not act with scienter even assuming there were misstatements or

omissions in the press releases, which there were not; and (9) TOKI was a foreign

corporation whose shares were not traded domestically (which excludes the applicability

of Section 10(b)), with an immaterial exception that its shares were traded on a de

minimis basis on an OTC link in the United States. All of the transactions conducted over

the Canadian exchange did not violate Section 10(b).

4

The SEC viewed what happened to TOKI in hindsight, as the debt did lead

eventually to a lawsuit. However, in real time, when the press releases were issued, the

SEC has alleged nothing to suggest that Mr. Caridi did not reasonably believe that

TOKI's financial situation was manageable, and the debt to CHU could be repaid in full,

and, therefore, there was no reason to disclose it other than in its ordinary course of

business, specifically, in regulatory filings.

### The Complaint and the Relevant Factual Background

Prior to the outbreak of Covid, TOKI was in the business of operating pain

management clinics and producing and distributing hemp-based CBD products. (Comp ¶

13). When Covid struck, Mr. Caridi recognized that this disaster could trigger an

expansion of TOKI's business while, at the same time, assisting health care institutions in

dealing with the scourge.  On March 18, 2020, he informed a business associate that he

would like to enter the PPE business. (Comp ¶ 18). As a result of this contact, TOKI

pivoted its business to include Covid related work.  On or about March 24, 2020, two

days before the contract with CHU, Mr. Caridi informed the Board of Directors of TOKI

that TOKI would offer "essential medical products to assist municipalities and

governments in COVID-fight". (Affirmation of Michael Caridi ("Caridi Aff."), Ex. 1). He

also informed the Board that he "has secured a sustainable large-scale supply for a

number of different essential medical products needed for the fight against the

COVID-19...." (Id). This pivot is established in a draft of an email, dated March 24, 2020, sent to Mr. Caridi and other members of the Board and its General Counsel, Scott Reeves, by an interested party, Dr. Kevin Rod, who later became a member of the Board of Directors.[2] (Id.). The email suggested that TOKI issue a press release disclosing TOKI's readiness to engage in this new PPE work. Id.  Although the press release was not issued, its existence undercuts (1) the SEC's contention that TOKI made a false statement in the May 22, 2020 press release when TOKI stated that it had made a "pivot" to engage in PPE work, which is exactly what TOKI had done; and (2) the SEC's further contention that Mr. Caridi concealed from the Board some of his efforts to provide PPE to customers even prior to the contract with CHU.

On or about March 26, 2020, TOKI, acting through Mr. Caridi, entered into a contract with CHU to furnish 3 million N-95 masks in exchange for $13,693,000. This was indeed TOKI's largest contract, but it believed that it could and would fulfill its promises under this contract.  Neither TOK nor TOKI issued a press release when this contract was entered into, or when this money was received, which could have favorably

---

[2]The Court may consider relevant extrinsic material when determining whether the facts alleged taken together give a strong inference of scienter. Tellabs Inc. Makor Issues & Rights, Ltd. 551 U.S. 308, 322-23 (2007); In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp.2d 549, 566 (S.D.N.Y. 2004) (rejecting plaintiffs' scienter allegations because they were inconsistent with the documents on which the complaint was based); Brennan v. Zafgen, 853 F. 3d 606, 617-18 (1st Cir. 2007) (company's disclosures before and during the class period weaken the complaint's scienter showing).

impacted the price of its publicly traded securities. The money was wired to TOK's account at the Chase Bank in New York.

On March 28, 2020, Mr. Caridi, to comply with TOKI's promises to CHU, entered into a contract with Athletix, LLC, identified in the Complaint as Company B, to procure the masks to be delivered to CHU. (Comp. ¶25). The contract stated that an "initial shipment" of 100,000 masks, from China, some of which were not N-95 masks, would be shipped on March 29, 2020. In connection with this contract with Athletix, TOKI provided Athletix and its partner, Eastsone, or their designees, with approximately $7.9 million, the majority of the money it received from CHU.

Unfortunately, TOKI was unable to comply with its contract with CHU because its supplier for the masks failed to deliver the masks to CHU. Rather, the supplier furnished a number of KN-95 masks which were not as effective as N-95 masks, according to CHU. Some of these KN-95 masks were in fact tested by CHU to determine whether they were equally protective as the N-95 masks, and CHU determined that they were not. (Comp.¶¶26-29).

As a result of TOKI's failure to deliver the N-95 masks, on April 23, 2020, CHU demanded its money back. TOKI agreed to refund the money on or about May 1, 2020, if it could not furnish the masks. (Comp ¶¶ 36, 43). TOKI returned approximately $2.5 million to CHU, which included $500 thousand which had been provided to TOKI to pay

7

taxes.  On May 4, 2020, another $1 million was returned.  On May 14, 2020 another $500

thousand was returned; and on May 15, another $500 thousand was returned.  (Comp ¶¶

36, 44).  May 15 was only one week before the first press release was issued on May 22,

2020.

TOKI had hoped to return more money to CHU but its supplier did not return the

money it was given by TOKI. Also, as the SEC has conceded, (Comp. page 13, n. 3), Mr.

Caridi's had hoped to furnish other PPE to CHU which would permit TOKI to further

reduce its debt, in addition to obtaining new contracts, the profits of which could further

be sent to CHU to reduce TOKI's debt.  These hopes were ultimately dashed, but Mr.

Caridi did not know this when the press releases were issued on May 22 and June 1.

Therefore, when the press releases were issued, Mr. Caridi believed the financial situation

of TOKI was manageable and there was nothing to hide, thereby undercutting any

suggestion of scienter.

When CHU was not refunded its money, it caused, through its attorneys, all bank

accounts associated with Mr. Caridi's and TOKI to be frozen, along with its suppliers.

(Caridi Aff. Ex. 2). This caused, as is shown below, "irreparable harm" to TOKI's

business.  (Id). As a result of this "irreparable harm", Mr. Caridi contacted Marc-Nicolas

Krobrynsky, the Assistant Deputy Minister for Quebec's Ministry of Health and Social

Services, a high Governmental official.  (Id). This Ministry oversaw the financial

activities of CHU.  On April 29, 2020, prior to the time of the two press releases at issue

in this case, which the SEC contends concealed TOKI's questionable financial condition,

Mr. Caridi wrote the following in an email to Mr. Kobrynsky and others:

It was nice talking to you today. We would like that by 9.15am this morning that
your bank withdraws any requests for funds.

This has caused us **irreparable harm** and harm to healthcare workers in the
United States and specifically the State of Maryland where healthcare workers have been
without PPE for 4 days as a result of this. Additionally, this has caused harm to my
company and some of our partners suppliers, and clients because they cannot access any
their funds.  One of these clients has billions in assets that is fully shut down. Once you
release the funds we will immediately pay the balance of the overpayment in taxes.

Please furnish us with all the testing results, pictures, and samples of the tested
products. We will review this testing data upon receipt after you send us the results. We
will take the appropriate steps to rectify the situation if necessary.

We look forward to getting this resolved. Please do not delay on releasing the
accounts.

Caridi Aff., Ex. 2. (Emphasis Added).

This email was an attempt to unfreeze bank accounts. It honestly disclosed to the

Government the "irreparable harm" that TOKI had suffered from the fallout from its

inability to perform under the contract with respect to N-95 masks.  The reference to

"testing results" relates to the KN-95 masks that were delivered to CHU which Mr. Caridi

was told were the equivalent in effectiveness of the N-95 masks.

Mr. Caridi imposed no restrictions upon Mr. Kobrynsky in disseminating TOKI's

financial desperation to the world, and he would have naturally believed that it could

9

have been disseminated.  Contrary to what the SEC has alleged, Mr. Caridi hid nothing concerning TOKI's financial problems.

Despite its debt to CHU, TOKI attempted to continue its pivot into the PPE business.  In early May 2020, TOKI executed a contract to facilitate the procurement of thermometers for a customer located in Chicago for a substantial amount of money. (Comp ¶ 53). When this contract was entered into, TOKI issued a press release on May 22, 2020 reflecting it. (Comp. 55; Caridi Aff. Ex. 3). The Press Release did not contain false or misleading statements or omissions.  TOKI had in fact, as stated in the press release, "made a pivot during these uncertain times to leverage its medical contacts and international relationships to procure medical equipment and personal protective equipment (PPE) to governments, municipalities, and healthcare distributors in Canada and the US."  The reference to the "pivot" was consistent with Mr. Caridi's statements on March 18, 2020 to a business associate (Comp. ¶18) and to the Board on or about March 24, 2020, as shown earlier, indicating that TOKI was expanding its business to include PPE work.

This press release did not mention the debt to CHU, but there was no intent to hide it, as its equivalent had already been disclosed to the Government of Quebec. Further, TOKI had not issued a press release when the CHU contract was entered into. The inference from this is TOKI would have believed there was no current need to disclose an

unfulfilled contract to a reasonable investor when no such investor would have known in the first place of the contract itself, and the debt to CHU would soon be disclosed in regulatory financial statements. Moreover, there is no allegation that TOKI did not believe that the debt to CHU would not be paid and, indeed, Mr. Caridi was in this very period engaged in negotiations with CHU to provide more PPE in exchange for receiving credits on its debt. And, importantly, TOKI at this time had approximately $2.5 million in cash (Comp ¶47) in its accounts which could have been used to further reduce its debt, if it chose to do so.

Mr. Caridi did not write this press release. He is not a lawyer. The SEC has conceded that the press release was written by someone other than Mr. Caridi and presented to Mr. Caridi in draft (Comp ¶54), establishing that Mr. Caridi relied on others to satisfy the law, and there is certainly no allegation that Mr. Caridi was part of a conspiracy. Indeed, at the time of the press releases, Mr. Caridi was no longer the interim CEO of TOKI (Comp ¶11) and was not in charge. The General Counsel of TOKI at this time, Scott Reeves, who was also a member of the Board, has sworn to the following:

"I was personally involved in the preparation of the May Release and the June Release. The board was fully involved and approved of the language of these press releases". (Caridi Aff., Ex. 3 (Reeves Affidavit)).

On June 1, 2020, TOKI issued another press release reflecting its facilitation of another contract for PPE, again establishing that it had made the pivot to PPE work. This

press release stated that TPLO was to provide 100,000 medical gowns to a hospital in Canada. The SEC does not claim that this was anything but accurate. This press release, like the May 22, 2020 press release, was prepared by the General Counsel of TOKI, Scott Reeves, not Mr. Caridi, as Mr. Reeves has sworn. The release did make the important, and accurate, point, which applied implicitly to the debt owed to CHU, that "[t]he Company confirms as of the date of this news release that there is no insolvency proceeding against it and there is no other material information concerning the affairs of the Company that has not been generally disclosed." (Caridi Aff., Ex. 3).

## ARGUMENT

The relevant elements of a Section 10(b) and Rule 10b-5 violation are the making, with scienter, of material false statements or omissions "in connection with the purchase or sale of any securities". <u>Aaron v. SEC</u>, 446 U.S. 680, 691 (1980). Scienter is a state of mind embracing intent to deceive, manipulate or defraud. <u>Aaron v. SEC,</u> 446 U.S. at 685 n.5. Consciously reckless conduct is also sufficient to establish scienter. <u>ACA Fin. Guar. Corp. v Advest, Inc.</u>, 512 F. 3d 46, 58 (1st Cir. 2008). None of these elements has been sufficiently alleged in the Complaint, other than by conclusory assertions contradicted by contemporaneous documents.

**A  The great majority of the allegations of the Complaint do not allege fraud "in connection with" the purchase or sale of any security**

The Complaint makes numerous allegations that Mr. Caridi made false statements and omissions in his communications with CHU to obtain the contract to provide masks to CHU, most of the fruits of which he allegedly expropriated for himself, his family and others. These allegations, even if true (which they are not), had nothing to do with the purchase or sale of securities, and are the subject of a lawsuit alleging fraud filed by CHU against Mr. Caridi currently pending in Quebec.   They allege simply common law fraud and common law fraud does not fall within the scope of Rule 10b-5.  SEC v. Zandford, 535 U.S. 813 (2002). The alleged false statements to obtain the contract, and the money, were not "reasonably calculated to influence the investing public", another requirement of the "in connection with" element. SEC v. Texas Gulf Sulpher Co. 401 F. 2d 833, 845-46, 858, 862 (2d Cir. 1968). There is not even an allegation in the SEC Complaint that the alleged false statements to obtain the contract and the misappropriation of the money were calculated to influence investors.  The only allegations in the Complaint that meet the "in connection with" requirement are arguably the allegations of falsity in the press releases, which were communicated to potential investors.

**B  The Press Releases contained accurate information along with cautionary statements and disclaimers.**

Not only did the Complaint fail to allege scienter, but it also failed to allege false statements or omissions made by Mr. Caridi in the first place.  "The test for whether a statement or omission is materially misleading ... is not whether the statement is

misleading in and of itself, but whether the defendants' representations, taken together and in context, would have misled a reasonable person." In re Vivendi, S.A. Sec. Litig, 838 F. 3d 223, 250 (2d Cir.2016). Under this standard no false statement or omission was made, and certainly not by Mr. Caridi who did not prepare the press releases.  The statements attributed to Mr. Caridi in these press releases are accurate and not even alleged by the SEC to be inaccurate.

The SEC claims that TOKI was required to disclose in its press releases on May 22, 2020 and June 1, 2020, which related to new, unrelated contracts, having nothing to do with CHU, the debt that TOKI incurred to CHU. These details were not required to be disclosed in press releases.  Traditionally, they are disclosed, as reasonable investors would believe, in regulatory filings which are required to be made every quarter (Securities Exchange Act of 1934 and its Canadian counterpart), which is exactly what TOKI did, as the Complaint acknowledges. (Comp.¶ 80).  Any reasonable investor would have known that it was the financial statements of TOKI's that were important to assess, not press releases touting new contracts. Nor was the omitted debt even material to any reasonable investor in real time. Debts can be repaid. There was no certainty in real time that the debt to CHU would not be repaid.

A misrepresentation or omission is material if there is a substantial likelihood that under all the circumstances it would have assumed actual significance in the deliberations

14

of a reasonable investor. <u>Basic Inc. v. Levinson</u>, at 232 (1988); <u>TSC Industries, Inc. v.</u>

<u>Northway, Inc</u>., 426 U.S. 438, 449 (1976). <u>SEC v. Texas Gulf Sulfur</u>, 401 F.2d 833,

848-50 (2d Cir. 1968), <u>cert. denied sub nom.</u>, <u>Coates v. SEC</u>, 394 U.S. 976 (1969).  No

such substantial likelihood existed here. Reasonable investors would want to assess

financial statements, including liabilities, which were certified as accurate, not press

releases touting, truthfully, new contracts.  It is important to emphasize that CHU had not

filed a lawsuit or insolvency proceedings against Mr. Caridi prior to these press releases.

The implication is that CHU was still hoping to be paid, the very belief that Mr. Caridi

had.  Just one week prior to the first press release TOKI did in fact return $500 thousand

to CHU.

The SEC's position is similar to a claim that a company is required to disclose

unsustainable business practices in its regulatory filings. But courts have routinely

rejected the proposition that "statements regarding ... accurately reported revenue and

income [can be] rendered materially misleading by failing to disclose that such income

was unsustainable." <u>Axis Capital</u>, 456 F. Supp. 2d at 587; <u>see also In re Citigroup, Inc.</u>

<u>Sec. Litig.</u>, 330 F. Supp. 2d 367, 378 (S.D.N.Y. 2004) (dismissing fraud claims).   And

these authorities apply to actual regulatory filings, let alone press releases.  The upshot is

that TOKI was not required to disclose the ups and downs of its business on a daily basis

and certainly not in unrelated press releases.

The SEC claims that TOKI made a false statement in its May 22, 2020 press release when it stated that it made a "pivot" to do PPE work. As shown earlier, this statement was accurate.  On March 24, 2020, prior to the contract with CHU, Mr. Caridi informed the Board that this focus on this new business was being made, and this fact is incontrovertible as it is reflected in a contemporaneous email of March 24, 2020, cited earlier.

The Complaint also asserts that the May 22, 2020 Press Release contained a falsehood when it stated that TOKI intended in future to buy back some of its shares. (Comp ¶ 58). The SEC's claim that this was a false statement, given TOKI's large debt to CHU, is a desperate stretch to establish a falsehood.  This was merely a forward-looking statement with an expressed disclaimer in the release, which stated:

Except for statements of historical fact relating to the Company, certain information contained herein relating to the timing of the filing of financial statements constitute forward-looking statements.  Although we believe that the expectations reflected in the forward-looking statements are reasonable, there can be no assurance that such expectations will prove to be correct.  We cannot guarantee future results, performance and achievements. Consequently, there is no representation that the actual results achieved will be the same, in whole or in part, as those set out in the forward-looking information.

Forward-looking statements are based on the opinions and estimates of management at the date the statements are made, and are subject to a variety of risks and uncertainties and other factors that could cause actual events or results to differ materially from those projected in the forward-looking statements.  The forward-looking information contained in this news release is expressly qualified by this cautionary statement.  Except as required by applicable securities laws, the Company undertakes no obligation to update forward-looking statements if circumstances or management's

16

estimated or opinions should change. The reader is cautioned not to place undue reliance on forward-looking statements." (Caridi Aff., Ex. 3).

This was a cautionary warning to investors which negates an allegation of falsity. Basic Inc. v. Levinson, 485 U.S. 224 (1988) (company may not be liable for failing to disclose all of the specific risks associated with an investment if it makes a cautionary statement that discloses the risk of investments). Any reasonable investor would have understood that the repurchase of shares was merely a possibility depending on the future financial status of TOKI. Indeed, any reasonable investor would have understood that the regulatory financial statements to be filed in the future should be studied on the issue as to whether this future buy- back was possible. See In re Sanofi Sec. Litig., 87 F. Supp. 3d 510, 529 (S.D.N.Y. 2015). Forward looking statements, accompanied by cautionary language, are not actionable.

Moreover, even if false statements were made (and they were not), Mr. Caridi himself did not make the statements complained of. In Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135 (2001), the Supreme Court addressed what it means to "make" an untrue statement under Section 10(b). It found that a mutual fund investment advisor could not be held liable for false statements in its clients' prospectuses, as it did not "make" the statements at issue. Rejecting the argument that liability could extend to the person who provided the false information, the Supreme Court held that "the maker of

17

a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." Id.

The identical reasoning should be applied to the June 1, 2020 press release which announced the acquisition of another new contract to furnish PPE product. It bears noting again that this press release was also drafted by someone other than Mr. Caridi, a non-lawyer, and approved by the Board, as the General Counsel has sworn. (Comp. ¶ 65; Caridi Aff., Ex. 3).

The General Counsel of CHU, Scott Reeves, has sworn that the issue raised by the SEC here with respect to the accuracy of the press releases was also investigated by the Canadian securities regulator, OSC, which did not file charges against anyone in respect to the press releases. (Caridi Aff., Ex. 3).

C. **There is no scienter alleged other than on a conclusory basis.**

Scienter requires an intent to deceive, or recklessness, at the time the alleged false statements were made.   A "strong inference" of such intent is required. This inference must be "more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs Inc. Makor Issues & Rights, Ltd. 551 U.S. 308 (2007). There can be no such inference here given the facts. The non-fraudulent inferences are much stronger.

18

First, as discussed above, Mr. Caridi, a non-lawyer, relied upon others, including TOKI's General Counsel, Mr. Reeves, to draft accurate press releases. This is corroborated by the SEC which concedes that Mr. Caridi did not write the press releases and that they were presented to him in draft. (Comp ¶ 65). Mr. Caridi's reliance on the General Counsel and the Board negates an intent by him to deceive anyone.

Importantly, the SEC does not allege, as it cannot allege, that Mr. Caridi believed that the debt to CHU could not be repaid. To the contrary, the allegations support the fact that Mr. Caridi and TOKI believed just this, that is, that the debt to CHU was manageable. If Mr. Caridi had this belief he could not have intended to deceive anyone about anything. In fact, Mr. Caridi would have believed, if he had even thought about this disclosure issue, that the debt to CHU was manageable, at least at that time, and did not have to be disclosed. And if the disclosure of the debt to CHU was made, it would not be made alone. It would have stated that TOKI had already repaid $2.5 million of the original $13 million received, but that the company reasonably believed the rest would also be repaid. At the time of the press releases, according to the Complaint, TOKI had approximately $2 million in its accounts which would have been available to be refunded. TOKI also was selling other products and had many opportunities to make other sales of PPE, the proceeds of which could reduce its debt to CHU. And Mr. Caridi would have reasonably believed that if this favorable scenario did not occur, full disclosure would be made in upcoming regulatory filings, which is what occurred. All of this shows that Mr.

19

Caridi had no motive to hide the debt as he would have believed that it could be paid.

This situation in real time was not viewed by Mr. Caridi with the pessimism that the SEC

now assumes.

Specifically, at the very time this press release was issued, Mr. Caridi believed he

could enter into other contracts with CHU which could be used to offset what was owed.

The SEC acknowledges this at page 13 of its Complaint, note 3, which states the

following:

In connection with the Repayment Agreement, Caridi also told [CHU] that TOKI
Entities would provide a sample of N-97 masks that the TOKI entities had procured and
that, if acceptable to [CHU], they would deliver some number of those masks to [CHU]
to offset a portion of the debt owed. The TOKI entities never provided any sample of
N-97 masks.

Moreover, in a letter to Mr. Caridi written by counsel for CHU, dated May 1, 2020,

(Caridi Aff., Ex. 4), counsel stated with respect to the possibility of more business

between CHU and TOKI, that if TOKI produced N-95 masks and samples of N-97

masks, "this will go  a long way to secure our position and may in fact lead to future

transactions between us as the need for medical equipment is great."  While it is true that

the N-95 masks were not delivered to CHU, Mr. Caridi did not know this in real time and

still had reason to believe they would be.

Second, Mr. Caridi had already disclosed to Government officials the "irreparable

harm" inflicted upon TOKI, the very thing the SEC alleges Mr. Caridi and TOKI

attempted to hide. Someone could not form an intent to conceal something he or she has

already disclosed potentially to the world. The SEC cannot create a disclosure claim by

cherry picking statements out of context and ignoring TOKI's previous disclosure. See In

re GLG Life Tech Corp. Sec. Litig., 2014 WL 464762, at *6-7 (S.D.N.Y. Feb. 3, 2014)

(dismissing claims based on information that was "readily accessible in the public

domain"); In re Pretium Res. Inc. Sec. Litig., 256 F. Supp. 3d 459, 476 (S.D.N.Y. 2017)

(finding that a corporation's "disclosure of the very information Plaintiffs contend [it] to

have omitted" rendered those purported omissions "immaterial as a matter of law").

Third, there is no reason that TOKI would feel an obligation to disclose in a press

release the debt when it knew the same data would be disclosed shortly in regulatory

filings. The regulatory filings which disclosed the debt were filed on September 2, 2020

and September 22, 2020 (Comp. ¶80-81). They would have been filed earlier but for

Ontario Securities Commission's authorization to delay the filings because of Covid,

which was disclosed in the June 1, 2020 release. (Caridi Aff., Ex. 3). All this further

contradicts the existence of scienter.

Finally, Mr. Caridi's awareness of the large debt to CHU, standing alone, does not

support an inference of intent to deceive in the press releases. See City of Philadelphia v.

Fleming Cos., 264 F 3d 1245, 1260 (10th Cir 2001) (allegations that defendants possessed

knowledge of facts without more is not sufficient to demonstrate an intent to defraud.); In

re Biogen Inc., Sec. Litig., 193 F. Supp. 3d, 53-55(D. Mass. 2016) (allegations that a defendant was overly optimistic when making public statements is generally insufficient on the issue of intent); Brennan v. Zafgen, Inc., 853 F 3d 606, 617-18 (1ˢᵗ Cir. 2017) (company's disclosures before the alleged fraud [as is the case here] weaken the complaint's scienter showing.)

Kramer v. Time Warner, 937 F. 2d 767 (2d Cir. 1991) is controlling here.  In Kramer, Plaintiffs contended that Defendants had failed to inform investors of important information relative to a public offering, that is, Defendants concealed doubts as to whether promises in the offering documents could be fulfilled.   In sustaining a finding of the lack of scienter, the Court stated the obvious principles which apply here as well: "The purpose of the antifraud provisions is disclosure, not substantive review by federal courts of corporate affairs." See also Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 479 (1977) ("The disclosure required ... is not a rite of confession .... What is required is the disclosure of material objective factual matters." Data Probe, 722 F. 2d at 5-6.  In Kramer, the Court noted that it would be one thing if the Defendants knew as an "absolute certainty" that representations could not be fulfilled, but because this "absolute certainty" was not alleged, no scienter could be found.  So too here.  No "absolute certainty" is alleged that Mr. Caridi knew that the debt to CHU could not be paid in full at the time of the press releases.  Indeed, there is nothing alleged to undercut that Mr. Caridi had a reasonable belief that the debt to CHU was manageable. It is important to repeat

22

that just one week before the first press release, which occurred on May 22, 2020, TOKI

paid $500 thousand to CHU, as is conceded by the SEC.

### D. TOKI did not violate Rule 10b-5 and, therefore, Mr. Caridi could not have abetting TOKI

As there is nothing to support the Complaint's claim that Mr. Caridi violated Rule

10b-5 as a principal, there is no basis to find that TOKI violated the Rule as a principal,

as no other senior person's conduct could be imputed to TOKI to make it liable.  See

Teamsters Local 445 Pension v. Dynes Capital, Inc., 531 F.3d 190, 195 (2d Cir 2008).

Therefore, Mr. Caridi cannot be found liable as an aider and abettor of TOKI's violation

of Rule 10b-5.

### E. Mr. Caridi received nothing from the alleged securities fraud and no investor suffered pecuniary harm, and, therefore, there is nothing for him to disgorge.

The Complaint alleges that Mr. Caridi received substantial money from the alleged

fraud against CHU.  But this alleged common law fraud is immaterial to the Rule 10b-5

fraud charged in the Complaint relating to the press releases.  And as there is no

allegation that the alleged securities fraud resulted in financial benefit to Mr. Caridi, or

that investors suffered pecuniary harm, there is nothing for him to disgorge in any event,

(see SEC v. Govil, No. 22-1658, 2023 WL 7137291 (2d Cir. October 31, 2023)), even if

there otherwise was a violation.

**F.**        **Section 10(b) only applies to securities listed on domestic exchanges.**

Section 10(b) applies only to securities listed on domestic exchanges or domestic transactions in other securities.  See Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247, 273 (2010).  Because TOKI shares were not listed on a United States Exchange, there can be no Section 10(b) action based on this security.  This is not lessened by the fact that the stock was listed OTC in the United States, where it was traded on a de minimis basis.

The test under Morrison is whether "irrevocable liability is incurred or title passes within the United States." Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60, 67 (2d Cir. 2012). The Second Circuit clarified that "while a domestic transaction or listing is *necessary* to state a claim under § 10(b)," it may not be *sufficient*. Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE, 763 F. 3d 198, 207 (2d Cir. 2014).  Thus, on the facts of that case, the Court found that a claim against foreign defendants based on "largely foreign conduct, for losses incurred by the plaintiffs . . . based on the price movements of foreign securities would constitute an impermissibly extraterritorial extension of the statute."  The de minimis trading OTC in this case in the United States is also not "sufficient".  According to the Complaint the trading in the United States amounted to a few thousand dollars.

## CONCLUSION

The Complaint should be dismissed.

Respectfully submitted,

1/4/2024

Michael Caridi