# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMISSION, | ) | 3:23-CV-1243 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL CARIDI, | ) | September 30, 2024 |
| *Defendant*. | ) | |

## RULING AND ORDER ON DEFENDANT'S MOTION TO DISMISS

Sarala V. Nagala, United States District Judge.

In this securities fraud action, the United States Securities and Exchange Commission ("SEC") alleges Defendant Michael Caridi violated and aided and abetted violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder by making materially false and misleading statements to investors concerning a company called Tree of Knowledge International, Inc. ("TOKI"), of which Caridi was the former Chairman and Chief Executive Officer. Defendant seeks to dismiss both of Plaintiff's claims for failure to state a claim. For the reasons described below, the motion to dismiss is DENIED.

## I.    FACTUAL BACKGROUND

The amended complaint contains the following allegations, which are accepted as true for the purpose of this motion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A.    The Hospital A Deal

TOKI is a Canadian-based company formed in 2018 that operated pain management clinics and sold hemp-based CBD products. Am. Compl., ECF No. 16, ¶ 13. Caridi, a resident of Greenwich, Connecticut, served as Chairman of the TOKI Board of Directors and, until April 28, 2020, as interim Chief Executive Officer. *Id.* ¶ 11. Caridi also served as President and a director

of Tree of Knowledge, Inc. ("TOK NV" and, together with TOKI, the "TOK Entities"), a subsidiary of TOKI, until February of 2021. *Id.* ¶¶ 1, 11. Caridi was one of TOKI's largest shareholders, owning more than 10 million shares. *Id.* ¶ 11. TOKI was not profitable. *Id.* ¶¶ 2, 25. For 2018 and 2019 combined, TOKI earned approximately $6 million in revenue but incurred more than $33 million in losses. *Id.* ¶ 25. By the end of 2019, TOKI had only $63,432 in cash. *Id.*

By March 2020, it was widely reported that healthcare providers faced a shortage of personal protective equipment ("PPE") because of the COVID-19 pandemic. *Id.* ¶ 26. On or around March 18, 2020, Caridi informed one of his personal business associates ("Consultant") that he would like to enter the PPE procurement business, despite that neither of the TOK Entitles had any experience procuring PPE for sale and distribution. *Id.* ¶¶ 26–27. On March 25, 2020, Consultant informed Caridi that a large Québec hospital ("Hospital A")[1] was in the market for a large, urgent PPE purchase. *Id.* ¶ 27. That evening, on Caridi's behalf, Consultant informed Hospital A that Caridi could fulfill an order for large quantities of KN-95 masks; Hospital A replied that it would only purchase N-95 masks, which, in contrast to KN-95 masks, were regulated and had been approved for use in Canadian hospitals. *Id.* ¶¶ 27–28.

On March 26, 2020, Caridi offered, on behalf of the TOK Entities, to procure three million N-95 masks and deliver them to Hospital A within two days for $11.9 million, plus taxes and fees; Hospital A accepted this offer. *Id.* ¶ 29. Caridi then caused TOKI to issue two invoices to Hospital A totaling $13,693,522, inclusive of fees and Québec sales tax. *Id.* Hospital A wired this sum to a U.S.-based TOK NV account controlled by Caridi. *Id.* ¶ 30. This transaction with Hospital A

---

[1] Some filings in this action refer to this hospital as "CHU," *see* Def.'s Br., ECF No. 13-1; Pl.'s Br., ECF No. 30, but the amended complaint refers to it exclusively as "Hospital A." To be consistent with the amended complaint, the Court refers to it as "Hospital A."

was by far the largest in the TOK Entities' history. *Id.* ¶ 31.  Yet, Caridi did not inform the TOK

Entities' other senior management or Board of Directors of the transaction at the time. *Id.* ¶ 32.

On the day the TOK entities were due to deliver the masks, Caridi caused TOKI to enter

into a contract to procure the masks with a company owned by one of his personal business

associates ("Company B"). *Id.* ¶ 34.  That contract described the masks as both KN-95 and N-95

masks. *Id.*  Through communications, Hospital A learned that KN-95 masks were in transit and

reminded Caridi that it had ordered, and needed, N-95 masks. *Id.* ¶¶ 35–36.  Caridi told the hospital

that the shipping manifest had been intentionally altered to list KN-95 masks, in order to clear

Chinese customs. *Id.*  By April 4, 2020, Hospital A had not received any masks, and had concluded

that the masks in transit were not in fact N-95 masks; again, the hospital stressed to Caridi that it

required N-95 masks. *Id.* ¶ 37.  On April 9, 2020, the TOK Entities delivered to Hospital A 2,000

KN-95 masks, which were labeled for "Non medical use." *Id.* ¶ 39.  An additional 154,000 KN-

95 masks, similarly labeled, were delivered on April 13, 2020. *Id.*

Around this time, Hospital A realized that the TOK Entities lacked a proper Canadian tax

identification number and were thus ineligible to collect the $1,188,022 in Québec sales tax that

TOK NV had collected. *Id.* ¶ 40.  Accordingly, Hospital A demanded a refund of the sales tax.

*Id.*  Caridi repeatedly promised to repay the amount in full, but the TOK Entities only returned

$500,000. *Id.*

On April 14, 2020, Caridi informed Hospital A that between 240,000 and 400,000

additional masks would be delivered that afternoon. *Id.* ¶ 41.  In response, a Québec government

official informed Caridi that the TOK Entities had failed to deliver as promised; that the hospital

would not accept any more deliveries; and that the hospital would test the KN-95 masks it had

received to determine their efficacy for medical use. *Id.* ¶ 41.  A third-party entity tested a sample

of the KN-95 masks and determined they were not sufficient for medical personnel treating patients with COVID-19 or any other airborne disease. *Id.* ¶ 43.

By April 23, 2020, Hospital A had concluded that Caridi had lied about the TOK Entities' ability to procure N-95 masks and demanded repayment of approximately $13.19 million.[2] *Id.* ¶ 44. On May 1, 2020, Caridi agreed that the TOK Entities would repay this sum pursuant to an installment repayment plan; when he agreed, however, he knew or recklessly disregarded that he had already caused TOK NV to disburse most of the funds Hospital A had paid and that the TOK Entities did not have sufficient assets or revenue to make repayment. *Id.* ¶¶ 45–46, 52. Specifically, between Hospital A's March 27 payment and the executing of the May 1 repayment plan, Caridi caused TOK NV to transfer nearly $6 million to persons and entities other than Hospital A, including, but not limited to, $953,500 to himself, $26,000 to his son, and $744,001 to a company owned by the Consultant. *Id.* at ¶¶ 48–51. In May of 2020, even after agreeing to the repayment plan, Caridi caused TOK NV to transfer still more funds to persons and entities other than Hospital A, totaling approximately $2.5 million—a portion of which included $169,822 to himself, $44,912 to his son, and $45,000 to the Consultant's company. *Id.* ¶ 55. The TOK Entities did, in fact, default on the repayment agreement and were left owing more than $11.19 million. *Id.* ¶ 53.

### B. Press Releases and Trading of Shares

TOKI shares were traded through various means. First, the shares were listed on the Canadian Securities Exchange. *Id.* ¶ 13. Second, and most relevant here, TOKI shares were made available for over-the-counter trading in the United States on platforms operated by a company called OTC Link LLC ("OTC Link"). *Id.* ¶¶ 13, 15.

---

[2] This figure is the purchase price, less the $500,000 in improperly collected taxes that the TOK Entities had already repaid to Hospital A. *See* Am. Compl., ¶¶ 40, 44 n.1.

As the Chairman of TOKI's Board of Directors, Caridi was a member of TOKI's informal corporate disclosure committee and was involved in all aspects of TOKI's public disclosures, including preparing, reviewing, editing, and approving TOKI's press releases, particularly where the disclosures touched on TOKI's operations. *Id.* ¶ 60. Between mid-May and early June 2020, TOKI, under Caridi's direction, issued two press releases through a business newswire service, on its own website, and on the websites for the Canadian Stock Exchange and OTC markets, touting the TOK Entities' supposed success in pivoting to the PPE procurement business during the pandemic. *Id.* ¶ 58. Neither press release mentioned the Hospital A contract, repayment plan, or impending default, or that Caridi had personally profited from the Hospital A deal. *Id.* ¶ 59.

First, on May 22, 2020, with Caridi's assistance and after a draft had been sent to him, TOKI issued a press release ("First Press Release") touting a recent contract to procure 23,000 thermometers for a hospital in Chicago, Illinois. *Id.* ¶¶ 63–64. Caridi was quoted in the press release as saying, "TOKI is proud to be on the forefront of the fight against COVID-19. We will continue to leverage our network to provide the US and Canada the critical PPE supply necessary during these trying times." *Id.* ¶ 64. The press release also represented that TOK NV "has made a pivot" to procure medical equipment and PPE for governments, municipalities, and healthcare providers in the United States and Canada. *Id.* ¶ 65. TOKI also announced buyback of up to five percent of its outstanding common shares because it "believes that, from time to time, the market price of its Shares may not reflect the underlying value of the Company's business and future prospects." *Id.* ¶ 67. The SEC alleges these statements were false and misleading, because TOKI had not in fact successfully pivoted to distributing PPE, in light of the failed Hospital A deal, and because neither TOKI nor Caridi had any basis to believe that the market value of the shares was inaccurate, since the failed Hospital A deal had not yet been publicly announced. *Id.* ¶¶ 65–68.

The First Press Release resulted in both a higher trading volume and a higher market price of TOKI shares in the United States and Canada.  *Id.* at ¶¶ 69–72.  Specifically, the average daily trading volume on OTC Link increased more than fivefold over the previous two weeks.  *Id.* ¶ 70.  The share price quoted on OTC Link saw a significant increase as well, rising by 36% on the day of the First Press Release and by another 34% the following day.  *Id.*  Over the course of just those two days, broker-dealers in four different American states traded TOKI shares via OTC Link's securities trading markets.  *Id.* ¶ 71.  During this time, retail customers in six American states also traded TOKI shares through broker-dealers via OTC Link.  *Id.*

On June 1, 2020, with Caridi's assistance and again after a draft had been sent to him, TOKI issued another press release to announce a transaction in which TOKI had contracted to procure 100,000 medical gowns ("Second Press Release").  *Id.* ¶¶ 73, 75–76.  TOKI again claimed to have successfully pivoted into the business of PPE procurement.  *Id.* ¶ 76.  The Second Press Release quoted Caridi as saying, "[t]here are a lot of difficulties in procuring PPE and medical equipment that we have overcome and are [*sic*] confident in our ability to provide PPE and medical devices for the foreseeable future."  *Id.* ¶ 78.

The Second Press Release also provided:

> Other than as previously disclosed by the Company and herein with this press release, the Company confirms that there have been no material business developments since the date of its third-quarter interim financial statements that were filed on November 21, 2019, other than as a result of the impact of the restatement disclosed above.

*Id.* ¶ 81.  At this point, TOKI had still not disclosed its failed deal with Hospital A and the related liability of over $11 million.  *Id.* ¶ 82.  The SEC alleges these statements in the Second Press Release were false and misleading.  *Id.* ¶¶ 77, 79, 82.

Following issuance of the Second Press Release, TOKI's trading volume and share price remained elevated compared to trading volume and share price in the weeks before the First Press Release. *Id.* ¶ 83. On June 1, following the Second Press Release, broker-dealers in four American states traded TOKI shares via OTC Link. *Id.* ¶ 84. During this time, retail customers in two American states also traded TOKI shares through broker-dealers via OTC Link. *Id.*

On August 6, 2020, the senior management and Board of Directors finally learned about the failed Hospital A transaction, when Hospital A sued TOKI, TOK NV, Caridi, the Consultant, and the Consultant's company in Canada. *Id.* ¶ 90. Up until this point, Caridi had not disclosed any details concerning the Hospital A deal or its fallout to the Board of Directors, despite having opportunities to do so at multiple board meetings. *Id.* ¶¶ 86–90.

TOKI filed an annual financial statement for 2019 on September 2, 2020, in which it publicly disclosed that a lawsuit had been filed "related to a contract by TOK NV" seeking damages in excess of $11 million, punitive damages of CAD $500,000, and an order appointing a receiver/manager over all assets, undertaking, and property of TOKI. *Id.* ¶ 91. TOKI filed interim financial statements later that month covering January through March of 2020, in which it disclosed for the first time that it had a "contract liability" of more than $12 million, reflecting the TOK Entities' unpaid debt to Hospital A, and that it received no revenue from the Hospital A deal. *Id.* ¶ 92.

In December 2020, the Ontario Superior Court appointed a receiver over TOK NV's business. *Id.* ¶ 93. That receiver found that all of the masks procured by the TOK Entities for Hospital A had a value of about $200,000. *Id.* In March 2021, TOKI entered into a settlement agreement with Hospital A, conveying all of TOKI's rights, title, and interest in TOK NV, including its interest in claims against Caridi, the Consultant, and Company B. *Id.* ¶ 94.

The SEC filed this action against Caridi in September 2023. ECF No. 1. Caridi, representing himself *pro se*, moved to dismiss the complaint for failure to state a claim. ECF No. 13. The SEC then amended its complaint, and Caridi applied his motion to dismiss to the operative amended complaint. *See* ECF Nos. 16, 20.

## II.     LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a case or cause of action for failure to state a claim upon which relief can be granted. When determining whether a complaint states a claim upon which relief can be granted, highly detailed allegations are not required, but the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. This plausibility standard is not a "probability requirement," but imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully." *Id.* In undertaking this analysis, the Court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief*." Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted).

The Court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions," *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008), and "a formulaic recitation of the elements of a cause of action will not do," *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*,

550 U.S. at 555).  Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.

Federal Rule 9(b) imposes additional heightened pleading requirements for actions alleging fraud.  In order to survive a motion to dismiss, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 167 (2d Cir. 2021) (citation omitted).  "Malice, intent, knowledge, and other conditions of a person's mind," however, "may be alleged generally."  Fed. R. Civ. P. 9(b).

Finally, Courts liberally construe briefs and pleadings from *pro se* litigants "to raise the strongest arguments they suggest."  *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994)).

## III.  DISCUSSION

The Court holds that the amended complaint states a claim against Defendant.  For the reasons described below, Defendant's motion to dismiss is denied.

### A.  Extrinsic Exhibits and Factual Statements in the Motion to Dismiss

The Court begins with a procedural matter.  In his motion to dismiss, Defendant has submitted many factual assertions that are not present in the amended complaint and four exhibits that are extrinsic to the amended complaint.  The Court will not consider most of these items, save for copies of the First and Second Press Releases referenced above and submitted as exhibits.

A motion to dismiss pursuant to Rule 12(b)(6) is a challenge to the legal feasibility of a complaint.  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 558 (2d Cir. 2016).  When evaluating such a motion, courts generally do not look beyond facts in the complaint, documents appended to the complaint

or incorporated by reference, and matters of which a court may take judicial notice. *Id.* at 559. A court may, however, consider an extrinsic document that is "integral" to the complaint if the complaint "relies heavily upon [the document's] terms and effect." *Id.* An integral document is typically "a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint." *Id.* (citation omitted).

Here, the Court cannot consider the additional facts supplied by Defendant in his briefing that are outside the four corners of the amended complaint. With respect to Defendant's exhibits, perhaps the only portions of these materials that may arguably be considered "integral" to the complaint are the copies of the First and Second Press Releases. *See* Affirmation of Michael Caridi and Exhibits, ECF No. 13 at 12–13, 15–16. The Court will therefore consider these Press Releases, but notes that they do not, when considered in full, appear to "undermine the legitimacy" of the SEC's claims. *See Goel*, 820 F.3d at 558.

## B. Extraterritorial Application of Section 10(b)

A threshold issue in this case is whether the SEC's claims are an improper attempt to apply Section 10(b) to extraterritorial activity. Section 10(b) generally prohibits the use of any manipulative or deceptive device in connection with the purchase or sale of a security. 15 U.S.C. § 78j. Defendant argues that Section 10(b) only applies to securities listed on stock exchanges within the United States and not to the securities trading alleged by the SEC here. The SEC, for its part, argues that it alleges only territorial securities law violations. For the reasons described below, the Court agrees with the SEC.

The U.S. Supreme Court addressed the extraterritorial application of Section 10(b) in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).  There, Australian investors brought an action against an Australian corporation for losses on securities traded on Australian and other foreign exchanges, alleging violations of, amongst other provisions, Section 10(b) and the SEC's corollary Rule 10b-5.  *Id.* at 250–53.  The starting point for the Supreme Court was the presumption of extraterritoriality: a default rule that, absent express Congressional intent to the contrary, federal law does not apply abroad.  *Id.* at 255.  The Court examined Section 10(b) under this lens and held that it did not apply extraterritorially because Congress did not indicate an intention for it to apply outside of the United States.  *Id.* at 265.  More specifically, the Court held that Section 10(b) only applies to transactions in securities "listed on domestic exchanges, and domestic transactions in other securities."  *Id.* at 267.  In establishing this transaction-focused test, the Court rejected the "conduct" and "effects" tests, a less bright-line inquiry that the Second Circuit and other courts had used, under which a Section 10(b) claim could proceed if wrongful conduct occurred within the United States or if wrongful conduct abroad had a substantial effect in the United States.  *Id.* at 255–59.

Almost in passing, the SEC also invokes the Dodd-Frank Wall Street Reform and Consumer Protection Act, which was enacted into law less than a month after *Morrison*.[3]  Pub. L. No. 111–203, 124 Stat. 1376 (2010); SEC's Opp. Br., ECF No. 30 at 45.  This Act amended Section 10(b) by giving district courts jurisdiction over an action or proceeding brought by the SEC alleging certain violations involving:

> (1) conduct within the United States that constitutes significant steps in furtherance of the violation, even if the securities transaction occurs outside

---

[3] In is decision in *Morrison*, the Second Circuit noted that Congress had never addressed the exterritorial reach of the securities laws' antifraud provisions, and "urge[d] that this significant omission receive the appropriate attention of Congress and the Securities and Exchange Commission."  *Morrison v. Nat'l Australian Bank Ltd.*, 547 F.3d 167, 170 n.4 (2d Cir. 2008).

the United States and involves only foreign investors; or (2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States.

15 U.S.C. § 78aa(b).

There is an apparent tension here. Within the span of a month, *Morrison* had repudiated the "conduct" and "effects" tests, in favor of an inquiry focusing on the location of the securities transaction in question, only for Congress to enact the Dodd-Frank Act, which contemplates giving federal courts jurisdiction over SEC actions under something very much like the "conduct" and "effects" tests. The Second Circuit has not opined whether the Dodd-Frank amendment supersedes *Morrison. See Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 211 n.11 (2d Cir. 2014) (noting that "[t]he import of [the Dodd-Frank] amendment is unclear"). Some district courts within this Circuit have concluded that it does, though. *See SEC v. Tourre*, No. 10-cv-3229 (KBF), 2013 WL 2407172, at *1 n.4 (S.D.N.Y. June 4, 2013) (concluding in dicta that the Dodd-Frank Act "effectively reversed *Morrison* in the context of SEC enforcement actions"); *see also SEC v. Gruss*, 859 F. Supp. 2d 653, 664 (S.D.N.Y. 2012) (concluding that the Dodd-Frank Act amended the Investment Advisers Act ("IAA") by allowing the SEC or Department of Justice to commence civil and criminal enforcement actions extraterritorially in certain cases, which thereby "restores the SEC's [pre-*Morrison*] extraterritorial authority over the IAA").

The SEC devotes little attention in its briefing to whether the Dodd-Frank Act would permit its claims here, and focuses instead on the *Morrison* test. Caridi, in reply, contends neither *Morrison* nor the Dodd-Frank Act test permits the exercise of jurisdiction here. Def.'s Reply Br., ECF No. 33 at 1–2. As the Court holds that the allegations of the amended complaint meet the "more stringent" *Morrison* test, it need not, and does not, decide whether the Dodd-Frank Act

supersedes *Morrison*. *See SEC v. Ahmed*, 308 F. Supp. 3d 628, 665 n.32 (D. Conn. 2018) (taking same approach).[4]

Under *Morrison*, the amended complaint's application of Section 10(b) is not an impermissible extraterritorial one. The inquiry centers on "where, physically, the purchaser or seller committed him or herself." *United States v. Vilar*, 729 F.3d 62, 77 n.11 (2d Cir. 2013). A securities transaction is considered domestic "when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012).

Here, trading of TOKI shares occurred in the United States. Am. Compl., ¶¶ 69–71, 83–84. Sellers and purchasers were located in the United States, placed and accepted trade orders through a system maintained on servers physically located in the United States, and transferred title to TOKI shares in the United States. *Id.* ¶¶ 15–21, 69–71, 83–84. Indeed, in a 2019 TOKI press release issued after TOKI received approval for its securities to be cleared and settled through the New York-based Depository Trust Company ("DTC"), Caridi stated "[r]eceiving DTC eligibility is a major step for Tree of Knowledge . . . . This will allow us to expand our investor base and reach new investors in the US market with our business." *Id.* ¶ 22.

---

[4] Even if the Dodd-Frank Act's test applied here, the SEC has plausibly alleged conduct within the United States that constitutes significant steps in furtherance of the alleged violation. *See* 15 U.S.C. § 78aa(b)(1). First, and most significantly, it alleges Caridi resided in Greenwich, Connecticut, and conducted business for the TOK Entities, "including the conduct described" in the amended complaint, in Connecticut. Am. Compl., ¶¶ 10–11. *See SEC v. Scoville*, 913 F.3d 1204, 1219 (10th Cir. 2019) (concluding that allegations that the defendant created and promoted the relevant investments over the Internet while residing in Utah sufficed to show conduct within the United States that constituted significant steps in furtherance of the securities law violation). Second, it alleges TOKI sought and obtained approval for its securities to be cleared through a New York-based central securities repository. *Id.* ¶¶ 13, 22. Third, it alleges TOKI shares were traded by investors in the United States during the relevant period. *Id.* ¶¶ 23, 71, 84. Should discovery reveal evidence that contradicts these allegations, Defendant is free to renew his contention that the Dodd-Frank Act test applies, and is not met, at the summary judgment stage.

Defendant is simply incorrect in arguing that under *Morrison*, Section 10(b) only applies to securities listed on domestic exchanges.  *Morrison* applied Section 10(b) not only to securities listed on domestic exchanges, but also to "the purchase or sale of any other security in the United States."  *Morrison*, 561 U.S. at 273.  The SEC's amended complaint clearly alleges that shares of TOKI were sold and purchased in the United States.  Defendant appears to concede there were sales in the United States, but contends the domestic trading was *de minimis*.  Def.'s Br., ECF No. 13-1 at 28.  As the SEC correctly points out, though, there is no *de minimis* exception in *Morrison* or the case law interpreting it.

For these reasons, the Court concludes that the SEC has not brought an extraterritorial Section 10(b) claim, over which the Court would lack jurisdiction.

## C.   Securities Fraud Claim under Section 10(b) and Rule 10b-5(b)

Having established that it may hear this case, the Court now turns to the SEC's claim that Caridi violated Exchange Act Section 10(b) and Rule 10b-5(b).  As noted above, Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device . . . ."  15 U.S.C. § 78j(b).  The corollary Rule 10b-5(b) makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," in connection with the purchase or sale of securities.  17 C.F.R. § 240.10b-5(b).

To adequately plead a primary violation of Section 10(b) and Rule 10b-5(b) based on the making of a misrepresentation, the SEC must allege that a defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent

device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Frohling,* 851 F.3d 132, 136 (2d. Cir. 2016) (citation omitted).

### 1. *Misrepresentations or Omissions*

Both false representations and "half-truths" are actionable misrepresentations. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–240 (2d Cir. 2016). Half-truths are statements that "state the truth only so far as it goes, while omitting critical qualifying information." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 188 & n.3 (2016) (noting that this definition applies in the securities law context); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 240–41 (noting that half-truths may be "misleading" within the meaning of Rule10b-5 "by virtue of what they omit to disclose"). Half-truths are actionable even without an independent duty to disclose information because, "upon choosing to speak, one must speak truthfully about material issues." *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002). Pure omissions, by contrast, are actionable only if the defendant had an independent duty to disclose. *See Chiarella v. United States*, 445 U.S. 222, 232 (1980); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). The amended complaint does not allege any pure omissions, but does plausibly allege false statements and half-truths.

The amended complaint perhaps most clearly alleges a false statement in the Second Press Release,[5] which stated that "there have been no material business developments since the date of [TOKI's] third-quarter interim financial statements that were filed on November 21, 2019 . . . ."

---

[5] The Court easily disposes of Defendant's contentions that TOKI had no duty to disclose the deal with Hospital A, or alternatively was required to disclose its large debt to Hospital A only in regulatory filings, not in press releases. Def.'s Br., ECF No. 13-1 at 7. Having chosen to speak on certain material subjects in its press releases, it was obligated to speak truthfully about them, regardless of whether it had made a previous "attempt to exploit" the Hospital A deal. *See* Def.'s Br., ECF No. 13-1 at 7; *Caiola*, 295 F.3d at 331. Once Caridi decided to make public statements about TOKI's business, he had a duty to be both "accurate and complete." *Caiola*, 295 F.3d at 331. The SEC plausibly alleges that he was not.

Am. Compl., ¶ 81.  At the time this press release was issued, TOKI had not yet publicly disclosed its deal with Hospital A and the press release did not itself otherwise discuss the deal.  *Id.* ¶ 82. Yet, Caridi knew that the TOK Entities had failed in the largest transaction in their history and had already defaulted on a repayment agreement, leaving the TOK Entities with a more than $11 million liability.  *Id.* ¶ 82.  The press release's statement as alleged, then, that there had been no material business developments since November of 2019, was decidedly untrue when made.

The First and Second Press Releases also contain actionable half-truths in that they misrepresented that TOKI had successfully pivoted to the PPE and medical equipment procurement business.  In touting a procurement order of 23,000 thermometers, the First Press Release represented that TOK NV "has made a pivot" to procuring PPE and medical equipment for governments, municipalities, and healthcare distributors in the United States and Canada.  *Id.* ¶¶ 64–65.  The Second Press Release took a similar tack when announcing a completed delivery of 100,000 medical gowns by saying that TOK NV "has developed a strategic focus during these uncertain times to leverage its medical contacts and international relationships" to procure PPE and medical equipment.  *Id.* ¶ 76.  In the same vein, the Second Press Release also quoted Caridi as saying that TOKI had "overcome" difficulties in procuring PPE and medical equipment.  *Id.* ¶¶ 78–79.

Together, these statements paint a picture to investors of the TOK Entities shifting from running pain management clinics and selling hemp products to successfully providing PPE and medical equipment.  But the SEC has plausibly alleged that, in fact, this characterization of TOKI's business was directly and materially contradicted by the actual state of affairs of the company.  *See In re Alstom SA*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005) (finding statements misleading when they "affirmatively creat[ed] an impression of a state of affairs that differ[ed] in a material way

from the one that actually exist[ed]").  Specifically, the SEC alleges that the Hospital A deal was not only the largest transaction in the TOK Entities' history, but that it was significantly larger than any of the PPE and medical equipment deals mentioned in the press releases.  *See* Am. Compl.,  ¶¶ 2, 59, 64–65, 76.  In terms of quantity of items contracted for, the Hospital A deal to procure three million N-95 masks was thirty times larger than order for 100,000 medical gowns and more than 130 times larger than the order for 23,000 thermometers.  *See id.* ¶¶ 2, 64–65, 76.  Because the largest deal in the TOK Entities' PPE procurement foray is alleged to have been such a decisive failure, it was plainly misleading, if not outright false, to portray the PPE shift as a success—especially because the SEC plausibly alleges that the fallout from the Hospital A deal posed dire existential implications to the TOK Entities' ability to operate as a going concern.  *Id.* ¶ 59.  Accordingly, the SEC successfully alleges that the First and Second Press Releases were rife with false statements and half-truths that would have misled reasonable investors.  *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 250 (recognizing, on appeal of partial judgment after trial, that the test is whether the defendant's representations, "taken together and in context, would have misled a reasonable investor") (citation omitted).

The amended complaint also alleges that the First Press Release contained a half-truth, if not a false statement, in its announcing that TOKI believed that "from time to time, the market price of its Shares may not reflect the underlying value of the Company's business and future prospects."  Am. Compl., ¶¶ 67–68.  The SEC alleges that this statement created the false impression that TOKI's shares were undervalued, in light of the value generated by its apparent recent pivot to PPE and medical equipment procurement.  *Id.* ¶ 68.  The SEC plausibly alleges that the opposite was true: that because TOKI had failed to disclose millions of dollars in debt to

Hospital A and its default on the plan to repay that debt, the market had not yet adjusted to reflect the detrimental effects of TOKI's failure.  *Id.*

The boiler-plate disclaimers tacked on to the press releases do not absolve Caridi of the wrongs the SEC has alleged.  Caridi points to caveats at the end of the press releases that warn investors that the release may contain "forward-looking statements" upon which an investor may not certainly rely for positive investment outcomes in the future.  Def.'s Br., ECF No. 13-1 at 16–17.  Such warnings shield a defendant from liability for prospective statements of future events but offer no defense to misrepresentations about the past.  *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

### 2.  *Materiality of Misrepresentations or Omissions*

Next, the SEC plausibly alleges that the false statements and half-truths were "material."  The materiality requirement is satisfied when a plaintiff alleges "a statement or omission that a reasonable investor would have considered significant in making investment decisions."  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161–62 (2d Cir.2000)).  Because this inquiry is a mixed question of law and fact, it "will rarely be dispositive in a motion to dismiss."  *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 151 (2d Cir. 2021) (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010)).  Instead, the Second Circuit has held that "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Ganino*, 228 F.3d at 162 (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985)).

Here, the SEC has plausibly alleged that the false statements and half-truths in the First and Second Press Releases touched on fundamental issues relating to TOKI's operational and financial condition, including the failure of the largest transaction in TOKI's history, the existence of millions of dollars in outstanding and undisclosed debt, and the ability of the business to profitably operate at all, much less in the PPE and medical equipment space. False statements and half-truths concerning such essential issues are not "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino*, 228 F.3d at 162. Caridi argues in response that he had no duty to disclose "the ups and downs of [TOKI's] business." Def.'s Br., ECF No. 13-1 at 19. It is true that a business need not disclose every detail of its operations, but what Caridi misrepresented concerned core aspects of TOKI's profitability and ability to continue as a going concern. *See In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 217–18 (D. Conn. 2001) (denying motion to dismiss, in part, because while Defendant argued it had no duty to disclose "mundane operational difficulties," Plaintiffs had plausibly alleged that Defendant "held back a substantial amount of information" including information relating to "the breakdown of operations . . . leading to loss of revenue").

Neither does Caridi's argument that any reasonable investor would have looked to financial statements instead of press releases when assessing TOKI's business change the Court's conclusion. *See* Def.'s Br., ECF No. 13-1 at 18–19. Securities law recognizes no such distinction in the medium of a material misrepresentation and, indeed, courts in this circuit have looked to press releases in ruling on securities fraud allegations. *See SEC v. Nutra Pharma Corp.*, 450 F. Supp. 3d 278, 289 (E.D.N.Y. 2020) (denying motion to dismiss in part and concluding that the complaint sufficiently alleged securities fraud claims based on press releases); *Sawant v. Ramsey*,

No. 07-CV-980 (VLB), 2010 WL 3937403, at *11–15 (D. Conn. Sept. 28, 2010) (denying in part Defendants' motion for summary judgment where Plaintiff based claims on press releases).

### 3.   Made by Defendant

The SEC also plausibly alleges that Caridi made the statements in the press releases for purposes of securities fraud liability.   In *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011), the U.S. Supreme Court held that a private right of action under Rule 10b-5(b) may be brought only against the "maker" of a misleading statement, which it defined as the person or entity "with ultimate authority over the statement, including its content and whether and how to communicate it."[6]   In determining whether an individual had "ultimate authority over the statement" within the meaning of *Janus*, courts in this circuit have looked to circumstances surrounding the statement, including various indicia of control indicating power and authority to decide its content.   *See Xu v. Gridsum Holding Inc.*, 624 F. Supp. 3d 352, 359–62 (S.D.N.Y. 2022) (holding that allegations that defendant was company co-founder, CEO, Chairman of the Board, owner of 29.9% of ordinary shares, was quoted in a press release, and had decision-making power plausibly supported the conclusion that defendant was the "maker" of the press release at issue); *Puddu v. 6D Global Techs., Inc.*, No. 15-cv-8061 (AJN), 2021 WL 1198566, at *8 (S.D.N.Y. Mar. 30, 2021) (defendant who reviewed SEC filings, provided instructions on what to include and not include, and participated in conference calls concerning the filings made the alleged misrepresentations, at motion to dismiss stage).   Moreover, a "maker" of a statement can be *an* ultimate authority and need not be the only ultimate authority.   *Puddu*, 2021 WL 1198566, at *8.

---

[6] The SEC is correct that *Janus* applies to claims brought under Rule 10b-5(b), not to claims asserting scheme liability under Rules 10b-5(a) or (c).   *Lorenzo v. SEC*, 587 U.S. 71, 76–79 (2019); *SEC v. Fiore*, 416 F. Supp. 3d 306, 320 (S.D.N.Y. 2019).   The SEC then contends that its claims in this action are scheme liability claims brought under Rules 10b-5(a) and (c).   SEC's Br., ECF No. 30 at 33 n.6.   But Rules 10b-5(a) and (c) are not mentioned in the amended complaint.   The amended complaint therefore gives no notice to Defendant that the SEC is proceeding on a scheme liability theory here.   To the extent the SEC seeks to proceed on such a theory, it must request leave to amend its complaint.

Here, the amended complaint alleges that as a member of TOKI's informal corporate disclosure committee, Caridi was "involved in all aspects of TOKI's public disclosures," which included "preparing, reviewing, editing, and approving TOKI's press releases, particularly where, as with [the First and Second Press Releases], the disclosures concerned information about TOKI's operations." Am. Compl., ¶ 60.  The SEC also specifically alleges that the First and Second Press Releases were provided to Caridi for his review before their publication.  *Id.* ¶¶ 63, 75.  The Amended Complaint further alleges other indicia of control, including that Caridi was Chairman of the TOKI Board of Directors and one of the largest TOKI shareholders, and that he was directly quoted in both press releases.  *Id.* ¶¶ 11, 64, 78.

Accordingly, not only does the SEC plausibly allege that Caridi made the statements he is specifically quoted as saying the press releases, *see Janus*, 564 U.S. at 142–143 (concluding that attribution of a statement to a person or entity is usually "strong evidence that a statement was made by—and only by—the party to whom it is attributed"), but also that Caridi had sufficient "ultimate authority" to be considered a "maker" of the press releases in their entirety.  Caridi's argument that because someone else drafted the press releases, he cannot be the "maker" of them does not change this Court's conclusion.  Def.'s Br., ECF No. 13-1 at 22.  Indeed, the SEC specifically alleges that Caridi did not draft the press releases, but that he reviewed them.  Am. Compl., ¶¶ 63, 75.  Such review and control over the contents of the press release are more important in the analysis than who initially drafted the documents.  *See Janus,* 564 U.S. at 142–144.

### 4.  Scienter

The amended complaint also plausibly alleges scienter.  Complaints alleging securities fraud must comply with Federal Rule of Civil Procedure 9(b)'s pleading standard, which provides

that allegations of fraud must state "with particularity the circumstances constituting fraud," and that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).   A statement is made with the requisite scienter if it is made with the "intent to deceive, manipulate, or defraud." *SEC v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016) (quoting *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012)).   Scienter can be demonstrated through a showing of "reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Id.* (quoting *Obus*, 693 F.3d at 286).[7]

Here, the amended complaint alleges that Caridi knew the content of the press releases was inaccurate, or was at least reckless in making the representations, given that he had accesses to non-public information that contradicted the press releases.   Specifically, it plausibly alleges that Caridi knew that TOKI had entered into and quickly defaulted on a repayment agreement with Hospital A (Am. Compl., ¶¶ 45, 53); incurred millions of dollars in undisclosed debt that it could not repay (Am. Compl., ¶¶ 46, 61); failed to profitably "pivot" to PPE procurement and "overcome" related difficulties (Am. Compl., ¶¶ 44, 65–66, 79); and that he had transferred large sums of money from Hospital A such that repayment was impossible (Am. Compl., ¶¶ 88–89)—

---

[7] The SEC need not meet the Private Securities Litigation Reform Act's ("PSLRA") more stringent pleading requirements with respect to scienter. *SEC v. Dunn*, 587 F. Supp. 2d 486, 501 (S.D.N.Y. 2008); *see also SEC v. Sason*, 433 F. Supp. 3d 496, 506 (S.D.N.Y. 2020).   Additionally, various district court cases brought by the SEC within this Circuit use language suggesting that a plaintiff must "allege facts that give rise to a strong inference of fraudulent intent," which can be established by alleging facts to show "that defendants had both motive and opportunity to commit fraud" or "that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *See, e.g., SEC v. Thurlow*, No. 21-cv-7700 (VSB), 2024 WL 4068881, at *4 (S.D.N.Y. Sept. 5, 2024); *SEC v. DeFrancesco*, 699 F. Supp. 3d 228, 242 (S.D.N.Y. 2023).   Defendant argues that a strong inference of intent is required here, and the SEC briefs the motive and opportunity test.   *See* Def.'s Br., ECF No. 13-1 at 22; SEC's Br., ECF No. 30 at 39–40.   It is not clear to this Court that a "strong inference" of fraudulent intent is required in a case brought by the SEC, as opposed to one brought by a private plaintiff under the PSLRA.   But the Court need not decide this issue, or whether Caridi had motive and opportunity to commit the fraud, as it finds that there are sufficient allegations Caridi acted recklessly, and therefore with the requisite scienter.

all of which in some way flatly contradicted the TOKI press releases or made their content misleading. These allegations successfully allege scienter.

Caridi counters the SEC's allegations supporting scienter by arguing that he genuinely believed he could repay the debt to Hospital A. Def.'s Br., ECF No. 13-1 at 23–26. This argument fails not only because it relies on facts outside of the pleadings, it also plainly contradicts the SEC's well-pleaded facts. Throughout its amended complaint, the SEC alleges Caridi knew or recklessly disregarded that the TOK Entities could not repay the debt. *See* Am. Compl., ¶¶ 46, 52, 61, 77. Finally, Caridi's argument that his disclosure of the TOK Entities' failure to perform the Hospital A deal to Québec Government officials somehow prevents the SEC from plausibly alleging scienter is misguided. Throughout his motion to dismiss, Caridi makes the argument that because he informed Québec Government officials about the "irreparable harm" the fallout of the Hospital A deal posed to TOKI, the SEC cannot attribute to him any intent to hide the Hospital A deal failure from the public. *See* Def.'s Br., ECF No. 13-1 at 8, 12–13, 24–25. Again, this argument relies on material outside of the amended complaint. But even if it is considered, the argument backfires: to the extent Caridi contends that he informed government officials of the grave financial state the TOK Entities' were in before the First and Second Press Releases, he is only conceding that he had personal knowledge of the existential threat the failed Hospital A deal presented, which in turn renders the Press Releases touting the TOK Entities' successful pivot to PPE distribution misleading.

### 5.  *In Connection with the Purchase or Sale of Securities*

Finally, the SEC's allegations unquestionably meet the "in connection with the purchase or sale of securities" requirement. Caridi comes very close to conceding this point himself by arguing that "[t]he only allegations in the Complaint that meet the 'in connection with' requirement

are arguably the allegations of falsity in the press releases, which were communicated to potential investors." Def.'s Br., ECF No. 13-1 at 17.  Caridi further argues that "the great majority" of the amended complaint's allegations do not allege fraud "in connection with" the purchase or sale of securities but, rather, discuss his communications with Hospital A.  *Id.* at 16–17.  This argument misses the mark because the only Section 10(b) and Rule 10b-5(b) violations the SEC alleges are found in the First and Second Press Releases and nowhere else.  *See* Pl.'s Br., ECF No. 30 at 36–37.  Courts have repeatedly held that public press releases may satisfy the "in connection with" requirement.  *See, e.g., In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953, 962 (2d Cir. 1993) (holding that in dismissing a securities fraud case, the district court erred, in part, by failing to consider press releases as made "in connection with" stockholders' purchases); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir. 1968) ("[W]e hold that Rule 10b-5 is violated whenever assertions are made, as here, in a manner reasonably calculated to influence the investing public, e.g., by means of the financial media.").  Accordingly, the alleged fraudulent conduct in connection with the two press releases, which were publicly published through various means to the investing public, occurred "in connection with" the purchase or sale of securities.

In sum, the amended complaint plausibly alleges a primary violation of Section 10(b) and Rule 10b-5(b).

### D.  Aiding and Abetting Violations of Section 10(b) and Rule 10b-5(b)

Caridi also moves to dismiss the SEC's second claim for relief, alleging that TOKI violated Section 10(b) and Rule 10b-5(b) and that Caridi aided and abetted TOKI's violations.  Caridi

contends only that, because there is no basis to find TOKI committed these violations, he cannot be liable as an aider and abettor. The Court disagrees.

To state a claim for aiding and abetting liability, the SEC must allege (1) a primary violation of the securities laws, (2) that the defendant knew or was reckless in not knowing of that violation, and (3) that the defendant provided "substantial assistance" in achievement of that primary violation. 15 U.S.C. § 78t(e); *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012).

First, the amended complaint alleges a primary violation of the securities laws by TOKI. As detailed above, the amended complaint plausibly alleges Caridi violated Section 10(b) and Rule 10b-5(b). As Chairman of the TOKI Board of Directors and a senior executive on TOKI's disclosure committee, Caridi's conduct and scienter is imputed to TOKI under agency law principles. *See SEC v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 390 (S.D.N.Y. 2014) (holding that one defendant, "as the CEO, President, and largest individual shareholder, is clearly an officer whose intent could be imputed to the corporation."); *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 90 (S.D.N.Y. 2017) ("There is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants." (quoting *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515–16 (S.D.N.Y. 2009))).

Second, in light of the plausibility of the amended complaint's scienter allegations, the Court concludes that it was plausible that Caridi knew or was reckless in not knowing of the primary securities fraud violation.

Finally, the amended complaint alleges that Caridi both knew of and substantially assisted TOKI's violation. To satisfy the "substantial assistance" element "the SEC must show that the defendant 'in some sort associate[d] himself with the venture, that he participate[d] in it as

something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed.'" *Apuzzo*, 689 F.3d at 206 (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938)).  The amended complaint plausibly shows that Caridi more than just "associate[d] himself" with the fraudulent and misleading statements in that he had ultimate control over their publication and sought for those efforts to keep in the dark the TOK Entities' unsuccessful transaction with Hospital A and failed transition into the PPE and medical equipment market more generally.[8]

## IV.    CONCLUSION

For the reasons described herein, Defendant's motion to dismiss Plaintiff's amended complaint is DENIED.

**SO ORDERED** at Hartford, Connecticut, this 30th day of September, 2024.

 /s/ Sarala V. Nagala
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE

---

[8] Finally, Defendant asks this Court to strike the SEC's claim for disgorgement.  Def.'s Br., ECF No. 13-1 at 7.  But disgorgement is a remedy, to be addressed only after a defendant has been found to have violated the securities laws. Defendant's request is therefore premature.  *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996) ("Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits.").