UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>           -against-<br><br>MICHAEL CARIDI,<br><br>                    Defendant. | 3:23 Civ. 1243 (SVN) |

## DECLARATION OF CHRISTOPHER M. COLORADO

Christopher M. Colorado, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am senior trial counsel at the Securities and Exchange Commission ("SEC") and represent the SEC in this litigation. I respectfully submit this Declaration and the Exhibits hereto in support of the SEC's opposition to Michael Caridi's ("Caridi") Motion to Vacate the Consent Judgment. The statements set forth herein are based on my personal knowledge and my discussions with persons within the SEC.

2. I participated in the SEC's settlement discussions with Caridi that resulted in the parties' settlement agreement and the Court's entry of the Final Judgment. During those discussions, neither I nor any person at the SEC provided Caridi with any written or verbal promise—or entered into any written or verbal agreement with Caridi—about any public statements, including any press release, that the SEC might make about any topic, including the resolution of this litigation or the Court's Final Judgment.

**The SEC's Action, the Ontario Action, and the Parties' Settlement Discussions**

3. On September 25, 2023, the SEC commenced litigation against Caridi alleging that he had violated the antifraud provisions of the federal securities laws. (ECF No. 1.)

1

4. That day, consistent with the SEC's policies concerning litigation releases, *see infra* ¶¶ 28-32, the SEC posted to its website Litigation Release No. 25847, which summarized the SEC's allegations against Caridi and provided the *public* with a link to a PDF of the SEC's Complaint. (Ex. 10.)

5. On July 9, 2024, the Ontario Superior Court of Justice in Canada, after a bench trial in the matter styled, *Chu De Quebec-Universite Laval v. Tree of Knowledge International Corp.*, CV-20-00645223-00CL, in which Caridi was a defendant, issued a decision finding Caridi liable to Chu De Quebec-Universite Laval. (Ex. 1.)

6. On or around September 30, 2024, Caridi and SEC staff renewed discussions of a possible settlement of the SEC's securities fraud claims against Caridi in this action.

7. During those settlement discussions, I explained to Caridi how the SEC's settlement process works. Namely, SEC staff, like me, cannot unilaterally agree to any settlement term. Instead, Caridi and I (and other members of the SEC staff) could discuss the contours of a potential settlement and then SEC staff could seek internal authority from our supervisor(s) to present and recommend potential settlement terms to the SEC's independent then-five-member Commission (the "Commission"). If, as a result of those discussions, Caridi and SEC staff identified potential settlement terms to which Caridi was willing to agree and that SEC staff was authorized to present to the Commission, then those terms would be reflected in a draft Consent to Judgment to be reviewed and signed by Caridi. By delivering a signed and notarized Consent to the SEC, Caridi would be making a settlement offer. SEC staff would then take the necessary steps to present the terms of that offer, along with SEC staff's recommendation, to the Commission for its review and possible approval.

8. Reference to this process—which Caridi never suggested to me or others that he did not understand—is also reflected in many of my emails to Caridi. (*E.g.*, Ex. 2 ("[T]he SEC staff is willing to recommend that the Commission accept the terms below. . . . It generally takes us 6 to 8 weeks to make our recommendation to he Commission seeking their review and approval of the settlement terms."); Ex. 4 at 2 (noting that SEC counsel would be required to "get authority" for one of Caridi's additional proposed settlement terms); *id.* at 1 ("SEC staff agrees to recommend to the Commission and the Court a settlement that includes [certain payment terms]"); Ex. 8 ("The Commission has approved the settlement terms.").)

9. On October 11, 2024, I had a call with Caridi to discuss potential settlement terms. During that call, Caridi and I discussed and successfully identified potential settlement terms to which Caridi was willing to agree and that SEC staff was willing to recommend to the Commission for approval and, if approved by the Commission, to submit to the Court for its approval. That day, I memorialized those terms in an e-mail to Caridi. (Ex. 2.)

10. On October 14, 2024, Caridi responded to my October 11 e-mail summary of the potential settlement terms that he and I had discussed, sending me an email which said: "I'm good in principle, couple of minor changes." (Ex. 3.)

11. Later on October 14, Caridi left me a voicemail and sent me a second email, each of which proposed changes to the list of potential settlement terms reflected in my October 11 email to him. The full content of Caridi's October 14, 2024, voicemail is as follows:

> Chris, good morning, Michael Caridi. A couple things, just, the no press release should be added to that. Then, on the 180, a payout over—quarterly basis, for one year, if you could add that, I'll need that just to put it together. Alright so, the first one, due the first quarter, and then the three quarters in equal increments of $45,000. ***Let me know if that's acceptable and then we could wrap this up***. Thanks, I appreciate it.

3

12. Caridi followed his voicemail with an email restating his proposed terms. (Ex. 4 at 2.) In that e-mail, he asked whether SEC staff would agree to recommend to the Commission that he be permitted to pay the $180,000 civil monetary penalty in one year because Caridi wanted additional time to gather funds to make payment. (*Id.*) He also asked me to "confirm" that the SEC would not issue a press release concerning the settlement and if contacted by the press that the SEC would say, "no comment." (*Id.*) Specifically, Caridi wrote,

> I left you a voicemail, a few additional points, one on $180,000. I would need one year to pay it out in quarterly payments. Also just confirming no press releases on the settlement and SEC or I would not have any comment if press sis [sic] reach out to you.

(*Id.*)

13. The next morning, October 15, Caridi and I discussed his additional proposals by telephone. I told him that, in my experience, the SEC does not issue press releases in cases that are the size of this case, but that SEC staff could not agree to recommend that the SEC limit its future public statements, whether to the press or otherwise. Additionally, either during this call or another call close in time, Caridi asked whether the settlement documents—the Consent and Final Judgment—could be filed under seal. I told Caridi that they could not be filed under seal and that they must be public documents.

14. Also during my October 15 call with Caridi, I told him that SEC staff might be able to recommend a payment schedule for his $180,000 civil penalty that allowed him to pay that amount over the course of a year, that I would discuss the proposal internally and determine whether I could obtain internal authority to recommend a one-year payment schedule for the civil penalty to the Commission, and that I would revert to him when I had that information.

15. That afternoon, after I communicated internally concerning Caridi's proposed payment schedule, I emailed Caridi a counterproposal for a schedule for his payment of the

4

$180,000 civil penalty that SEC staff was willing to recommend to the Commission, if it was part of Caridi's settlement offer. (Ex. 4 at 1.) This counterproposal was different than what Caridi had proposed in his October 14 voicemail and email. It contemplated a larger upfront payment than Caridi had proposed (*i.e.*, an $80,000 initial payment rather than a $45,000 initial payment, as Caridi had suggested); it contemplated five payments rather than four quarterly payments; and it contemplated the entire civil penalty being paid within 360 days rather than within one year. (*Id*. at 1.) In response, Caridi said, "Good to go !!" (*Id.* at 1.)

16. I never promised Caridi verbally or in writing to recommend that the SEC would limit its public statements concerning the settlement. To the contrary, I told Caridi that the SEC could not be limited in its public statements and that the settlement documents would be public.

17. On October 15, 2024, the parties filed a Joint Motion requesting that the Court stay all deadlines for sixty days "to allow the Parties to finalize settlement documentation and to allow SEC counsel to present the settlement terms to the Commission[.]" (ECF No. 59.)

**Caridi's Consent to Judgment**

18. On November 12, 2024, I sent an email to Caridi attaching drafts of (i) a Consent to Judgment ("Consent") setting forth the potential settlement terms that we had discussed and that SEC staff was authorized to recommend to the Commission; and (ii) a draft proposed Final Judgment that incorporated the Consent and, assuming the Commission authorized SEC counsel to accept the settlement terms, that the SEC would propose to the Court. (Ex. 5.) Neither of those documents include any limitation on the SEC's ability to issue a press release concerning the settlement or final judgment in this matter.

19. After my November 12 email to Caridi sending the draft Consent and draft proposed Final Judgment, I spoke to Caridi by telephone. He told me that before he signed and

5

delivered the Consent to the SEC, he wanted an attorney, Dominic Amorosa, Esq., to review its terms. Mr. Amorosa is a white-collar defense attorney in New Jersey with whom I have dealt with in another SEC enforcement matter, and Mr. Amorosa represented Caridi in the SEC's investigation that preceded this litigation.

20. On November 18, 2024, Mr. Amorosa called me to ask questions about the terms of the Consent and I responded to him by e-mail. (*See* Ex. 6.)

21. Mr. Amorosa did not ask any questions or make any requests concerning the SEC's ability to issue a press release about a settlement, if consummated, or a final judgment, if entered.

22. On November 26, 2024, Caridi delivered to me a Consent that he had signed and notarized and that did not include any changes from the draft that I had sent him on November 11. (Ex. 7.) Caridi's Consent did not include any limitation on the SEC's ability to make public statements concerning the settlement or final judgment, to the press or otherwise. (*Id.*)

23. Caridi's Consent says expressly that Caridi did not receive any promises or assurances from the SEC or its counsel:

> Defendant enters into this Consent voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the Commission or any member, officer, employee, agent, or representative of the Commission to induce Defendant to enter into this Consent.

(*Id.* at 3-4, ¶ 7.)

24. The only limitation on public statements in Caridi's Consent applies to Caridi and is as follows:

> Defendant understands and agrees to comply with the terms of 17 C.F.R. § 202.5(e), which provides in part that it is the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings," and "a refusal to admit the allegations is equivalent to a denial, unless the defendant or respondent states that he neither admits nor

6

> denies the allegations." As part of Defendant's agreement to comply with the terms of Section 202.5(e), Defendant: (i) will not take any action or make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis; (ii) will not make or permit to be made any public statement to the effect that Defendant does not admit the allegations of the complaint, or that this Consent contains no admission of the allegations, without also stating that Defendant does not deny the allegations; (iii) upon the filing of this Consent, Defendant hereby withdraws any papers filed in this action to the extent that they deny any allegation in the complaint . . . .

(*Id.* at 5-6, ¶ 12.)

**Commission Authorization and Court Approval of the Settlement Terms**

25. On December 13, 2024, I sent an email to Caridi notifying him that the Commission had approved the settlement terms and that the following week the SEC intended to inform the Court of this development, including the settlement terms, and request that the Court review and approve the settlement. (Ex. 8.)

26. Caridi asked that the SEC briefly delay its request that the Court approve the settlement so that he had additional time until the first installment payment of his $180,000 civil penalty would become due, and the SEC agreed to that delay as a courtesy. (ECF No. 62.)

27. On December 27, 2024, the SEC filed a motion, with Caridi's consent, describing the parties' settlement, attaching Caridi's Consent, and requesting entry of the proposed Final Judgment. (ECF No. 64.) On January 2, 2025, the Court approved the parties' consent settlement and entered the Final Judgment comprising the settlement terms. (ECF No. 65.)

**The SEC's Litigation Releases and Press Releases**

28. The SEC's processes for issuing litigation releases are guided by Administrative Regulation 18-2, "Media Relations Policy," Part 3.11, "Litigation Releases." (Ex. 9.)

7

29. The SEC generally posts litigation releases to its website, www.sec.gov, when it begins or ends an enforcement action. The purpose of litigation releases is to "inform the public of an SEC enforcement action and [they] are a permanent, official record of SEC court enforcement actions." (*Id.* at 4.) Litigation releases include, among other things, summaries of the SEC's allegations in a litigation and, in the event of a consent settlement with a defendant, a summary of the relief to which the SEC and defendant agreed. (*Id.*) Litigation releases are "limited to publicly available factual information obtainable from public documents." Additionally, although litigation releases are posted to the SEC's website, they are generally not proactively sent to media outlets or posted to the SEC's social media accounts.

30. As noted above in paragraph 4, when the SEC filed this litigation against Caridi in September 2023, it posted Litigation Release No. 25847 to its website, which included a two-paragraph summary of the SEC's factual allegations and a one-paragraph summary of the securities laws that Caridi was alleged to have violated and the relief the SEC sought in this action. (Ex. 10.)

31. When the SEC concluded its litigation against Caridi and after the Court entered the Final Judgment, the SEC posted Litigation Release No. 26213 to its website, which included a one-paragraph summary of the SEC's factual allegations that is substantially similar to the summary of those allegations in the September 2023 litigation release and a one-paragraph summary of the Final Judgment, including that Caridi neither admitted nor denied the SEC's allegations against him. (Ex. 11.)

32. From time to time—and separate from and more infrequently than litigation releases—the SEC also issues press releases "highlighting recent actions taken by the SEC and other newsworthy information." (Ex. 12.) Unlike litigation releases, press releases are available

in the "Newsroom" portion of the SEC's website.  (*Id.*)  Also unlike litigation releases, the SEC generally proactively distributes press releases to media outlets, and press releases can be posted to the SEC's primary social media accounts (*i.e.*, @SECGov on Twitter/X).  Further, while litigation releases are limited to a summary of publicly available information, press releases often include a statement by one or more SEC Commissioners and/or senior officers about the subject matter of the press release.  (*E.g.*, Ex. 13.)

33. The SEC did not issue a press release related to its settlement with Caridi or the Court's Final Judgment.

**Exhibits**

34. The following exhibits are true and correct copies of the documents described:

| Ex. | Document Description |
|---|---|
| 1 | Post-Trial Decision in *Chu De Quebec-Universite Laval v. Tree of Knowledge International Corp., et al.*, CV-20-00645223-00CL (Ontario Superior Court of Justice, Canada), dated July 9, 2024. |
| 2 | E-mail from C. Colorado to M. Caridi, dated October 11, 2024, describing potential settlement terms. |
| 3 | E-mail from M. Caridi to C. Colorado, dated October 14, 2024, describing potential settlement terms and with earlier dated e-mails as part of email string. |
| 4 | E-mail from M. Caridi to C. Colorado, dated October 15, 2024, describing potential payment plan and with earlier dated e-mails as part of email string. |
| 5 | E-mail from C. Colorado to M. Caridi, dated November 12, 2024, attaching draft Consent to Judgment and draft Proposed Final Judgment. |
| 6 | Email from D. Amorosa to C. Colorado, dated November 22, 2024, concerning draft Consent and with earlier dated e-mails as part of email string. |
| 7 | Consent to Judgment by Michael Caridi, dated November 26, 2024. |
| 8 | E-mail from C. Colorado to M. Caridi, dated December 13, 2024, discussing filing of Consent and Final Judgment and with earlier dated e-mail as part of email string. |
| 9 | SEC Administrative Regulation No. SECR18-2, "Media Relations Policy," dated May 8, 2019. |

| Ex. | Document Description |
|---|---|
| 10 | SEC Litigation Release No. 25847 (Sept. 25, 2023) |
| 11 | SEC Litigation Release No. 26213 (Jan. 8, 2025) |
| 12 | SEC.gov Webpage for Press Releases, https://www.sec.gov/newsroom/press-releases as of February 13, 2025. |
| 13 | SEC Press Release 2025-15 (Jan. 16, 2025) |
| 14 | Excerpts of Form 10-K publicly filed by Perf-Go Green Holdings, Inc., dated July 14, 2009. |
| 15 | Excerpts of Form 2A publicly filed by Tree of Knowledge International Corp., dated June 28, 2018. |
| 16 | "Developer Resume" produced by Michael Caridi to the SEC, Bates numbered SEC-CaridiM-E-0032312 to CaridiM-E-0032314. |

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on February 24, 2025

/s/ Christopher M. Colorado
Christopher M. Colorado