# Exhibit 1

CITATION: Chu De Québec-Université Laval v. Tree of Knowledge International Corp., 2024
ONSC 3541
**COURT FILE NO.:** CV-20-00645223-00CL
**DATE:** 20240709

### ONTARIO

### SUPERIOR COURT OF JUSTICE

| | | |
|---|---|---|
| **BETWEEN:** | ) | |
| | ) | |
| CHU de Québec-Université Laval | ) | *John J. Pirie, Ahmed Shafey and Ajanthana* |
| | ) | *Amandarajah*, for the Plaintiff |
| Plaintiff | ) | |
| | ) | |
| – and – | ) | |
| | ) | |
| Tree of Knowledge International Corp., | ) | *Michael Caridi*, Self-Represented |
| Tree of Knowledge Inc., Michael Caridi, | ) | |
| Blu Stella Consulting Group Inc., and Fabio | ) | |
| Gesufatto | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | **HEARD:** September 26, 27, 28 and 29 and |
| | | October 3, 2023 and November 21, 2023 |

### WILTON-SIEGEL J.

[1]     In this action, the plaintiff, CHU de Québec-Université Laval, seeks damages for fraudulent misrepresentation, oppression and unjust enrichment together with ancillary relief in respect of a contract for the purchase of three million N95 respirator masks entered into between the plaintiff and Tree of Knowledge Inc.

***The Parties***

[2]     The plaintiff, CHU de Québec-Université Laval ("CHU", which is an acronym for Centre Hospitalier Universitaire), is the largest hospital network in Québec, with five hospitals serving the populations of eastern Québec and northern New Brunswick. François La Treille ("La Treille") was the chief financial officer of CHU at the time of the events giving rise to this action.

[3]     Sigma Santé ("Sigma Santé") is a non-profit organization representing health establishments in the Montreal and Laval regions of Québec. During the COVD-19 pandemic, the Ministry of Health and Social Services of the Province of Québec (the "Ministry of Health")

authorized Sigma Santé to manage the procurement and supply of goods and services to health and social service establishments in Québec, including CHU. In this capacity, Sigma Santé oversaw the sourcing of personal protective equipment, including gloves, gowns, masks and respirators (collectively "PPE") for CHU as its agent, although only CHU had authority to enter into agreements on its behalf.

[4]    Elie Boustani ("Boustani") was a supply and logistics advisor at Sigma Santé. Pierre Julien ("Julien") was the general manager of Signa Santé at the time of the events giving rise to this action.

[5]    Tree of Knowledge International Corp. ("TOK Corp.") is a corporation incorporated under the laws of Canada, having its registered office in Alberta and its principal place of business in Scarborough, Ontario. TOK Corp.'s business was the provision of pain management services and cannabis derived products. TOK Corp. is a public corporation whose shares are listed on the Canadian Securities Exchange. TOK Corp. changed its name to Optima Medical Innovations Corp. on or about November 18, 2021.

[6]    Jessie Lin ("Lin") is a corporate accountant employed by TOK Corp. Scott Reeves ("Reeves") was a director and the secretary of TOK Corp. during the relevant period for this action. Dr. Kevin Rod ("Rod") is the medical advisor to TOK Corp. and between April 27, 2020 and July 27, 2020 was also the interim chief executive officer of TOK Corp.

[7]    Tree of Knowledge Inc. ("TOKI") is a corporation incorporated in the State of Nevada, in the United States, having its registered address in Spokane, Washington and its principal place of business at 5460 Yonge Street, Unit 209, North York, Ontario. TOKI is a wholly owned subsidiary of TOK Corp. In 2020, the TOKI head office was at 32 Cutler Road, Greenwich, Connecticut, in the United States.

[8]    Michael Caridi ("Caridi") was the chief executive officer and a director of TOK Corp. and the president and director of TOKI during the relevant period for this action. On or about February 22, 2021, he resigned as a director and officer of TOKI and as an officer of TOK Corp. He was removed as a director of TOK Corp. on or about September 22, 2021 at an annual shareholder meeting. Caridi resides, and during the relevant period for this action resided, at 32 Cutler Road, Greenwich, Connecticut in the United States. Daniel Caridi is Caridi's son. During the relevant period, Daniel Caridi was an employee of TOKI.

[9]    Blu Stella Consulting Group Inc. ("Blu Stella") is a corporation incorporated under the laws of the Province of Ontario having its registered office in Woodbridge, Ontario. Fabio Gesufatto ("Gesufatto") is the director and chief executive officer of Blu Stella.

[10]    Conrad Roncati ("Roncati") is a resident of the United States and a former business associate of Caridi. Athletix LLC ("Athletix") is a corporation wholly owned by Roncati.

[11]    Anthony Lee ("Lee") was a significant client of Roncati's architectural firm. In his principal affidavit for this trial, Roncati described Lee as a "prominent business executive and real

estate developer with admitted personal, business and government contacts in China." He further stated that Lee "is also in the banking industry and owns several e-commerce companies doing business in China." Lee was neither a party to, nor a witness in, this proceeding.

## Factual Background

[12]    I propose to set out the relevant facts in three stages. I will first summarize the evidence regarding NIOSH certified N95 masks and other masks, including KN95 masks. I will then describe the business relationship and dealings between Caridi/TOKI and CHU, which forms the basis of CHU's claim, followed by the evidence regarding the business relationship among Caridi, Roncati/Athletix and Lee, which is necessary for an understanding of Caridi's actions in attempting to cause TOKI to perform the agreement with CHU described below and his defence to CHU's claims in this proceeding. Lastly, I will set out the evidence of the Receiver (defined below) regarding activity in the relevant TOKI bank account at Chase Bank and regarding the assets of TOKI as of the end of 2020.

### NIOSH Certified N95 Respirator Masks and KN95 Masks

[13]    A respirator is a medical quality mask with certain characteristics. An N95 mask is a respirator designed to achieve a very close facial fit and efficient filtration of airborne particles. N95 masks are commonly used in healthcare settings and industries where exposure to respiratory hazards is a concern.

[14]    A "NIOSH certified N95 mask" refers to a respirator that has been tested and approved by the National Institute for Occupational Safety and Health ("NIOSH") in the United States. NIOSH is a branch of the United States Centre for Disease Control ("CDC"). NIOSH examines, tests and certifies certain medical products including respirators.

[15]    The Occupational Safety and Health Administration ("OSHA") regulates health and safety in the workplace in the United States. In 1995, NIOSH issued regulation 42 CFR 84 which established, among other classes of air-purifying particulate respirators, nine classes of filters for respirators, of which N95 is one class. OSHA's respirator regulation requires employers to use only NIOSH approved respirators to protect workers from inhalation hazards. NIOSH certified N95 respirators are frequently chosen by healthcare employers.

[16]    The "95" in "N95" stands for the filtration capacity. It is capable of filtering out at least 95% of airborne particles. The NIOSH certification ensures that the mask meets specific performance standards that provide a high level of respiratory protection. If a mask is labelled N95 but is not NIOSH certified, it may not provide the expected level of respiratory protection.

[17]    An expert witness produced by CHU, Dr. Harold Cohen ("Cohen"), testified as to the NIOSH respirator certification process as it existed as of March 26, 2020.  The following summarizes his evidence. The NIOSH certification process for approval of a filtering respirator involves two stages. First, a manufacturer must complete a site qualification approval process. Thereafter the manufacturer is subject to regular quality assurance audits of manufacturing sites

and operations. The second stage involves approval of the design and materials of the proposed respirator together with, in the case of N95 respirators, three or four specific tests depending upon the particular type.

[18]    The CDC maintains a website that contains a list of all NIOSH certified products. Any product that is NIOSH certified receives a seven-digit certification number. The NIOSH regulation requires that approved NIOSH respirators exhibit specific markings printed on the facepiece and that the packaging of such respirators also satisfies certain labelling requirements, both of which would identify any particular respirator mask as NIOSH certified. In particular, each reproduction of the certified product must bear the label "NIOSH certified" followed by the certification number.

[19]    As a supplementary matter, Cohen also testified that, at least until 2023, NIOSH had rejected respirator masks that used ear loops rather than head straps. As I describe below, the KN95 masks delivered to CHU used ear loops. Caridi attempted to suggest, by way of a question to Cohen, that a particular mask, which he referred to as a DTC3X, distributed by a particular company as early as 2020, had ear loops. As this mask was not in evidence and Caridi's alleged facts could not be authenticated, the question was denied.

[20]    A KN95 mask is a respiratory mask designed to filter out at least 95% of airborne particles according to a Chinese standard. KN95 masks are regulated by the Chinese government. While similar to N95 masks, KN95 masks are not generally NIOSH certified. They meet different Chinese standards for respiratory protection, are subject to different testing standards, and have not undergone the same certification process as N95 masks. N95 masks produced in China that are NIOSH certified would be designated N95 masks and bear NIOSH certified markings.

### The Relationship Between Caridi and CHU

[21]    In February 2020, Caridi/TOKI engaged Blu Stella and Gesufatto to market healthcare products sourced by a third party, Mark Valentine ("Valentine") or a company owned by him, who was known to Caridi. Caridi provided Gesufatto with marketing materials for PPE, including respirator masks, received from Valentine to send to prospective purchasers.

[22]    On March 18, 2020, Boustani contacted Gesufatto as he had been advised that Gesufatto might be able to assist in providing PPE to CHU. That evening he received an e-mail from Gesufatto indicating that he could supply products directly from factories. The e-mail attached specifications and prices for hand sanitizer and KN95 masks. In respect of masks, the e-mail pictured a KN95 mask and a document in Chinese related to the N95 mask.

[23]    A further e-mail from Gesufatto on March 19, 2020 referred to the availability of KN95 masks that were compliant for Europe and of other KN95 masks that were compliant for USA/Canada as well as surgical masks and other PPE.

[24]    On March 23, 2020, Gesufatto sent a further e-mail (the "Gesufatto March 23 Email") which described both an "FDA Qualified: N95 Protective Mask" and an "FDA/CE/ISO/NIOSH

Certified N95 Respirator" for which NIOSH certification was said to be available. The e-mail contained a three-page attachment which referred to an "N95 8200 Respirator", contained several pictures of the mask with clear NIOSH markings, and included the statement that "NIOSH certification is also available with this model". The attachment also included a picture designed to illustrate that this mask was equal in quality to the 3M 8210 mask, which was a NIOSH certified N95 mask. As described below, some or all of this attachment was reproduced in later emails of Gesufatto.

[25]    Gesufatto also sent a further e-mail on the morning of March 24, 2020, which reproduced the two N95 masks shown in the Gesufatto March 23 Email but did not include the three-page attachment describing the N95 8200 Respirator.

[26]    Boustani says that he informed Gesufatto on or about March 25, 2020, that the masks he was offering were KN95 masks, not NIOSH certified N95 masks. There is no evidence of this alleged statement and no reason for it, given that, as of that date, Boustani /CHU were not focused on obtaining masks. It is also incorrect in respect of the N95 8200 Respirator which, moreover, Boustani sought to acquire the following day as described below. For these reasons, I do not accept this testimony.

[27]    By March 26, 2020, as a result of the onset of the COVID-19 pandemic, the Province of Quebec faced an imminent shortage of N95 masks. Because the Gesufatto March 23 Email indicated that he was able to source NIOSH certified N95 masks, Boustani contacted Gesufatto regarding this product.

[28]    As a result of this contact on March 26, 2020, Gesufatto sent an e-mail in the afternoon limited to the N95 8200 Respirator described in the Gesufatto March 23 Email. Gesufatto's email of March 26, 2020 (the "Gesufatto March 26 Email") included the content in the three-page attachment in the Gesufatto March 23 Email pertaining to this product, although reduced in size to one page.

[29]    After receiving this e-mail, Boustani called Gesufatto to ask how long it would take to deliver 3 million NIOSH certified N95 masks. Gesufatto advised that his contact, Caridi and his company "Tree of Knowledge", would be able to assist. He then initiated a conference call with Caridi, who confirmed his ability to supply the masks quickly but at a higher price than indicated in the promotional materials. Caridi also stated that a purchase order would have to be issued that day and payment made in full the following day. Caridi advised that, if these conditions were met, delivery would occur on March 28, 2020.

[30]    After this call, Boustani conducted a very cursory due diligence regarding Caridi and "Tree of Knowledge". Based on information that TOK Corp. was a publicly listed Canadian company of which Caridi was the chairman and which appeared to do business at the address supplied by Caridi, Boustani was content to contract with TOKI on Caridi's terms. Accordingly, he confirmed to Caridi that there was an interest in pursuing the transaction and that he would have CHU issue a purchase order.

[31]    In furtherance of this transaction, Gesufatto sent Boustani a further e-mail (the "Gesufatto Confirmation Email") in the evening, copying Caridi, which attached an invoice dated March 26, 2020, generated by or for Caridi under the letterhead of TOKI, which Caridi signed as chairman of TOK Corp. (the "Invoice").

[32]    The Gesufatto Confirmation Email read as follows:

> Hi Elie,
>
> Per our conversation with Michael Caridi please see details below.
>
> Description: **FDA/CE/ISO/NIOSH Certified N95 Respirator Mask**
>
> 3 million masks will be shipped out tomorrow morning to be delivered by Saturday, March 28, 2020 by end of day at:
>
> Trudeau Airport
>
> Romeo-Vachon Blvd N, Dorval, Quebec H4Y 1H1
>
> Confirmation of NIOSH Specifications and FDA Approved Facility.
>
> Cost: $3.72 USD per mask
>
> Shipping: $750,000 USD will adjust on confirmation of the tracking details.
>
> **Please issue PO to:**
>
> Tree of Knowledge International, Inc.
>
> Mr. Michael Caridi, CEO
>
> 32 Cutler Road Greenwich, CT 06831
>
> Invoice attached including bank wire instructions:

[33]    The Gesufatto Confirmation Email attached a document regarding FDA Establishment Registration of an unidentifiable entity in China and a further document that reproduced the content of the second and third pages of the three-page attachment to the Gesufatto March 23 Email in respect of the N95 8200 Respirator, although it is referred to as the KN95 8200 Respirator in one place. The Gesufatto Confirmation Email clearly refers, however, to the product being NIOSH certified.

[34]    The Invoice generated by TOKI described the product to be sold by TOKI as an "FDA/CE/ISO/NIOSH Certified N95 Respirator Mask". It contemplated "shipping for March 28" for arrival in Montreal at Trudeau Airport. Under the arrangements, the total cost of the 3 million

masks, at $3.72 per mask, was $11,160,000, plus taxes and shipping costs initially estimated at $750,000 but subject to adjustment for actual costs. The Invoice required a purchase order and payment by wire transfer of the full transaction cost of $11,910,000 on the morning of March 27, 2020. The Invoice included wire instructions for an account of TOKI at Chase Bank in the United States. In these Reasons for Judgment, all dollar amounts are in U.S. dollars except where otherwise indicated.

[35]    Throughout most of the course of this litigation, Caridi took the position that he also advised Boustani in this telephone call that the masks that he could deliver were KN95 masks that were compliant with NIOSH standards, that is, of equivalent quality, rather than NIOSH certified. It is quite possible that there was some imprecision in this conversation. However, Caridi's suggestion is not credible. I am satisfied that Caridi took away, or should have taken away, from his communications with Gesufatto and Boustani on March 26, 2020 that the N95 masks that CHU sought were NIOSH certified N95 masks for the following reasons.

[36]    First, as discussed below, there is no evidence that, before the communications, Caridi was advised by his supplier, Lee, that he could not supply masks meeting those specifications. There was therefore no reason for Caridi to state that he could only deliver masks that conformed to NIOSH standards. Second, the specifications in the Roncati March 26 Email (defined below) reflected Caridi's instructions to Roncati regarding the specifications of the product ordered by CHU. Lastly, the Invoice that was prepared by or for Caridi, as well as for the Gesufatto Confirmation Email under the cover of which the Invoice was sent and copied to Caridi, expressly called for NIOSH certified N95 masks.

[37]    There remains a question of how much Caridi understood regarding the nature of a NIOSH certified N95 mask and its significance for CHU. This issue is addressed in greater detail below.

[38]    Boustani forwarded the Gesufatto Confirmation E-mail and Invoice to CHU, who generated two purchase orders on March 26, 2020. These were delivered to Caridi later the same evening. Two purchase orders were required for reasons internal to CHU that are not relevant for this action. Corrected purchase orders were delivered to Caridi on the morning of March 27, 2020, to include the shipping cost. This correction is also not relevant.

[39]    The purchase orders were prepared in the French language by CHU. They described the seller as TOKI at its Toronto address. The product being sold, as translated, was described as an "N95 DTC3X high-capacity filtration face mask (MSSS reserve) USD NIOSH-certified". It is agreed that the reference to "DTC3X" was an error that resulted from using an earlier precedent of CHU. While Caridi suggests that he was misled by this reference, he did not articulate how he was misled or any consequences of this error. There is no suggestion that Caridi delivered DTC3X masks. It is also acknowledged that the DTC3X mask was an N95 NIOSH certified mask. In the absence of any evidence that Caridi was misled by this error, it is not relevant for the issues in this action.

[40]    The agreement between CHU and Caridi/TOKI for the purchase and sale of 3 million NIOSH certified N95 masks, collectively referred to in these Reasons for Judgment as the "Contract", is therefore constituted collectively by the Gesufatto Confirmation Email and attached Invoice together with the CHU purchase orders.  The transaction contemplated by the Contract is sometimes referred to herein as the "CHU transaction".

[41]    Boustani suggests that he asked Caridi, in their call in the evening of March 26, 2020, if he would be able to supply the masks by March 28. He says that Caridi advised him that he would be paying his supplier in full that evening in order to ensure that the masks would arrive by March 28, 2020. There is no evidence for this alleged statement of Caridi. It is also not consistent with business practice given the amount involved and the size and financial resources of TOK Corp/TOKI. For these reasons, I do not accept this evidence of Boustani.

[42]    On the morning of Friday, March 27, 2020, at 9:07 a.m., CHU transferred $13,693,522.50 by wire transfer to the Chase Bank account specified on the Invoice. This amount included the purchase price and estimated shipping costs, GST and QST. Chase Bank confirmed the receipt of the funds to Caridi at 12:12 p.m. that day. However, Chase Bank put a hold on the funds until the following Monday, March 30, 2020.

[43]    There is no explanation for the hold imposed by Chase Bank. It was not put in place at the request of CHU. Caridi suggested that Chase Bank took this action on its own because CHU's financial institution, the Federation des caisses Desjardins du Quebec ("Desjardins"), did not use the SWIFT network, but this was not established. Whatever the reason, there is no evidence that the delay in the availability of the funds to TOKI from Friday to Monday affected the timing of the arrangement reached between Caridi/TOKI and Lee/Roncati described below, except in one non-material respect described below. More importantly, there is no evidence that this delay had any causal connection with the inability of Lee' supplier(s) or manufacturer(s) to deliver NIOSH certified N95 masks. Accordingly, I see no basis for Caridi's argument that this lack of availability of funds provides a defense of some sort in his favour.

[44]    In the evening of March 27, 2020, Caridi advised Boustani by e-mail that he had received confirmation from his supplier that an Air China flight had been secured for delivery of 500,000 – 1 million masks leaving Shanghai on Sunday, March 29, 2020, at 11:00 a.m., with the balance to arrive shortly. As described below, there is no evidence that Caridi had ordered or paid for any masks as of March 27, 2020. There was therefore no basis in the evidence for this statement. Caridi also advised that there had been an "unprecedented amount of cancellations in China on a daily basis, which caused this delay". While the latter was probably correct, there is no basis in the evidence for connecting such cancellations in China with either the delay of one day or the reduced delivery amount.

[45]    As a result of this e-mail, Boustani and Julien, his superior, called Caridi on Saturday, March 28, 2020, to express their concern about the delay. Caridi assured them that the masks would arrive in a few days. As Caridi did not have any contract with Lee as of this date, there was

also no basis for this statement apart from any expectation Caridi may have held based on his conversations with Lee, which are not in evidence.

[46]    Julien says that he also required assurances that the masks being delivered were NIOSH certified N95 masks and that Caridi "stated that he was '100%' certain that the masks that would arrive were NIOSH certified N95 masks". To this point, there was no reason in the communications between Boustani and Caridi to believe otherwise and the pressing issue was the delivery date. However, Julien says he raised the issue because an increasing number of suppliers were having difficulty sourcing NIOSH certified N95 masks and many suppliers from China were attempting to sell KN95 masks in North America. In the absence of any testimony from Caridi to the contrary, I accept this evidence of Julien.

[47]    At or about 6:31am on March 29, 2020, Boustani received an e-mail from Caridi that included a screenshot of a Chinese declaration form for export intended to demonstrate that a shipment of 100,000 masks was en route, although not the 500,000 masks promised by Caridi on March 27, 2020. The declaration form referred to the masks being shipped as KN95 Respirator Masks.

[48]    Boustani called Gesufatto immediately, who arranged a call with Caridi. During that call, Caridi stated that the masks shipped were NIOSH certified N95 masks but were described as KN95 masks to clear Chinese customs. It is not possible to determine whether this call took place before or after the exchange of text messages between Caridi and Lee on the same morning, described below, in which Caridi requested a factory letter regarding compliance with NIOSH standards.

[49]    While I accept Boustani's evidence regarding this call in the absence of any denial from Caridi, I do not accept Boustani's further allegations that he was also repeatedly told by Gesufatto and Caridi that the masks being delivered were NIOSH certified N95 masks in "numerous further conversations over the following several days". There is no evidence of these conversations and no reason why Gesufatto, in particular, would be giving such assurance in any conversation that he had with Caridi and Boustani during this period.

[50]    I have therefore proceeded on the basis that the next significant event was a blank e-mail dated April 4, 2020, sent by Caridi to Boustani and headed "KN-95 Specifications", but without any attachment in the evidence before the Court. It appears from a reference in the Boustani e-mail described below sent in response on the same day that the attachment to this e-mail was a 3M document comparing the specifications of the 3M N95 respiratory mask with other masks including KN95 masks.

[51]    Boustani responded immediately to reiterate that the masks that were ordered were not KN95 masks and that KN95 masks were not certified by NIOSH and not approved by Health Canada as equivalent to NIOSH certified masks. He included an excerpt from the Gesufatto March 26 Email, which had a picture of the mask that he understood had been ordered – being item #3 FDA/CE/ISO/NIOSH Certified N95 Respirator for which NIOSH certification was said to be available. Boustani's e-mail of April 4, 2020, ended unequivocally by asking Caridi to "[p]lease

make sure that the masks are FDA/CE/ISO/NIOSH Certified N95 Respirator as indicated in your proposal, in your invoice and in my order".

[52]     Caridi responded with the following email to Boustani, the thrust of which is that the KN95 masks should be acceptable because they met or exceeded the N95 standards:

> Hi Elie,
>
> Fabio mentioned that the masks that came in may be some perceived differences with the original specifications, however, I wanted to clarify a lot of misinformation in the market.
>
> The KN95 is the same materials as the N95 and in our offering it mentioned KFDA or FDA, the KFDA standard is the KN95 and acceptable by Health Canada. Now also accepted by the U.S.
>
> 3M through its lobbying has tried to keep the KN95 out of the market place, but in reality meets or exceeds the same standards as the N95. Also, we requested Niosh specifically from our manufacturing group who furnished their certification in the below. Additionally, The Chinese Government has introduced new rigorous standards and has personally audited our facilities to ensure we meet all their new requirements, which we did.
>
> Please note that the KN95 are certified: GB2626-2006. Please keep in mind North American Hospitals typically use NIOSH N-95 (42 CFR Part 84) masks, however the Canadian Government is indicating these KN95 (GB2626-2006) as an alternative. You can see here on the Covid-19 procurement for Canada.
>
> KN95 has been approved by Canada and USA.
>
> https://buyandsell.gc.ca/specifications-for-COVID-19-products
>
> Thank you.
>
> Warm regards,
>
> Michael

[53]     From this email interchange, it is clear that, as of April 4, 2020 at the latest, Caridi understood that the masks that he was supplying were KN95 masks and that, whether or not they were substantially equivalent to some N95 masks, they were not NIOSH certified N95 masks. Conversely, Boustani was aware that Caridi was proposing that CHU accept KN95 masks.

Page: 11

[54]    I also note that there is no evidence before the Court to support the assertions in Caridi's second email of April 4, 2020, that the Canadian government was indicating that KN95 masks could be used as an alternative to NIOSH certified N95 masks, that "KN95 has been approved by Canada and USA" or that KN95 masks were acceptable to Health Canada.

[55]    On April 9, 2020, approximately 2,000 masks were delivered to CHU. A further approximately 154,000 masks were delivered on April 13, 2020 according to Boustani; Caridi suggests in total 160,00 masks were delivered. Caridi also advised that 240,000 masks would be delivered on April 14, 2020, with the potential for a further 400,000 masks to be sent later that day. The labelling of all of these masks identified the model as "KN95 (Non medical use)". The packaging of these masks stated that the manufacturer was "DongGuan MiaoMiaoLove Daily Necessities Co., Ltd." and were "Not for Medical Use".

[56]    Based on the materials provided by Daniel Caridi to Dr. Jose Bensoussan for his report, which is addressed below, it appears that these masks were accompanied by a "Certificate of Compliance" regarding compliance with European Community standards, test reports regarding compliance with European standards and Chinese standards for KN95 masks, an "FDA Registration Certificate" showing registration of the manufacturer, and certain other materials. The "FDA Registration Certificate" referred to various devices including one with a "proprietary name" of "KN95" and the following description under the heading "Device Name": "N95 respirator with antimicrobial/antiviral agent for use by the general public in public health medical emergencies."

[57]    On April 10, 2020, Roncati emailed Caridi under the re line "2000 masks" setting out details regarding a manufacturer named "Anhui Meihu Medical Supplies Technology Co., Ltd." including documentation suggesting that this manufacturer was registered with the FDA and that a device described as a "KN95 self-priming filter" was listed with the FDA. It is probable but not in evidence that Caridi provided this information to Boustani at this time. However, apart from the question of the significance and relevance of this documentation, there is no evidence that the masks delivered to CHU at this time were produced by this manufacturer.

[58]    On April 14, 2020, Caridi emailed Eric Blanchette-Ouellet, who was responsible for logistics in respect of the anticipated deliveries, advising that 160,000 masks had been delivered the day before and that a further 240,000 masks at a minimum and possibly as many as an additional 400,000 masks would be delivered that day.

[59]    On the same day, in the following email to Caridi ("the Kobrynsky Email"), Marc-Nicolas Kobrynsky ("Kobrynsky"), the Assistant Deputy Minister of Health for the Province of Quebec, responded to Caridi's email rejecting the delivery of any further KN95 masks in the following terms:

        Good morning, Mr Caridi, O'Rourke,

Please be aware that I have instructed Mr Blanchette-Ouellet and all the good folks at Robert Transport to refuse any further masks from your shipment until we are able to validate the quality of the masks you've sent us.

I thought that was made clear by Mr Boustani earlier, but it seems it's not the case.

As you are aware, we've purchased N95 from you, and you've sent us KN-95. You claim that these work as well. In my opinion, that's beside the point and I would have refused the whole shipment and asked for a refund. But Elie has convinced me to tests [sic] them to see if something could be salvaged out of this whole mess. Which is what we are doing now.

We will receive whatever you sent today, but will be put in quarantine like the rest of the shipment we've received earlier. That being said – I cannot be any clearer, no additional merchandise from you will be received at this point at Robert Transport. Any truck you send will be turned around.

We will advise once we've received the results of the tests.

Thank you for your understanding.

[60]    The Kobrynsky Email is ambiguous on the purpose of the tests "to validate the quality of the masks". The Email suggests that there was a prior conversation between Caridi and Boustani in which the suspension of the deliveries, and possibly the purpose of the tests, was discussed, but there is no evidence of any such conversation.

[61]    Boustani says the purpose was to determine whether the masks could be used outside of the healthcare sector in other institutions such as schools, jails, elder care facilities and police departments. Caridi says he understood from the Kobrynsky Email that the testing was for the purpose of determining whether the KN95 masks were equivalent to N95 masks and could be accepted as an alternative to the N95 masks that had been ordered. However, the language "to see if something could be salvaged out of this whole mess" is inconsistent with the concept of tests to validate the satisfaction of NIOSH certification standards. It is also inconsistent with the circumstances at the time. The KN95 masks delivered by TOKI on April 9 and April 13, 2020 were not NIOSH certified N95 masks and therefore were not compliant with the Contract. Boustani and Julien had made it clear on several previous occasions that they were insisting on compliance with the Contract. Caridi should have understood that, in this context, CHU had a much more limited purpose in arranging for the testing with IRRST. Caridi chose instead to believe without any justification, and without requesting any confirmation from CHU, that CHU was proposing to test the masks to determine if they could be accepted as NIOSH complaint even if they were not NIOSH certified N95 masks. That was his mistake. As discussed below, any consequences of that mistake must fall on Caridi/TOKI.

[62]    Caridi also says that, throughout the period until the commencement of this litigation, he awaited the results of the tests. He suggests that, as a result of this action, TOKI suffered considerable loss as it was unable to resell the masks that had been ordered and were delivered during this period. A counterclaim for such loss has, however, been withdrawn. This is addressed further below.

[63]    On April 23, 2020, prior to the receipt of any test results, a manager of accounting and reporting at CHU asked Desjardins to recall the funds that it had sent to TOKI, less $500,000 which had already been reimbursed in respect of Quebec sales tax. Desjardins was, however, unable to recall the funds.

[64]    On the evening of April 28, 2020, however, Caridi advised La Treille that a freeze had been placed on TOKI's bank account as well as the bank accounts of TOKI's partners, suppliers and clients. In this discussion, Caridi also told La Treille that all of TOKI's cash was tied up in inventory so that he could not reimburse CHU at that time but he would make a proposal for full reimbursement.

[65]    In an email of April 29, 2020 from Caridi to Kobrynsky, Caridi reiterated his demand that the freeze be lifted. In a further email on the same day, Caridi made a proposal for dealing with the arrangements between TOKI and CHU if the bank restrictions were lifted the following day.

[66]    La Treille responded to Caridi providing a summary of the key facts from his perspective, reiterating that the masks that were delivered were not the masks that had been ordered, and advising that CHU required full reimbursement of the monies paid to TOKI. He also advised that the masks had not passed testing conducted by the Ministry of Health, having been advised by Kobrynsky earlier that day that a sample had not passed certain spray tests and so were worthless and not reusable even by the general public. The letter ended with a specific statement that CHU was cancelling its order and would take all steps necessary to recover the monies it paid, although it was also open to seeking a mutually satisfactory solution if a proposal were made by Caridi.

[67]    Concurrently, La Treille confirmed in writing by email to Simon Giroux ("Giroux"), a senior investigator at Desjardins, that CHU had never instructed Desjardins or anyone else to freeze the accounts of "Tree of Knowledge" in connection with CHU's request to Desjardins to take steps to recover the monies paid to TOKI. The letter referred to a conversation the day before in which Giroux had advised La Treille that Desjardins had mistakenly suggested in the SWIFT information that Desjardins provided to Chase Bank that fraud was suspected. The La Treille email requested Desjardins to take the required steps to "rectify the situation" and to recover the funds. In a reply, Giroux indicated that the SWIFT message was corrected the day before and that Desjardins' banking correspondents were informed of this situation by email.

[68]    In a later email on the same day, Caridi stated that CHU needed to withdraw its request for the return of funds, failing which the freeze would remain in place. He reiterated an earlier proposal that, if the freeze were lifted, $1 million would be wired immediately "to show good faith" and a further $250,000 would follow the next day.

[69]    In a further email of the same day, La Treille informed Caridi of his communications with Giroux and his understanding that the accounts would be unfrozen shortly. He then suggested that a telephone call be arranged later that afternoon to discuss Caridi's proposal made the day before regarding repayment of the CHU monies.

[70]    The telephone call in the late afternoon of April 29, 2020 was attended by LaTreille, Boustani, Caridi and others. An email of LaTreille to Caridi on May 1, 2020, summarized the agreement reached in the meeting, the principal terms of which were as follows:

> 1.    TOKI would transfer $1 million that day or the next day, as soon as its bank allowed wire transfers;
>
> 2.    Caridi would provide CHU with samples of NIOSH certified N95 masks for review by May 7; if acceptable, he would deliver 1 million masks within 10 days of receiving a purchase order at the price of $3.72 per mask;
>
> 3.    Caridi would also deliver very shortly to CHU samples of N97 medical sterile masks for review by CHU; if acceptable, deliveries of these masks, at prices and on a schedule to be determined, would reduce the amount owing to CHU;
>
> 4.    Caridi would attempt to sell the KN95 masks already delivered to CHU with the proceeds to be paid to CHU and applied against the amount owed to CHU; and
>
> 5.    A minimum payment of $1 million would be made every 10 days, commencing May 4, 2020, to be applied against the outstanding amount owing to CHU.

[71]    Caridi confirmed the terms of this arrangement by email on May 6, 2020. Caridi alleges that he entered into this arrangement under duress as a result of the freeze order, which had held up delivery of other PPE that Caridi/TOKI had contracted to supply to other customers in the United States. He did not, however, assert this position until after this litigation was commenced.

[72]    On May 5, 2020, the payment of $1 million contemplated by this arrangement was paid. Two equal payments of $500,000 were also made on May 14 and May 15, 2020. No further payments were made after that date.

[73]    CHU rejected the N97 masks provided by Caridi as unacceptable, without objection from Caridi in his email exchange with Boustani on this issue. While Caridi picked up the KN95 masks that had been delivered to CHU, no proceeds of sale were ever remitted to CHU as contemplated by the arrangement. In addition, Caridi never delivered any NIOSH certified N95 mask samples to CHU despite representations on several occasions that they would be provided.

[74]    On June 18, 2020, counsel for CHU delivered a letter to Caridi on behalf of TOKI which, among other things, demanded receipt of 30 samples of N95 masks allegedly held in Toronto and payment of $2 million by wire transfer within four business days, failing which CHU would commence legal proceedings. As these demands were not satisfied, CHU commenced this action by a Statement of Claim dated August 6, 2020.

### The Relationship Among Caridi, Roncati and Lee

[75]    From the foregoing, CHU would reasonably have expected that Caridi/TOKI were dealing directly with Chinese manufacturers or suppliers of N95 masks, although Caridi never made his source of masks clear. In fact, Caridi was dealing with and relying on Lee, who represented that he had relationships in China that could arrange for the supply of masks. The following sets out the limited evidence before the Court concerning the relationship among Caridi/TOKI, Roncati/Athletix and Lee.

[76]    Lee was a Chinese American businessman known to Roncati but unknown to Caridi. Apparently, Roncati knew Lee in connection with various property transactions that Mr. Lee had entered into in the United States. As mentioned, Roncati also says that Lee was a significant client of Roncati's architectural firm.

[77]    On March 21, 2020, while Blu Stella/Gesufatto were marketing PPE on behalf of Caridi/TOKI to various parties including Sigma Santé/CHU, Roncati introduced Caridi to Lee by way of a telephone call.

[78]    I think it is likely that Caridi, Roncati and Lee spoke on a daily basis between March 21 and March 29 or March 30, as Roncati suggests, initially regarding opportunities for the supply of PPE in general and, after Caridi obtained the Contract from CHU on March 26 which had to be filled immediately, regarding the sale of masks in particular. However, there is very little evidence regarding any of the discussions among or between Caridi, Lee and Roncati. This is principally because most of such discussions were oral and no notes were produced, if any were taken. In addition, Caridi refused to answer questions regarding his relationship with Lee on discovery and put forward only minimal evidence on this relationship at trial.

[79]    The evidence of Roncati and Caridi is that, in the telephone call of March 21, 2020, Lee advised Caridi that he had a Chinese source that could deliver PPE including masks quickly and could provide Caridi's "requirements" within the cost parameters that Caridi had given Roncati. It remains unclear whether Lee's source was a manufacturer or another intermediary.

[80]    On March 26, 2020, at or about the time of finalizing the CHU order, Caridi decided to change suppliers from Valentine to Lee. He says he did so because of Valentine's requirement for payment of the full amount of Caridi's order up-front to a Chinese supplier, which would have left Caridi with no recourse to recover the funds if the Chinese supplier failed to deliver the contracted masks. Caridi says he took comfort from the fact that Lee had extensive property holdings in the United States which would have permitted recovery under such circumstances. Caridi did not tell

Sigma Santé or CHU of his decision to go with a supplier who was not the supplier whose marketing materials Boustani had seen and upon which the CHU order was based.

[81]    Caridi relied upon Lee based on Roncati's introduction. Based on Roncati's representation that Lee owned a licence for UnionPay, which was said to be owned by the Chinese government, Caridi concluded that Lee had to have "high connections in China". Caridi did not undertake any due diligence to determine Lee's source(s) for the masks to be ordered, the quality of the masks being ordered, the certification of the masks to be supplied under the NIOSH regime, or the reliability of Lee or his Chinese source(s) for PPE.

[82]    Roncati and Caridi also say that, in their introductory call on March 21, 2020, they discussed Caridi's specific "requirements", being the need to deliver 3 million NIOSH certified N95 masks for a customer in Eastern Canada. I am satisfied that a conversation occurred amongst these three individuals concerning the provision of 3 million masks. However, it is unlikely that this conversation occurred on March 21 as the CHU order did not materialize until March 26, 2020. It is more likely that this conversation occurred on or shortly after the latter date.  More significantly, however, there is no evidence as to how detailed the discussions were regarding product specifications, and no evidence that Caridi specifically asked Lee whether his suppler(s) would deliver NIOSH certified N95 masks or that Lee made any such statement.

[83]     It is not possible to determine whether this conversation occurred before or after Roncati sent an email to Lee in the evening of March 26 (the "Roncati March 26 Email"), after Gesufatto sent the TOKI Invoice to CHU. The Roncati March 26 Email reflects the specific details of the CHU order – 3 million N95 respirator masks for immediate delivery by Saturday March 28 in Montreal. The Email specifically states "NIOSH/FDA approved; Provide certification (see attached)". The attachment is a copy of the second page of the three-page attachment to the Gesufatto March 23 Email pertaining to the N95 8200 Respirator offered in that Email, which contains specific NIOSH markings on the mask and provides "NIOSH certification is also available with this model." This product was offered in the marketing materials provided by Valentine to Caridi. It is not the product that Lee delivered.

[84]    The purpose of the Roncati March 26 Email is unclear. It appears to set out the principal details of the CHU order for the information of Lee. There is, however, no evidence that this Email was intended to form the basis of a contract between Caridi and either Roncati or Lee at this time. Caridi says that Lee confirmed to Roncati, and Roncati confirmed to Caridi, that Lee's supplier(s) could deliver masks that met the specifications in the Roncati March 26 Email. This is addressed further below.

[85]    I note for the sake of completeness that Roncati also sent Caridi an earlier email on March 26, 2020 which reproduced a 2018 document that described a streamlined regulatory procedure for obtaining NIOSH certification in the United States for N95 respirator masks. The source and purpose of this document is unknown.

[86]    In a text exchange of March 29, 2020 between Caridi and Lee directly, dealing with shipping arrangements and documentation, Caridi included the following request: "please have factory email the letter to us that the N95 respiratory mask is FDA, CE and made to NIOSH standards." Lee replied to this request, "the FDA certificate its [sic] come with it." As discussed below, the FDA certificate referred to by Lee that was attached to the Athletix Agreement was not evidence of NIOSH certification. I note that this exchange took place before the meeting in Roncati's office among Caridi, Lee and Roncati at which the arrangements between Caridi/TOKI and Roncati/Lee were agreed to. As mentioned above, its relationship to the call among Caridi, Boustani and Gesufatto on the same day is unclear.

[87]    Roncati says that Caridi's order for 3 million N95 masks was placed with Lee on March 28 or March 29, 2020. This is reflected in an agreement between TOKI and Athletix which is dated March 28, 2020 (the "Athletix Agreement"). In fact, however, it is probable that Caridi and Lee did not reach agreement on the terms of the TOKI order until a meeting on March 29, 2020, among Caridi, Roncati and Lee, held in Roncati's office and that the Athletix Agreement was signed at or shortly after that meeting.

[88]    The recital of the Athletix Agreement provided for the purchase and sale of "N95 face masks". Section 2 of the Agreement refers to the sale by Athletix to TOKI of 3 million units of a product specified in an attachment at a price of \$2.30 per unit with payment upon confirmation of shipment. The contents of the attachment are described below. The Agreement contemplated an initial shipment of 100,000 masks on March 29, 2020 for delivery estimated to be the following day, Monday, March 30, 2020. The Agreement expressly provided however that the parties understood that delivery was "subject to worldwide COVID19 pandemic and international rules, restrictions and regulations" and that "[a]dditional deliveries are planned every day or so to follow subject to air freight capacity and availability."

[89]    Caridi has offered minimal details of the meeting on March 29, 2020, and few are otherwise in evidence. However, it is probable that Lee wanted a deposit which delayed agreement on the TOKI order. In this regard, TOKI's inability to access the moneys sent by CHU until Monday, March 30, 2020, undoubtedly presented a problem for Caridi. Ultimately, it appears that Lee agreed at this meeting to the initial shipment of 100,000 units referred to in the Athletix Agreement without payment of a deposit.

[90]    Caridi also produced an undated invoice of Athletix to TOKI for 500,000 units of N95 masks at \$2.30 per unit, to be shipped on March 30, 2020. This invoice is attached to a supplemental affidavit of Roncati sworn September 25, 2023. Caridi found this invoice and provided it to Roncati, who says that he remembers creating it after the meeting on March 29, 2020 based on notes he took at that meeting. I note that the arithmetic does not reconcile, suggesting that something is missing that was part of the arrangements. However, the invoice does reflect the fact that Lee did not think he could arrange more than 500,000 masks at that time. It also reflects an "Advance Deposit" of \$690,000, which corresponds to a payment to Athletix out of the TOKI bank account on March 30, 2020, although there is no explanation for a further payment to Athletix

of $920,000 on the same day. Caridi did not communicate the fact that the order was limited to 500,000 masks at this time to Sigma Santé.

[91]    In summary, therefore, the evidence indicates that Lee committed to arranging for shipping of 100,000 masks on or about March 29, 2020 and a further 500,000 masks shortly thereafter against payment for all of the 600,000 masks on March 30, 2020. The arrangements for future deliveries of the remaining 2,400,000 masks are not in evidence.

[92]    Roncati claims that the involvement of Athletix in respect of the sale transaction contemplated by the Athletix Agreement was that of an escrow agent rather than a seller. He says this arrangement was requested by both Lee and Caridi because they had no prior association and therefore each wanted financial arrangements that protected themselves. The language of the Athletix Agreement is, however, that of a sale. As no further details of the financial arrangements among Caridi, Lee and Roncati are in evidence, it is not possible to determine the nature of the involvement of Athletix. However, I do not think that the characterization of that involvement has any significance for the issues in this action. Whether Athletix was a seller, a principal in a pass-through transaction or merely an escrow agent, Caridi's case rests on his reliance on Lee to provide masks that satisfied the CHU order.

[93]    On the other hand, the terms of the Athletix Agreement are relevant in a different context. The Agreement states that "the Purchaser has reviewed the specifications provided by the Seller and approves accepts same" and "is relying on the affirmations and certification provided by the Manufacturer with respect to applicable testing and certification."

[94]    The attachment to the Agreement contains a picture of a mask that is packaged as a "kn95" mask and has none of the markings required for a NIOSH certification. This mask is not the mask in the picture appended to the Roncati March 26 Email. In addition, and more significantly, it is not the mask whose picture was attached to the Gesufatto Confirmation Email nor is it a picture of any of the PPE offered to Sigma Santé/CHU by Blu Stella/Gesufatto. The attachment also included a picture of a box labelled "N95" with all other printing on the box in Chinese and no NIOSH markings. The specifications included in the attachment were in Chinese. The attachment also included pictures of two documents entitled "Verification of CE Registration" and "FDA Certificate of Registration" for an unnamed manufacturer or more likely two different manufacturers, given different locations in China. Roncati says that the attachment was provided to him by Lee as the product that Lee would be supplying, which I accept as there is no other evident source.

[95]    Accordingly, from the Athletix Agreement, if not from earlier discussions with Lee, Caridi was aware that Lee proposed to supply masks that were not the masks that Sigma Santé/CHU had ordered and that, while packaged as N95 masks, did not have any markings or other evidence of NIOSH certification and were described in the description/specifications as "kn95" masks.

[96]    On March 30, 2020, Roncati emailed Lee (the "Roncati March 30 Email") enumerating various documentation required in respect of a proposed shipment of masks. This Email was sent

by Roncati at Caridi's direction. The Roncati March 30 Email does not, however, refer to a specified shipment of a particular quantity of masks. It refers simply to N95 masks and requests copies of the manufacturer's "FDA facility approval certification and CE facility approval certification" and mask testing data if they have it. It also states that the Canadian buyer is requesting a letter on the manufacturer's letterhead that included language that "the masks are produced to NIOSH standards" and adds "If they don't want to mention NIOSH they still need the letter." [underlining in original] There is no explanation for the underlined phrase in the Email. However, it is significant that the Roncati March 30 Email was sent the day following Boustani's call to Caridi regarding the reference to 100,000 KN95 masks in the Chinese export declaration form described above. A further email of March 31, 2020 included the following similar request from Caridi: "please have factory send letter confirmation of FDA, CE and all N95 are made to Niosh specs."

[97]    There is no further documentation in evidence of relevance for the relationship among Caridi/TOKI, Roncati/Athletix and Lee.

**The Evidence of the Receiver**

[98]    On December 16, 2020, in a motion brought by CHU in this action (the "Mareva Motion"), Grant Thornton Limited (the "Receiver") was appointed as an investigative receiver of TOKI pursuant to an order of Koehnen J., whose order also included Mareva injunctive relief against Caridi, TOKI and TOK Corp. (the "Mareva Injunction Proceeding"). The Receiver has filed four reports and an affidavit of Robert Stelzer ("Stelzer"), who acted for the Receiver in this matter.

[99]    For present purposes, the Receiver's evidence that is principally relevant is his reporting regarding the transactions in March, April and May in the TOKI bank account at Chase Bank that received the CHU payment for the Contract price. The Receiver's reports and the evidence of Stelzer are the only evidence before the Court regarding these transactions. This evidence can be summarized as follows.

[100]   The Receiver examined the TOKI bank statements for the period March 1, 2020 to November 30, 2020. The opening and closing balances in these accounts totalled approximately $5,000 in each case. Receipts during the period totaled $13.1 million of which $11.2 million was the net receipt related to the CHU transaction. The additional receipts were represented by three receipts from Manufacturers & Traders Trust ("MTT") totaling $743,750 in April 2020 and three receipts in respect of Fortis Medical Products LLC ("Fortis") totaling $1,147,500 in May 2020. The amounts received in respect of these two parties were, in turn, disbursed for the purpose of purchasing PPE sold by TOKI to third parties in transactions apparently engaged in during April and May 2020 respectively. Total disbursements during this period were $12.9 million. Only disbursements over $500,000 were analyzed by the Receiver.

[101]   Of the $11.2 million net receipts relating to the CHU transaction, the Receiver identified disbursements totaling $8.3 million that appear to be directly related to the CHU transaction, of which $1,105,072 was paid to Caridi and $41,691 was paid to Daniel Caridi. The disbursements

also included payments to Athletix ($3,375,020), Shenzhen Qiyuie Trading Co. Ltd ($2,259,000), Blue Stella ($815,251, of which $744,001 related to the CHU transaction), Easton Equities ($784,000), which is understood to be owned by Lee, and Ya Zhou ($400,000), which the Receiver believes is also related to the CHU transaction.  Essentially, the difference between the $11.2 million net receipts and the identified disbursements of $8.3 million, or approximately $2.9 million, represents monies that were disbursed out of the CHU payment monies for purposes unrelated to the CHU transaction. Of this amount, the Receiver has identified three payments totaling $1.475 million which appear to relate to transactions for the purchase and sale of PPE to third parties. The Receiver has also identified a payment of $973,765 which it believes relates to the sale of PPE which was funded by the Fortis payment. The Receiver believes the balance is represented by payments that fall below the $50,000 threshold it applied for its review which were therefore not examined.

[102]   Accordingly, the Receiver has concluded that the $11.5 million of disbursements analyzed by the Receiver (being the 10 largest disbursements) can be categorized as follows:

> 1.    disbursements totalling $8.3 million directly related to the CHU transaction;

> 2.    disbursements totalling $1.475 million, funded using the monies paid by CHU but not directly related to the CHU transaction, related to PPE transactions involving third parties; and

> 3.    disbursements totalling $1.7 million unrelated to the CHU transaction and funded by receipts from third parties.

[103]   While it is not possible to relate specific receipts and disbursements with specific transactions for the purchase and sale of PPE to third parties in which TOKI engaged during the relevant period for this action, being March 1, 2020 to June 30, 2020, it is possible to draw the following conclusions:

> 1. As mentioned, Caridi received at least $1,105,072 effectively out of the monies paid by CHU;

> 2. Caridi/TOKI engaged in other PPE purchase and sale transactions with third parties during the period and effectively used the remaining CHU monies as working capital in respect of these other unrelated transactions; and

> 3.    The approximately $2.9 million that was disbursed out of the CHU payment monies for purposes unrelated to the CHU transaction was reduced to the extent that TOKI was unable to collect payment in respect of these additional PPE transactions, as was the case in respect of a transaction involving an Ottawa Hospital and possibly other third parties. In this regard, the financial statements of TOKI included an account receivable of $1.1 million (Cdn.) from Onyx Platinum Development Inc. ("Onyx") which supplied gowns to an Ottawa Hospital. Onyx apparently defaulted on this account receivable.

[104]  The question of CHU's loss is more complicated given TOKI's involvement in the importation and sale of other PPE, some of which was also sold to CHU and the remainder of which was sold to third parties. The Receiver's reports attempt to establish the mask inventory of TOKI as of the end of 2020 and to identify the TOKI transactions involving the importation and sale of masks in particular.

[105]  The Receiver reported in its second report that it understood from Caridi that TOKI received a total of 2 million masks in North America plus 670,400 masks which were sent to CHU, were subsequently repossessed by TOKI, and then were stolen by an unidentified third party. A further 330,00 masks were reported to be in China, for a total of 3 million masks. Ultimately, this number was revised downward to 1,499,450 masks in North American warehouses to which would be added the 330,000 masks said to be stored in a warehouse in China and the 670,040 masks that Caridi says were stolen for a total of approximately 2.5 million masks. I note that the figure of 670,400 masks delivered to CHU and subsequently repossessed by TOKI cannot be reconciled with the evidence in the record in this action.

[106]  More importantly, Caridi and Lee were offered, but declined, the opportunity to submit an offer to purchase the 1,499,450 masks warehoused in the United States (apparently none were stored in Canada). The Receiver then engaged a liquidator who included the masks in an auction with other PPE in late June 2021. No bids were received for the masks in the auction. Given the storage costs owed to the warehouses and the low value attributed to the masks at that time, the Receiver elected not to take possession of the masks and instead abandoned them.

[107]  Accordingly, the Receiver's reports indicate that, of the monies paid by CHU under the Contract to TOKI, TOKI paid a total of $8,896,785 at the direction of Athletix according to Caridi. Of that amount, the Receiver determined that $6,818,020 in total was applied toward the purchase of approximately 2,500,000 masks which ultimately had no value.

**Observations and Findings**

[108]   The following observations and findings are relevant for the conclusions reached in this Judgment.

### Credibility of the Parties/Witnesses

[109]   I have the following observations regarding the witnesses which have informed my approach to their evidence.

#### Elie Boustani

[110]   Boustani was the central figure in the negotiation of the Contract and the principal contact between Sigma Santé/CHU and Caridi. As such, he was undoubtedly in a difficult position, having recommended a transaction, involving immediate and full payment on an unsecured basis to an unknown party after limited due diligence, that did not proceed as intended. Perhaps for this reason, but in any event, his affidavit evidence included a number of allegations identified above that were

not credible and therefore diminished the reliability of his testimony. I have therefore generally restricted my findings regarding the misrepresentations on the part of Caridi alleged by Boustani to those supported by documentation and the context.

### Conrad Roncati

[111]  I do not find Roncati to be credible except to the extent that there is documentation supporting his evidence. Roncati's principal affidavit, sworn September 14, 2023 (the "Roncati Affidavit"), was basically limited to documentation provided to him by Caridi and statements that he purported to make on behalf of Lee, in an apparent attempt by Lee and Roncati to avoid the direct involvement of Lee in this action. It was also evident that Roncati's principal objective as a witness was to avoid any significant personal involvement and to preserve his personal relationship with Lee.

[112]  Roncati's evidence on several specific issues was unreliable for different reasons. His memory of when Caridi/TOKI reached an agreement with Roncati/Lee for the placement of orders with Lee or his supplier(s) or manufacturer(s) in China was inconsistent with the rest of the evidence. I also do not accept his testimony that he never received a telephone call from a representative of the Receiver given the nature of the Receiver's mandate and the Receiver's obligations to the Court. In addition, Roncati's failure to recall litigation in which he was named as a defendant with Caridi was not credible, even if the litigation was ultimately resolved satisfactorily from his perspective.

[113]  I would observe however that, because of the absence of any significant evidence from Caridi or Roncati, and of any evidence from Lee, regarding the nature of the relations among them, there is a very large "black hole" in this case. At a minimum, that evidence would likely have explained the respective understandings of these individuals regarding what was intended to be delivered to CHU and, in particular, how and when the disconnect between what CHU ordered and what was delivered arose.

### Anthony Lee

[114]  As mentioned, Lee was not a witness in this trial. Instead, he asked Roncati to relay certain comments on matters by means of statements in the Roncati Affidavit. Lee's comments broadly covered five topics – that he paid Caridi for "consulting services relating to logistics and FDA compliance", that he identified suppliers capable of providing masks manufactured in compliance with NIOSH standards designated as KN95 masks, that he told this to Caridi, that documentation and test results confirming this were delivered at the time of shipment, and that his accounts were also frozen at Chase Bank which caused him loss.

[115]  Lee's comments, as relayed by Roncati, are hearsay. I have taken them into consideration only insofar as there is documentation that supports these statements. On the principal issue of whether Caridi agreed to provide NIOSH certified N95 masks or KN95 masks that were manufactured in compliance with NIOSH standards, it is clear that Lee could not and did not

arrange for the supply of NIOSH certified N95 masks, which became known to Caridi at some point, as discussed below. The issue of what Caridi was told by Roncati/Lee is addressed in greater detail elsewhere based on the documentation before the Court.

### Michael Caridi

[116]  Caridi's evidence presents a unique problem. As CHU emphasizes, throughout the entire pre-trial period through the trial, Caridi's position was that CHU had contracted for KN95 masks that were manufactured to NIOSH standards rather than NIOSH certified N95 masks. He then changed his position on the last day of the evidentiary portion of the trial with the introduction of a further affidavit of "additional information" sworn October 10, 2023, which he alleged demonstrated that he ordered NIOSH certified N95 masks and was let down by Lee and his supplier(s) or manufacturer(s). Caridi did not offer any explanation for this change of position. Further, in his testimony, he sought to maintain both positions as illustrated below. In view of the inconsistency in Caridi's testimony, I have also relied principally on the documentation in evidence and the context as the basis for my conclusions regarding his actions.

### **The Evidence Regarding the Masks Delivered to CHU**

[117]  As mentioned, 2,000 KN95 masks and a further approximately 154,000 KN95 masks were delivered by TOKI to CHU on April 9 and April 13, 2020, respectively. The following summarizes the principal findings regarding these masks.

### *Were the Delivered KN95 Masks NIOSH Certified?*

[118]  There are no pictures in evidence of the masks that were delivered to CHU on April 9 and April 13, 2020. I conclude that the masks that were delivered to CHU in April 2020 were not NIOSH certified N95 masks based on the absence of any evidence of NIOSH certification regarding these masks and the following evidence that the masks were marketed as KN95 masks that were not NIOSH certified.

[119]  First, to the extent that the masks delivered were the same as the masks described in the Athletix Agreement, there is no evidence that those masks were NIOSH certified N95 masks. The attachment to the Athletix Agreement includes materials that are principally in Chinese. However, the attachment includes a picture of a mask labelled "kn95" without any NIOSH markings. In addition, the attachment included a document entitled "Certificate of CE Registration" ("CE" is understood to refer to the European Community) and a further document entitled "Certificate of Registration" referring to "FDA Establishment Registration" and "Device Name" in respect of, among other things, an N95 protective mask.  As discussed below, this is not evidence of NIOSH certification.

[120]  Second, there is no evidence in any of the various materials, including test results, regarding the masks which Lee suggested in his emails with Caridi that his manufacturer(s) or supplier(s) could deliver that any of such masks were NIOSH certified, other than the "3Q" masks referred to subsequent to the deliveries to CHU.

[121]   Second, while Lee suggested in his text message to Caridi on March 29, 2020 that an "FDA Certificate" was evidence of NIOSH registration or compliance of the masks that were to be delivered, that was incorrect. Cohen's evidence was that this form of certificate was not an FDA document, as the FDA does not issue such a document. Cohen also testified that the FDA was not involved in quality assessment of masks, such as those delivered to CHU, which were not for medical (i.e. surgical) use. The "FDA Registration Certificate" attached to the Athletix Agreement and the similar certificate(s) apparently received with, or at least in respect of, the KN95 masks that were delivered to CHU on April 9 and April 13, 2020, were merely statements of a third party that the indicated manufacturers were shown as registered on a public database maintained by the FDA. However, this registration with the FDA for marketing purposes was not evidence of NIOSH certification or compliance with NIOSH standards.

[122]   Lastly, In the Chinese export declaration form described these masks as KN95 masks, not N95 masks let alone NIOSH certified N95 masks.

### *Were the KN95 Masks NIOSH Compliant Although not NIOSH Certified?*

[123]   In his evidence, Caridi sought to establish that the masks delivered to CHU satisfied the standards for a NIOSH certified mask on two bases. While this is not relevant for purposes of the CHU's claim in deceit or CHU's allegation of breach of contract, it is relevant for the determination of CHU's loss.

[124]   As mentioned, in his email to Caridi on April 29, 2020, in which CHU cancelled the contract, La Treille advised that the masks delivered to CHU "do not perform to the minimum standards required by us to have any use for them". In making this statement, La Treille relied upon two test reports dated April 21, 2020 (collectively, the "IRSST Test Report") conducted by a testing/research entity referred to "IRSST".

[125]   Caridi challenged the tests conducted for CHU by IRSST, noting in particular that the IRSST Test Report was marked draft and was not signed. However, CHU did not rely on the IRSST Test Report as evidence that the KN95 masks failed to comply with NIOSH standards as IRSST did not purport to conduct tests to determine if the masks met NIOSH specifications. In any event, for his part, Caridi did not demonstrate that the masks supplied to CHU met NIOSH standards. In short, neither the IRSST Test Report nor the test results and documentation delivered in respect of the masks supplied to CHU were useful in this regard with the possible exception of the filtration effectiveness described below which supports the conclusion that the masks did not meet NIOSH standards.

[126]   Dr. Jose Bensoussan ("Bensoussan"), a witness for Caridi, testified as a non-expert witness with regard to the IRSST Test Report.  He raised several issues respecting the testing. As Bensoussan's report was late filed, Bensoussan's evidence was admitted without objection from CHU on the basis that CHU could examine Cohen on his views of the documentation referred to, and issues raised, by Bensoussan.

[127]   Considered as a whole, the relevant evidence on these matters can be summarized in the following three statements. First, even if the KN95 masks supplied to CHU met the European standards, as the "Certificate of Compliance" suggests, they would not have met NIOSH standards. Second, insofar as the IRSST tested the KN95 masks as a barrier mask, that is, to stop the spread of infectious agents by the wearer of the mask, the testing was not relevant for masks in a healthcare setting. Third, the filter material of the mask was only effective in removing 40-50% of particles, not the 80% required for a medical mask or 95% for an N95 mask.

[128]   The foregoing evidence establishes that the KN95 masks delivered to CHU did not comply with NIOSH standards. The evidence, particularly the evidence regarding the removal of particles, also supports the position of CHU that the masks had no resale value even at the time of their delivery to CHU.

[129]   Caridi also tendered certain documentary evidence intended to suggest that, for Canadian purposes, manufacturers were permitted to self-certify that their masks met NIOSH specifications. In his principal affidavit, Caridi further stated that "as per Canadian law, the manufacturers self-certified that they were making the masks [delivered to CHU] to NIOSH standards." However, even if manufacturers were purporting to self-certify KN95 masks as NIOSH compliant masks, which was not established, Caridi did not establish that any such self-certification rendered the masks received by CHU compliant with NIOSH standards under Canadian regulations.

[130]   In addition, Caridi suggested that an emergency authorization of the FDA allowed the importation and use of KN95 masks in the United States. Although there apparently was an emergency authorization initially covering 85 manufacturers, that number was revised down to 25 after testing demonstrated "unreliability and poor quality" of the other 60 masks. The evidence before the Court did not establish that the KN95 masks delivered to CHU were covered by either the initial authorization or the revised authorization.

[131]   In summary, therefore, there is no evidence that the masks delivered to CHU on April 9 and April 13, 2020 were compliant with NIOSH standards and there is evidence that establishes on a probability standard that they were not compliant.

### The Understanding of Roncati and Lee Regarding NIOSH Certification or NIOSH Compliance of the Masks to be Supplied

[132]   There is very little evidence on the question of whether Lee and Roncati understood that the masks to be supplied by Lee's supplier(s) or manufacturer(s) were to be NIOSH certified or complaint with NIOSH standards.

[133]   I accept Caridi's statement that he communicated CHU's specifications of NIOSH certified N95 masks to Lee. As noted above, the Roncati March 26 Email reflected the specific details of the CHU Order – 3 million N95 respirator masks for immediate delivery by Saturday March 28 in Montreal. The Email specifically stated "NIOSH/FDA approved; Provide certification (see attached)". Attached to this email was a copy of the second page of the three-page attachment to

the Gesufatto March 23 Email pertaining to the N95 8200 Respirator offered in that Email, which contained specific NIOSH markings on the mask and provided "NIOSH certification is also available with this model."

[134]   However, all subsequent communications involving Lee or Roncati addressed N95 masks that conformed to NIOSH standards rather than N95 masks that were NIOSH certified.

[135]   As discussed above, there was no mention of NIOSH certification in the Athletix Agreement. Section 2 of the Agreement referred to the sale by Athletix to TOKI of 3 million units of a product specified in an attachment, which contained a picture of a mask that was packaged as an N95 mask but had none of the markings required for a NIOSH certification. This mask is also not the mask in the picture appended to either the Roncati March 26 Email or the Gesufatto Confirmation Email. The texts that were exchanged between Caridi and Lee on March 29 and March 31, 2020 included requests from Caridi for evidence that the masks were made to NIOSH standards. The first Caridi text included a request that the "factory email the letter to us that the N95 respiratory mask is FDA, CE and made to NIOSH standards." Lee replied to this text by stating "the FDA certificate it's come with it" which suggests that Lee considered that FDA registration constituted evidence of NIOSH compliance rather than NIOSH certification. The second included the request that Lee arrange to have the "factory send letter confirmation of FDA, CE and all N95 are made to Niosh specs." There is no reply to this text message in evidence.

[136]   Similarly, the Roncati March 30 Email, which referred to N95 masks and listed various documents required in respect of a proposed shipment of masks, requested copies of the manufacturer's "FDA facility approval certification and CE facility approval certification" and mask testing data if they have it. It also stated that the Canadian buyer was requesting a letter on the manufacturer's letterhead that included language, among other things, that "the masks are produced to NIOSH standards". No factory letter or manufacturer's letter was ever received in response to these requests.

[137]   In addition, according to Roncati, the subject of the transaction among himself, Caridi and Lee was understood to be N95 masks that conformed to NIOSH standards rather than NIOSH certified N95 masks. This was also the substance of the comments that Lee wished Roncati to communicate in the Roncati affidavit, although I note the limited probative value of these statements as they constitute hearsay.

[138]   From the foregoing, I conclude that, notwithstanding the communication of the requirement for NIOSH certified N95 masks under the Contract with CHU, Roncati and Lee proceeded, with whatever knowledge of the difference between such masks and KN95 masks that they had, on the basis that the transaction with Caridi would involve masks that the Chinese manufacturer described as KN95 masks and that were alleged to conform to NIOSH standards but were not NIOSH certified N95 masks. I address Caridi's knowledge in the next section.

### Caridi's Understanding of the Masks to be Delivered

[139]   An important issue in this trial is whether Caridi acted recklessly in representing the product that he could supply to CHU at and after the time that he caused TOKI to enter into the Contract with CHU. In the particular circumstances of this case, this issue requires consideration of at least three separate if related questions: (1) whether Lee confirmed or advised that his supplier(s) or manufacturer(s) would deliver NIOSH certified N95 masks; (2) the extent of Caridi's knowledge that Lee's supplier(s) or manufacturer(s) would not be delivering NIOSH certified N95 masks; and (3) Caridi's knowledge of the difference between NIOSH certified N95 masks and KN95 masks and of the significance of the difference to CHU and therefore for the performance of the Contract. I propose to address each question in turn.

#### Whether Caridi Received Confirmation that the Masks to be Delivered would be NIOSH Certified N95 Masks

[140]   Caridi alleges that Lee advised him that his supplier(s) or manufacturer(s) would deliver NIOSH certified N95 masks. However, there is no evidence that Lee ever advised or confirmed to Caridi that his supplier(s) or manufacturer(s) would deliver masks that were specifically NIOSH certified N95 masks as opposed to manufactured to NIOSH standards. In this regard, the following considerations are relevant.

[141]   First, and most importantly, any such confirmation would be inconsistent with the finding above that Lee proceeded on the basis that the transaction with Caridi would involve masks that the Chinese manufacturer described as KN95 masks and that were alleged to conform to NIOSH standards but were not NIOSH certified N95 masks. If, as appears most likely, Lee believed that there was no significant difference between the KN95 masks and the masks CHU ordered, there would have been no reason to bring the difference to Caridi's attention unless and until CHU objected to the delivery of KN95 masks.

[142]   Second, while, as described above, Lee advised Caridi that he could meet Caridi's "specific requirements" in the telephone call of March 21, 2020, as of that date, TOKI had not had any communications with Boustani/CHU. Accordingly, Lee's advice on that day could not have related specifically to NIOSH certified N95 masks.

[143]   Third, in his closing submissions, Caridi stated that he received the alleged confirmation from Lee through Roncati rather than from Lee directly. There is however no evidence of any confirmation of this nature from Roncati at any time after the telephone call of March 21, 2020.

[144]   The Athletix Agreement, which Caridi received from Roncati, did not contemplate the delivery of NIOSH certified N95 masks. The attachment to the Athletix Agreement made it clear that Lee proposed to supply masks that were not the masks that Sigma Santé/CHU had ordered and, while packaged as N95 masks, did not have any markings or other evidence of NIOSH certification and were described in the description/specifications as "kn95" masks. Accordingly, the content of the Athletix Agreement effectively indicated that the masks to be delivered would

not be NIOSH certified N95 masks (unless the KN95 masks were specifically NIOSH certified, for which there was no evidence).

[145]   Fourth, in the absence of any confirmation by March 29, 2020, Caridi sought confirmation directly from Lee in his text exchanges with Lee on that date and again on March 31, 2020. Clearly, Caridi was aware that Lee had not provided evidence to that date that the masks to be delivered would be NIOSH certified N95 masks. Moreover, at 6:31am on March 29, 2020, Caridi received the Chinese export declaration form which referred to KN95 masks.

[146]   The only response to Caridi's text messages was Lee's reference to the "FDA certificate" in response to Caridi's text of March 29, 2020. While a letter from the manufacturer specifically confirming NIOSH certification was requested, none was ever produced or even promised. Further, as described above, Lee's response to a request in Caridi's text message for confirmation that the "N95 respiratory masks is FDA, CE and *made to NIOSH standards*" was the limited statement, "The FDA certificate it's come with it". In his text message, as reflected in the italicized phrase, Caridi sought confirmation of compliance with NIOSH standards, not NIOSH certification. Caridi could not have relied upon Lee's reference to the "FDA Certificate" as evidence of NIOSH registration (which in any event it was not) without some understanding on his part of what the "FDA Certificate" indicated, which he knew that he lacked in the absence of some investigation on his part. In any event, Caridi does not suggest that he relied upon this particular message as confirmation that NIOSH certified N95 masks were being delivered.

[147]   Based on the foregoing, I find that Lee did not advise or confirm to Caridi that his supplier(s) or manufacturer(s) would deliver NIOSH certified N95 masks at any time prior to March 30, 2020. I am also satisfied that the only advice that Lee provided to Caridi, and that Caridi acted upon, was advice that the masks could meet Caridi's/TOKI's specifications, which was understood to mean that they would be compliant with NIOSH standards in the view of Lee's supplier(s) or manufacturer(s).

### The Extent of Caridi's Knowledge Prior to March 30, 2020 that Lee Could Not Deliver NIOSH Certified N95 Masks

[148]   The issue of the extent to which Caridi knew, or reasonably ought to have known, prior to March 30, 2020, that Lee's supplier(s) or manufacturer(s) would not be delivering NIOSH certified N95 masks is an objective, rather than a subjective, issue.

[149]   I have considered whether it would be appropriate to draw an adverse inference to the effect that Caridi had actual knowledge prior to March 30, 2020 based on his refusal to provide all of the communications between himself and Roncati and Lee during the period from March 21, 2020 to March 30, 2020. I have not done so for the reason that it is not clear to what extent Caridi has withheld such communications.

[150]   There is a reasonable possibility that Lee communicated what he could, and could not, deliver to Caridi in the course of finalizing the arrangements between Lee/Roncati and TOKI.

However, there is no direct evidence before the Court regarding either Lee's knowledge of the difference between NIOSH certified N95 masks and NIOSH compliant masks or of the extent of Lee's knowledge regarding the product that his supplier(s) or manufacturer(s) could deliver. There is therefore no evidence regarding whether Lee understood that Caridi/TOKI specifically required NIOSH certified N95 masks to satisfy the Contract or believed that Caridi/TOKI required only masks that were manufactured to NIOSH standards.

[151]   On the other hand, it is my view that, at the latest, by March 29, 2020 before his call with Boustani and Gesufatto on that day, Caridi knew that there was a real possibility that the masks that TOKI would be supplying to CHU would be KN95 masks that were not NIOSH certified N95 masks and would not be NIOSH certified unless "kn95" masks were also NIOSH certified.

[152]   By this date, he had signed the Athletix Agreement. As mentioned above, from the attachment to that Agreement, Caridi would have been aware that Lee proposed to supply masks that were not the masks that were referenced in the Gesufatto March 26 Email. He would also have been aware that the masks described in the Athletix Agreement while packaged as N95 masks, did not have any markings or other evidence of NIOSH certification and were described in the description/specifications as "kn95" masks. In addition, the only certificates provided were a "Certificate of CE Registration" and an FDA "Certificate of Registration" for a manufacturer whose name was redacted. There was no evidence that either certificate evidenced or confirmed NIOSH certification. In addition, the screenshot of the Chinese export declaration form for the first delivery indicating KN95 masks also suggested that Lee was arranging for the delivery of KN95 masks that were not NIOSH certified.

[153]   From the foregoing documentation, I am satisfied that by March 29, 2020 at the latest, although Caridi may not have had known with absolute certainty that the masks that were going to be delivered would not be NIOSH certified N95 masks but instead would be KN95 masks that would not be NIOSH certified, he understood that there was a real possibility that this was the case.

### *Caridi's Knowledge of the Difference Between KN95 Masks and NIOSH N95 Certified Masks*

[154]   The third issue is more subjective – the extent and nature of Caridi's knowledge of the difference between NIOSH certified N95 masks and KN95 masks and of the significance of the difference to CHU and therefore for the performance of the Contract.

[155]   As mentioned, in the course of the trial, Caridi has taken two different positions. For most of this proceeding, Caridi took the position that he did not promise, and did not have access to, NIOSH certified N95 masks and that he told Boustani that what could be delivered were KN95 masks from China that were manufactured to NIOSH standards. Caridi then changed his formal position after CHU had presented its evidence and asserted that he ordered NIOSH certified N95 masks from Lee as required by the Contract and that he was let down by his suppliers, Lee and Roncati/Athletix.

[156]   As the excerpts below demonstrate, in his testimony at trial, Caridi attempted to take both positions simultaneously notwithstanding that they are inconsistent:

> Q. … I want to go down to number 4, "NIOSH"/FDA approved," and then it says, "Provide certification, see attached." You instructed him on that number 4?
>
> A.      That's correct.
>
> Q. And so if I hear you correctly, what you're saying today is that on the night of March 26th, 2020, you tried to get NIOSH certified N95 respirator masks starting on that night?
>
> A. I, I didn't try. I was told that they were available by Mr. Lee and, and by Mr. Roncati, and that's what I just reconfirmed, and, and he reconfirmed it to Anthony Lee. So Mr. Lee assured Conrad, and Conrad assured me that the product was readily available. And this is his reaffirmation that he understood it and directed it to Mr. Lee once again. (at page 9) …
>
> Q. And so you communication, or you instructed Mr. Roncati to send this email the night of March 26th. And that you did that because this is the product, you understood, that CHU wanted and had ordered. Right?
>
> A. Yes. In fact, in my previous depositions I always said that I did have the conversation on – with [Boustani]. He knew it was coming from China, so we always brought up the KN95, but at the same token, I ordered N95 from my, my supplier. (page 10)

[157]   The following three excerpts refer to paragraphs 14-16 in Caridi's affidavit sworn November 2, 2020 in the Mareva Injunction Proceeding. They also reflect the same inconsistency although in this affidavit Caridi emphasized his position that he told Boustani that the masks he could supply were not NIOSH certified but were KN95 masks manufactured to NIOSH standards:

> Q. All right, sir. And this – these three paragraphs is what you say you told Mr. Boustani in a conversation before binding TOKI-US to the CHU transaction?
>
> A. This was a conversation we, we had. It was clearly indicated on the documentation that was submitted. We did say they were coming from China. And in, *in my mind, there was no delineation between N95 or, or KN95 at that point. And the main objective was to make sure that they were done to NIOSH standards.* (page 11) …
>
> Q. And if I read these paragraphs correctly, you're telling us here that you knew from the outset you couldn't get NIOSH certified N95 respirators to CHU. Right?

A. No. It was clarification that it was coming from, from China that *N95 is a delineation of what they're looking for, 95 percent protection. And we did let him know that being that it's coming from China, it may have the K designation, however, it would be to the same standards*. And further to that, you know, Mr. Boustani's intention was also to order what he did. And, and I relayed that. I said to Mr. Roncati and Mr. Lee that they're saying that its KN – I'm sorry, N95, but we did have that conversation, for sure. (page 12) …

A.      But, again, before I committed to this, I did reaffirm with Mr. Roncati and Mr. Lee that these masks were available and that he was available to source them. So KN or N, we requested N95 from Mr. Roncati and Mr. Lee, and, and he again confirmed, and I reconfirmed via text messages to Mr. Lee that the client wants N95 NIOSH certified masks. (page 13) …

A. … My intention was to deliver masks on an expedited basis during a pandemic when no one could get masks in the world, including the Canadian government. So my intention was to give them mask that were quality, NIOSH certification by the supplier. *I requested N95, but I let them know they're coming from China. So I didn't know, I didn't know there's a difference, quite frankly, if it has a K in front of it, is it the same mask or not.* Is it – what, what the model number on the purchase order, it showed a KN95. *So there was confusion, confusion on CHU's point, confusion on our part.* We didn't hide anything in our materials we gave him. [Emphasis added.]

[158]  In its closing submissions, CHU argued that the Court need not make a determination between these two scenarios, arguing that Caridi was liable under either scenario. I do not agree. I have set out above my reasons for finding that Caridi did not advise Boustani in their telephone call of March 26, 2020 that the masks that he could deliver were KN95 masks that were compliant with NIOSH standards. In this section, I propose to consider the extent of Caridi's knowledge as it is relevant for the analysis below regarding the knowledge requirement in CHU's action for deceit or civil fraud.

[159]  Caridi communicated the requirement of NIOSH certified N95 masks to Roncati/Lee as evidenced by the Roncati March 26 Email. It is clear that the existence of a difference between NIOSH certified N95 masks and KN95 masks, and CHU's insistence upon NIOSH certified N95 masks, was pointed out to Caridi by La Treille and Boustani in the telephone calls of March 28 and March 29, 2020. However, neither of these circumstances is necessarily evidence that Caridi understood either what a NIOSH certified N95 mask was or the significance of NIOSH certified N95 masks for CHU.

[160]  Considering Caridi's testimony as a whole, particularly the italicized portions of the excerpts set out above and the contradictory answers given on his cross-examination, I conclude that, during the period from March 26, 2020 to March 30, 2020, Caridi had only a very general

understanding of the N95 designation, of the NIOSH certification requirements, and of the differences between a NIOSH certified N95 mask and a KN95 mask.

[161]   As Caridi admitted, he was "confused" and did not understand the difference between a KN95 mask and an N95 mask at the time, only that KN95 masks were masks that were produced in China that were said to be comparable to N95 masks produced in the United States and that each involved 95% protection on some basis. In particular, while he understood that both N95 masks and KN95 masks purported to remove 95% of airborne particles, his understanding did not extend to the particular requirements for a NIOSH certification.

[162]   Accordingly, at that time, for Caridi, there did not appear to be any significant difference between a NIOSH certified N95 mask and a KN95 mask said to be manufactured to NIOSH standards. He therefore did not appreciate that CHU was not prepared to accept KN95 masks that were alleged to meet the NIOSH standards in place of the NIOSH certified N95 masks specified by the Contract. To the extent there was any difference between a NIOSH certified N95 mask and a KN95 mask, he assumed that delivery of whatever masks Lee supplied would be satisfactory in the circumstances given CHU's urgent need for respiratory masks.

[163]   This description of the extent of Caridi's limited knowledge is consistent with, and supported by, the evidence regarding the context in which he was acting. Caridi had no medical training, no prior involvement in the market for PPE, and in particular no previous experience in providing respirators or masks to hospitals.

[164]   He also did not have the time to educate himself nor did he have any advisor to assist him in explaining the nature of the products that he was proposing to sell to CHU, as CHU apparently had. There is no indication that he conducted any research or other education regarding the PPE offered by Blu Stella on behalf of TOKI prior to Boustani's call to Gesufatto on March 26, 2020. As a result, he had no prior understanding of the requirements for a NIOSH designation or the types of concerns that were presented by KN95 masks originating in China. The Contract was formed subsequently in a number of hours over March 26 and March 27, 2020. When Boustani specifically identified NIOSH certified N95 masks as the product that CHU wanted in their telephone call on March 26, 2020, Caridi had no time to inform himself of the specifications of a NIOSH certified N95 mask even if he had wanted to. In any event, there is no evidence that he sought out such information.

[165]   Rather than developing an understanding of the different specifications for respirator masks before causing TOKI to enter into the Contract, Caridi did no more than relay the product specifications that CHU wanted to Lee via the Roncati March 26 Email, which required no knowledge of the specific requirements for a NIOSH certified N95 mask and no understanding of why certification, as opposed to mere compliance, might be required by CHU. As discussed above, while he sought an assurance from Lee that his supplier(s) or manufacturer(s) would deliver NIOSH certified N95 masks, he never received any such assurance or confirmation at any time prior to March 30, 2020. Instead, at some point in this period, Caridi accepted at face value an unattributed statement that a KN95 designation on the Chinese export declaration form was solely

for Chinese customs purposes, without any explanation as to why such designation was necessary and any due diligence on his part to verify that the masks were NIOSH certified N95 masks before giving that assurance to Boustani in the telephone call of March 29, 2020. In the email of April 4, 2020, he also suggested without evidence that Health Canada was accepting KN95 masks as an alternative to NIOSH certified N95 masks. The basis for this assertion is also not in evidence.

[166]   Instead, after the Contract was formed, Caridi's time was taken up with the need to settle the arrangements with Lee and ensure the commencement of shipping of the product that Lee could supply. Caridi's contribution to the arrangements with Lee and Roncati was in respect of logistics and facilitation of the importation of PPE during a difficult time for transportation from China, to which by his own admission he devoted a considerable amount of time and for which he was paid approximately $80,000 by Lee.

[167]   More generally, given that Caridi saw his role as that of a middleman facilitating the supply of N95 masks from third parties in China, he also saw no need for an informed understanding of the PPE that he was offering to North American clients, including CHU. For Caridi, the CHU transaction represented the first transaction of what was hoped would be a promising business venture for Caridi and TOKI to source and resell for a commission a product that it was difficult for a healthcare organization to source on its own without the necessary contacts.

[168]   It is not clear whether, or to what extent, Caridi came to understand the significance of the difference between NIOSH certified N95 masks and the masks that were delivered to CHU and, in particular, that CHU was insisting upon strict compliance with the terms of the Contract rather than accepting KN95 masks that were alleged to be comparable in standards. It is not necessary to reach a conclusion on this issue, however, as any such understanding would have occurred after March 30, 2020 by which time the Contract had been formed and CHU had paid the full purchase price under the Contract.

### Did the Board of Directors of TOK Corp. Approve the CHU Transaction?

[169]   The parties devoted considerable attention to the question of whether Caridi's actions on behalf of TOKI were authorized by the board of directors of TOK Corp. on the basis that Caridi would not be entitled to the benefit of the corporate shield if they were not so authorized. As discussed below, however, I reach a conclusion regarding Caridi's personal liability based on case law which renders the issue of formal authorization irrelevant. I have nevertheless set out my views on the authorization issue in this section in case I have erred in reaching the conclusion below so that the issue of the authorization of Caridi's actions on behalf of TOKI may become relevant.

[170]   At the time of the CHU transaction, the board of directors of TOK Corp. (the "Board") was comprised of five individuals, including Caridi and Reeves, who were the only directors who testified in this trial.

[171]   It is Caridi's position that the board of directors was aware of, and approved, the CHU transaction.  He refers to the following evidence in support of his position.

Page: 34

[172]   First, the TOK Corp. website was updated to reflect the involvement of TOKI in offering PPE for sale, for which Caridi was the contact. The date when this occurred is not in evidence but it is likely that it occurred in late March 2020. In this connection, Rod drafted a proposed press release on or about March 25, 2020 announcing TOK Corp.'s entry into the business of supplying PPE. From Rod's testimony in particular, it is clear that Caridi discussed his plans for this new line of business for TOK Corp. with Rod and Spencer Walker ("Walker"), the chief financial officer of TOK Corp. The plans envisaged sharing the profits between TOK Corp. and Caridi personally or through Bedford Capital, Caridi's private holding company. The draft press release was not released however because, as of March 25, 2020, the PPE business, as understood by Rod and Walker, was prospective. It should be noted that Boustani did not contact Gesufatto regarding the purchase of masks until March 26, 2020.

[173]   Second, Caridi says that a number of individuals within TOK Corp. learned of the CHU transaction shortly after TOKI entered into the Contract. In particular, he says that Walker became aware of the CHU transaction when the CHU payment was deposited in the TOKI bank account at Chase Bank. In addition, particular employees of TOK Corp. were involved in helping obtain insurance for the transportation of masks from the Chinese Embassy in Canada to CHU, which included or comprised the KN95 masks shipped by Lee's supplier(s) or manufacturer(s), and in dealing with GST and QST information. The emails respecting these matters are dated April 9 and April 10, 2020, respectively.

[174]   Lastly, Caridi says the CHU transaction was discussed at a board meeting of TOK Corp. held on April 1, 2020.  The agenda for that meeting includes an item which reads "Medical Equipment transaction". Caridi suggests that the CHU transaction was specifically discussed at this board meeting and approved by the board of directors.

[175]   The only director who provided testimony on this issue was Reeves who provided two affidavits.

[176]   In his first affidavit, Reeves acknowledged that, in late March 2020, Caridi "introduced a proposal to the board of the Corporation about venturing generally into the provision of …[PPE], particularly focusing on supplying masks to Canadian institutional purchasers."  He also stated that "Caridi said he had the ability to secure [a] significant stock of PPE in anticipation of these transactions".  Reeves acknowledged that Rod recommended issuing a press release, upon which he commented, but, as noted above, the press release was never released.  Reeves also stated that "a preliminary agenda was developed for our board meeting held on April 1st 2020 highlighted [sic] generally PPE transactions referenced in this case as "Medical Equipment Transaction."

[177]   In his second affidavit, Reeves was at pains to dispel any suggestion that the Board approved the CHU transaction at the meeting held on April 1, 2020.  He says that the agenda did not refer to any specific PPE transaction, that he "had no knowledge of any formal agreements or specific PPE transactions [Caridi] caused [TOKI] or [TOK Corp.] to enter into", that the Board "never approved, nor was it asked to approve the CHU transaction or any other PPE transactions" and that he and the rest of the Board became aware of the CHU transaction in late April 2020 when

Walker informed the Board that Chase Bank had contacted him regarding the unilateral closure of the TOKI bank accounts. Reeves also says the Board held an emergency meeting on April 27, 2020 at which Caridi described a PPE transaction between a Montreal-based health region and Bedford Capital. Reeves also alleged that, with regards to internal authorizations, he "confirmed" at a board meeting after TOK Corp. became public in 2018 that any material contract required Board approval and suggested that this "mandate" had been adhered to until the CHU transaction.

[178]    While not a Board member on April 1, 2020, Rod attended the Board meeting on that date. He says that he only learned about the CHU Transaction "at a high level" in or about the middle of April 2020.

[179]    Based on the evidence before the Court, I make the following findings.

[180]    First, Caridi identified the supply of PPE to institutional purchasers in North America as a promising business opportunity in late February 2020. He advised the Board informally of his intention to do so by late March 2020 indicating an intention that profits would be split between himself or Bedford Capital and TOK Corp. on a 50/50 basis. The Board was not opposed to Caridi pursuing such transactions using TOKI as the transacting entity.

[181]    Second, it is probable that the CHU transaction was discussed at a high level at the Board meeting on April 1, 2020, but without the specific name of the purchaser, as the CHU transaction was still in its early stages. However, there is no evidence that the CHU transaction was specifically authorized by corporate resolution at the Board meeting on that date.

[182]    Third, the Board members learned informally from Caridi or members of management of the existence and material details of the CHU transaction at different times between April 1 and April 15 2020. In particular, Walker, who did not testify, probably learned of the CHU transaction on or very shortly after April 1, 2020, if he did not already know by that date, in his capacity as the chief financial officer. In addition, as mentioned, the involvement of Lin regarding GST issues on April 10, 2020, in respect of which she received copies of the actual CHU purchase orders in the email chain sent to her, and of another individual in arranging insurance for a shipment of masks from the Chinese embassy, provided TOK Corp. management with notice of the CHU transaction. I think it is improbable that these matters did not get reported to the directors through Walker or otherwise, given the unusually large transaction involved.

[183]    Lastly, after learning informally of the transaction, the Board took no action to require formal approval or otherwise of the CHU transaction for two reasons. First, notwithstanding Reeves' allegation, Caridi's actions were consistent with the degree of independence he was effectively delegated by the Board. Second, the main interest of the Board members after they learned of the CHU transaction was the potential profit to TOK Corp. rather than any potential liability. This continued even after they learned of the extraordinary action of Chase Bank in closing or freezing the TOKI bank accounts.

[184]   In this regard, the minutes of the Board meeting of April 27, 2020 are significant in two respects. First, it is clear from the minutes that Caridi gave the directors a detailed description of the CHU transaction as of that date. Second, while Reeves' affidavit implies that the Board called an emergency meeting to discuss this matter, the Board meeting was not called primarily to deal with the closure of the TOKI bank accounts. The minutes highlight the reality that the Board had pressing financial, corporate governance and disclosure issues that were addressed before the discussion of the CHU transaction.  Notwithstanding that $13,693,522.50 had flowed into the TOKI bank accounts and that Chase Bank had unilaterally closed those accounts, the directors accepted very general statements and commitments of Caridi.  They did not seek any further explanation, whether from Caridi or otherwise, regarding the transaction giving rise to the account closure.

[185]   In summary, I conclude that the Board did not formally approve TOKI's participation in the CHU transaction.  However, in his capacity as the president and a director of TOKI, the Board gave Caridi wide latitude to engage in transactions outside the ordinary course of business of TOK Corp. through Bedford Capital provided the profits were to be shared between Bedford Capital and TOK Corp. Accordingly, after the Board members informally learned of the CHU transaction during the first half of April 2020, they acquiesced in respect of TOKI's involvement in the CHU transaction, being more interested in the fact that the profits were to be shared equally between Caridi/Bedford Capital and TOK Corp. In doing so, the Board effectively adopted the CHU transaction as of April 27, 2020.

**Procedural Matters During the Trial**

[186]   It is necessary to document the following procedural matters that were addressed in the course of this action.

[187]   First, prior to the trial, TOKI reached an agreement dated May 25, 2021 with CHU, among other parties, in the form of a "Pierringer Agreement" (the "TOKI Settlement Agreement"). The TOKI Settlement Agreement includes a consent of TOKI to a judgment for the full amount of CHU's claim (in Canadian dollars at the time of the Agreement). While TOKI remained a party to the action at the time of the trial, it chose not to appear at the trial. While Caridi has objected to the TOKI Settlement Agreement, I am not persuaded that the Agreement prejudiced his ability to present his defence to the CHU claims against him in this action.

[188]   In addition, the parties filed an Agreed Statement of Facts dated September 27, 2023. The Agreed Statement contemplated that the parties may call evidence at the trial provided that any such evidence was not inconsistent with the facts set out in the Agreed Statement. Caridi did not object to any evidence adduced by CHU at the trial on such grounds.

[189]   In light of the TOKI Settlement Agreement and the Agreed Statement of Facts, it is my understanding that the Court may make determinations in respect of TOKI's actions and its liability, to the extent of CHU's claim, insofar as such determinations are relevant to the issues raised by CHU in its Fourth Amended Statement of Claim in respect of Caridi.

[190]   Second, after the plaintiff completed the presentation of its case, Caridi brought two motions. In the first motion, Caridi moved for a dismissal of the action on the ground that the plaintiff had failed to disclose a cause of action. Caridi did not file a motion record but instead relied on the evidence presented by the plaintiffs and his assertion that he acted in good faith and relied upon his suppliers who, as mentioned, he says advised him that they could provide masks to the specifications agreed to in the Contract.

[191]   The motion was dismissed. The *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194 do not specifically contemplate a motion of this nature in mid-trial. However, and in any event, the motion was dismissed on the basis that Caridi had not demonstrated to a "plain and obvious" standard that there was no genuine issue for trial regarding the alleged fraudulent misrepresentation that TOKI could deliver NIOSH certified N95 masks and, in particular, whether Caridi's actions demonstrated recklessness that satisfied the requirements for a claim of deceit or civil fraud.

[192]   In the second motion, Caridi sought dismissal of the action on the grounds that the plaintiff had "failed to join an indispensable party to the action", being Mr. Lee and all other parties who received money out of the monies sent by CHU to TOKI.

[193]   Caridi also did not present a motion record for this motion. He stated however that, in support of this motion, he relied on the decisions in *Haida Nation v. British Colombia (Ministry of Forests)*, 2004 SCC 73, *Silver v. IMAX Corporation*, [2009] O.J. No. 5585 (S.C.), and *Saugeen First Nation v. Ontario (MNRF)*, 2017 ONSC 3456.

[194]   After a review of these decisions, I advised Caridi that, in my view, the decisions upon which he relied did not support the right to bring a motion of this nature. There was also no basis on the facts of this case for the relief that he sought on this motion given that he had the right to join third parties in the action. Accordingly, this motion was also dismissed.

[195]   Third, the day following the presentation of Roncati's evidence, Caridi moved to introduce a further supplementary affidavit of Roncati apparently prepared and sworn after trial had adjourned the preceding day.

[196]   This motion was also dismissed for the following reasons. The effect of the further supplementary affidavit was arguably to change Roncati's testimony on matters that were addressed in his examination and cross-examination the day before. It was not proposed however that Roncati would be available for further cross-examination on this further supplementary affidavit and his motivation for putting forth this supplementary affidavit was not clear. I also note that, in the course of argument on this motion, Caridi stated that, in any event, he believed that Roncati's original affidavit accurately reflected his testimony.

[197]   Lastly, as mentioned, throughout most of the course of this litigation, Caridi took the position that, prior to formation of the Contract, he advised Boustani that the masks that he could deliver were KN95 masks that were compliant with NIOSH standards, that is, of equivalent quality, rather than NIOSH certified. However, on the last day of the trial, Caridi retracted this

Page: 38

position in favour of an alternate position that he ordered NIOSH certified N95 masks from his supplier, being Lee, but that the supplier let him down.

[198]   In response to this change of position, after Caridi presented his evidence, CHU sought leave to amend the Third Amended Statement of Claim principally to include pleadings that addressed this new allegation by pleading misrepresentations by omission. This motion was granted on the condition that Caridi would have 14 days from the date of service of the Fourth Amended Statement of Claim to amend his Fresh as Amended Statement of Defence. In effect, although the motion was brought by CHU, the motion was granted for the purpose of allowing Caridi to amend his defence in the manner described above and to permit CHU to respond by amended pleadings. Each party has made such amendments to their pleadings.

## Analysis and Conclusions

[199]   CHU's principal claim in this action is a claim against Caridi personally for civil fraud or deceit on the basis of a lifting of the corporate veil or alternatively by way of a claim of oppression under the *Canada Business Corporations Act*. CHU also asserts claims for unjust enrichment, or constructive trust for which it seeks a tracing order. In addition, CHU asserts a claim of breach of contract against TOKI. I will address each of these claims in turn.

## The Plaintiff's Claim of Deceit

[200]   The plaintiff alleges that Caridi made a number of fraudulent misrepresentations by way of express statements, or by way of omission to disclose material facts, that give rise to a valid claim in deceit.  After addressing the relevant legal principles, I will turn to a consideration of the particular misrepresentations alleged by CHU.

### Applicable Legal Principles

[201]   The requirements for a claim in deceit were set out most recently by the Supreme Court in *Bruno Appliance and Furniture, Inc. v. Hryniak*, 2014 SCC 4504, at para. 21, as follows:

1.  A false representation made by the defendant;

2.  Some level of knowledge of the falsehood of the representation on the part of the defendant (whether through knowledge or recklessness);

3.  The false representation caused the plaintiff to act; and

4.  The plaintiff's actions resulted in a loss.

The onus of demonstrating deceit lies on the plaintiff who must establish each of the elements of the tort on a balance of probabilities standard.

Page: 39

[202]   Fraudulent representations include express statements of fact that are not true regardless of whether there was an intention to cheat or injure the person to whom the statement was made: see *Bruno Appliance* at para. 18, citing *Derry v. Peek*, (1889), 14 App. Cas. 337 (H.L.), at p. 374, per Lord Herschell.   The knowledge requirement includes not only a false representation made knowingly or without a belief in its truth but also a false representation made "recklessly, careless whether it be true or false": *Bruno Appliance*, at para. 18.

[203]   Non-disclosure of material facts can, in certain circumstances, also constitute a fraudulent misrepresentation as contemplated in the following statement in *Midland Resources Holding Ltd. v. Shtaif*, 2017 ONCA 320, at paras. 163-164:

> A misrepresentation can involve not only an overt statement of fact, but also certain kinds of silence: the half-truth or representation that is practically false, not because of what is said, but because of what is left unsaid; or where the circumstances raise a duty on the representor to state certain matters, if they exist, and where the representee is entitled, as against the representor, to infer their non-existence from the representor's silence as to them: Robert Van Kessel and Paul Rand, *The Law of Fraud in Canada* (Toronto: LexisNexis, 2013), at 2.69 and 2.72.

[204]   In this case, the level of knowledge required for a claim in deceit is important.  The plaintiff says Caridi either knew that he could not supply NIOSH certified N95 masks or acted recklessly in representing that he could do so.  For this purpose, the definition of recklessness is important.  Recklessness is defined in Black's Law Dictionary (7th ed.) (St. Paul, Minn, 1999) as follows:

> "Conduct whereby the actor does not desire harmful consequence but *... foresees the possibility and consciously takes the risk*", or alternatively as "a state of mind in which a person *does not care about the consequences of his or her actions*". [italics added]

[205]   The seminal case of *Derry v. Peek* confirmed the elements of civil fraud. The House of Lords held that fraud is made out where there is proof that a defendant made the statement recklessly, that is, without an honest belief in its truth. In this case, the directors made a false representation in a prospectus. The trial judge concluded however that the directors had an honest belief that their statement was true. Lord Herschell found that the claim of deceit had not been made out on these facts. He also observed at p. 369 that, even if the directors' honestly held belief was unreasonable, their statement would not have been fraudulent. The same standard was enunciated by the Supreme Court in *Parna v. G. & S. Properties Ltd.* (1970), 15 D.L.R. (3d) 336 (S.C.C.), at p. 344: "[Fraud is] a false representation of fact, made with a knowledge of its falsehood, or recklessly, without belief in its truth…". Accordingly, in the present case, any negligence on the part of Caridi in respect of his belief in the truth of the representations at issue may be evidence of fraud but is not sufficient on its own to establish fraud.

[206]   In *Derry v. Peek*, at p. 373, Lord Herschell also confirmed that "willful blindness" is a form of dishonesty, and therefore considered fraudulent:

> [A]lthough means of knowledge are, as was pointed out by Lord Blackburn in *Brownlie v. Campbell*, 5 App Cas at p 952, a very different thing from knowledge, if I thought that a person making a false statement had shut his eyes to the facts, or purposely abstained from inquiring into them, I should hold that honest belief was absent, and that he was just as fraudulent as if he had knowingly stated that which was false.

This statement was quoted with approval in *Precision Drilling Canada Limited Partnership v. Yangarra Resources Ltd.*, 2017 ABCA 378, at para. 35.

[207]   As noted above, "carelessness" has been held to constitute "recklessness". In this regard, it is important to note that "careless" can mean indifference to the truth of a statement or it can mean failing to take care. This distinction was identified by Lord Herschell in *Derry v. Peek,* at p. 361: "To make a statement careless whether it be true or false, and therefore without any real belief in its truth, appears to me to be an essentially different thing from making, through want of care, a false statement, which is nevertheless honestly believed to be true".

[208]   This distinction was also clearly articulated in *Chapman v. Warren*, [1936] 2 D.L.R. 157 (Ont. High Ct.) at pp. 162-163, which concluded that recklessness included only the first meaning of "carelessness," that is, being indifferent or not caring about whether the statement being made is true:

> Ever since the decision in *Derry v. Peek* (1889), 14 App. Cas. 337, the law has been settled that carelessness, however gross, is not fraud. Where the word "careless" is used in the cases the expression does not mean "without taking care" but "not caring". Very gross and culpable carelessness is not enough to constitute fraud: *Angus v. Clifford*, [1891] 2 Ch. 449. The element of moral turpitude must be present, as put by one learned Judge, to constitute fraud. The statement must be with a wicked indifference, immorally not caring whether the thing is true or not.

[209]   The concept of "carelessness" as "recklessness" was affirmed more recently in *Precision Drilling* by the Alberta Court of Appeal, which quoted with approval the statement of Bruce MacDougall in *Misrepresentation* (Toronto: LexisNexis Canada, 2016) that "[r]ecklessness typically involves a person's stating information in an authoritative way without having bothered at all to find out whether the information is accurate": at para. 34.

[210]   The present case raises involves circumstances which arise not infrequently in practice. A party may make a representation expecting or hoping that it is true but without having devoted any effort to verifying its accuracy because of a belief that its possible falsehood would be of no consequence given the particular circumstances in which it is made. Often such indifference to the truth of a representation is based on an expectation or hope that future circumstances will validate the truth of the statement. In other circumstances, such as the present case, such indifference is based on a belief or hope that, ultimately, the representation will not be material to the innocent party or that the innocent party will otherwise choose to disregard the representation. The

important point is that, in these circumstances, the representing party's indifference to the possibility that the representation is false constitutes recklessness.

[211]   A similar fact pattern was addressed by McLachlin J. (as she then was) in *Noble v. Fuller, Ellis Realty Ltd*., 1985 CarswellBC 4167 (S.C.), a case involving the sale of a house which was subsequently discovered to have urea formaldehyde insulation. The buyers stated that they had specifically asked the real estate agent if the house was so insulated. The real estate agent denied any conversation regarding a particular type of insulation. McLachlin J. believed the buyers and found that they had established fraud, stating at para. 20:

> The statement must have been made with the intention to deceive or with reckless disregard for the truth and without an honest belief in the truth of the statement: see *Derry v. Peek* (1889), 14 App. Cas. 337 at p. 374; *C.R.F. Holdings Ltd. et al. v. Fundy Chemical International Ltd et al*. (1981) 33 B.C.L.R. 291 at p. 295. In the case at bar there is no explanation for the statement with respect to urea formaldehyde consistent with an honest belief in its truthfulness. Nor was there any indication of an attempt to investigate to learn whether or not the statement might be true. The position of a real estate agent showing a property is one of high responsibility. *To answer an inquiry of a potential purchaser without knowing whether or not the answer is correct and without qualification constitutes reckless disregard for the truth*, in my opinion. It may be, as I have earlier suggested, that [the real estate agent] failed to appreciate the impact of [the plaintiff's] question and gave him the assurance he was seeking, confident that the insulation was satisfactory and that his answer would not matter in any event. This hypothesis, while it may explain his conduct, does not in my view excuse it or make it any the less reckless. The essence of recklessness is not a premeditated intention to deceive, but a wanton disregard as to whether one deceives or not. *When a professional salesperson chooses to give answers to serious questions from potential purchasers without ascertaining whether or not they are true, recklessness and the tort of deceit are established*. [Emphasis added.]

I note that this passage was cited with approval by Hainey J. *in Business Development Bank of Canada v. Experian Canada Inc*., 2017 ONSC 1851, at para. 143, which involved similar circumstances insofar as the defendant did not consider the truth of the representation to be significant at the time it was made.

[212]   I adopt the principle in these decisions. I have therefore proceeded on the basis that "carelessness" can extend to being indifferent as to whether the representation upon which a claim is based was true or false at the time that the representation was made and, in that regard, includes foreseeing the possibility that the representation may be false and consciously taking the risk. I address the operation of this principle in respect of the representations of Caridi and TOKI below.

[213]   I propose first to address CHU's claim for civil fraud or deceit against TOKI and then to address the personal liability of Caridi in respect of that claim.

**Analysis and Conclusions Regarding the Plaintiff's Claim in Deceit Against TOKI**

[214]   The plaintiff alleges that Caridi made numerous misrepresentations in the course of the period that is relevant for this action, being from March 26, 2020 in the course of the formation of the Contract until June 18 when CHU formally demanded certain actions on the part of Caridi/TOKI, the inaction in respect of which resulted in the commencement of this action.

[215]   Such misrepresentations fall into three broad categories:

1.   Misrepresentations made prior to March 30, 2020 in the context of the formation of the Contract and CHU's payment of the purchase price under the Contract;

2.   Misrepresentations made from March 30, 2020, when TOKI first applied the monies paid to it by CHU, until April 9 and April 13, 2020 when it received the KN95 masks delivered to it by TOKI; and

3.   Misrepresentations made after April 14, 2020, in particular, in the context of the arrangement entered into by TOKI/Caridi on April 29, 2020, and thereafter regarding the ability and intention of Caridi/TOKI to comply with the terms of that arrangement.

I will deal with each of these categories of misrepresentations in turn.

***Misrepresentations Made in the Context of the Formation of the Contract and Subsequently Prior to Payment by CHU***

[216]   The first and most significant category of alleged misrepresentations are statements made by Caridi between March 26 and March 30, 2020 in the context of the formation of the Contract on March 26, CHU's execution of its obligations thereunder by making payment of the full amount of the purchase price on the morning of March 27, and the oral representations made to Boustani and La Treille on March 28 and March 29. CHU refers specifically to the following actions which it says gave rise to misrepresentations:

1.   Caridi's omission in failing to advise CHU that he had changed his supplier and thereby the actual product that was to be delivered;

2.   Caridi's statement that he would be advancing the full amount of the purchase price to his supplier on the evening of March 26, 2020;

3.   Caridi's representations on March 26, 2020 that TOKI would deliver the 3 million NIOSH certified N95 masks by March 28, 2020; and

4.   Caridi's representations prior to March 30, 2020 that TOKI had the ability to deliver 3 million NIOSH certified N95 masks if full payment were made on the morning of March 27, 2020.

I will deal with each of these alleged misrepresentations separately.

*Alleged Misrepresentations that Do Not Ground a Claim in Deceit*

[217]   With respect to the first representation, Caridi failed to advise CHU on March 26, 2020 in the course of the formation of the Contract that he had changed his supplier and therefore would not be supplying the product identified in the attachment to the Gesufatto Confirmation Email. However, I do not think that this omission constituted a misrepresentation upon which a claim of deceit can be based.

[218]   The Contract, and in particular the Invoice, specified the subject of the sale to be an "FDA/ISO/NIOSH Certified N95 Respirator Mask". It did not however identify a specific product having those characteristics. The attachment to the Gesufatto Confirmation Email was significant only insofar as it identified that, as between the two masks offered in previous Gesufatto emails, CHU had selected the mask which had a NIOSH certification.

[219]   In addition, CHU's own conduct demonstrates that CHU did not rely upon TOKI's ability to obtain the specific model in that Email. CHU's purchase orders incorrectly specified another NIOSH certified N95 mask. Further, CHU has never suggested that the reference in its purchase orders was intended to be a reference to the specific product identified in the attachment to the Gesufatto Confirmation Email. In addition, Boustani's concern, as expressed to Caridi after Boustani learned that there was a possibility that Caridi/TOKI were going to deliver KN95 masks, was that CHU had ordered NIOSH certified N95 masks, not that CHU had specifically ordered the mask illustrated in the attachment to the Gesufatto Confirmation Email.

[220]   For these reasons, I conclude that CHU did not rely upon any representation that could be implied from the Gesufatto emails that Caridi/TOKI would be supplying the particular model identified in those emails. Put another way, if Caridi/TOKI had delivered NIOSH certified N95 masks, it is not reasonable to believe that CHU would have rejected them unless they were the specific mask whose picture was on the attachment to the Gesufatto Confirmation Email. In the circumstances at the time of the Contract, delivery of any NIOSH certified N95 mask would have satisfied TOKI's obligation under the Contract.

[221]   With respect to the second representation, I have found above that the evidence does not support Boustani's statement that Caridi advised him that he would be advancing the full amount of the purchase price to his supplier in the evening of March 26, 2020.  In the absence of such representation, there can be no claim in deceit based on this allegation.

[222]   Any claim of CHU in deceit based on the third representation regarding delivery by March 28 would be subject to several difficulties. Caridi's representation to this effect seems to have been based on wishful thinking, whether on the basis of an oral assurance of Lee or otherwise, rather than on any evidence of the feasibility of shipment. However, the Invoice actually speaks to shipping on March 28, 2020 leaving the delivery date unspecified. In addition, as the language regarding shipment in the Athletix Agreement demonstrates, there were serious logistical

challenges in arranging for the exportation and shipment of PPE at the end of March 2020 which were beyond the control of anyone procuring PPE from China and which may therefore have engaged the application of *force majeure*.

[223]   In addition, CHU did not specifically rely on this representation. CHU did not have any other source of supply that it decided to forego in reliance on Caridi's representation. CHU was prepared to accept masks provided they were delivered within a reasonable period of time after the shipment date indicated on the Invoice. As late as April 29, 2020, in the arrangement reached between CHU and Caridi/TOKI, Chu was prepared to accept delivery of NIOSH certified N95 masks in reduction of TOKI's liability to CHU. In these circumstances, it is difficult to see any damages that arose specifically as a result of breach of the representation regarding the delivery date of the masks that TOKI contracted to supply under the Contract.

[224]   In any event, it is not necessary to deal with this specific representation given the conclusions below regarding the most important representations of Caridi/TOKI – that TOKI was able to supply, and would deliver, 3 million NIOSH certified N95 masks provided payment of the full purchase price was made by CHU on March 27, 2020. The following analysis addresses the CHU claim of deceit based on this alleged misrepresentation.

### CHU's Claim of Deceit

[225]   Prior to March 30, 2020, when TOKI first applied the monies received from CHU on account of the purchase price under the Contract, Caridi made four representations to the effect that TOKI had the ability to deliver 3 million NIOSH certified N95 masks.

[226]   The first representation to this effect was Caridi's confirmation of his ability to supply 3 million NIOSH certified N95 masks made in the conference call among Gesufatto, Boustani and Caridi on the afternoon of March 26, 2020.  The second representation was the implied representation constituted by the Invoice of TOKI, attached to the Gesufatto Confirmation Email, to deliver 3 million NIOSH certified N95 masks if the full amount of the purchase price were paid on the morning of March 27, 2020. The third representation was the oral representation that Caridi made to Julien in their telephone conversation of March 28, 2020 to which Boustani was also a party. On this occasion, in response to Julien's request for assurances, Caridi "stated that he was '100%' certain that the masks that would arrive were NIOSH certified N95 masks". The fourth occasion was the telephone call involving Gesufatto and Boustani on March 29, 2020 following Caridi's email to Boustani showing a Chinese export declaration form that referred to the masks being shipped as KN95 respirator masks. During that call, Caridi stated that the masks shipped were NIOSH certified N95 masks but were described as KN95 masks to clear Chinese customs.

[227]   I will deal with these four representations collectively as each represented that TOKI had the ability to deliver 3 million NIOSH certified N95 masks.

### Is CHU's Claim in Contract or Tort?

[228]   Before proceeding, I note that CHU has not expressly addressed the issue of whether the alleged misrepresentations are regarded as constituent elements of the Contract thereby giving rise to an action in contract based on a fraudulent misrepresentation(s) or are regarded as having been made outside of the Contract thereby giving rise to an action in tort.

[229]   I have proceeded on the basis that each of these representations was made outside of the Contract. Caridi's oral representation made in the conference call with Gesufatto and Boustani on the afternoon of March 26, 2020 was made prior to the formation of the Contract. While the Invoice ultimately formed part of the Contract, it was delivered prior to the formation of the Contract as an attachment to the Gesufatto Confirmation Email. The Contract was formed later upon delivery of CHU's purchase orders. The representations of Caridi during the telephone calls on March 28 and March 29, 2020, were express oral representations made outside of the Contract, which had come into existence by this time and was not altered or amended in any way in the course of these telephone conversations.

[230]   On this basis, to the extent that it is relevant, I consider that the making of these representations, if false, would give rise to a claim for damages in tort by way of an action for deceit or civil fraud, rather than a claim in contract based on a fraudulent misrepresentation contained in the Contract. However, even if the implied representation that arose upon delivery of the Invoice were treated as a contractual representation, I consider that the same principles would apply as those applicable to the other representations given the circumstances of this case, including the need to consider these representations collectively.

*The Elements of Deceit: A False Representation*

[231]   As mentioned, Caridi made four representations prior to March 30, 2020 to the effect that TOKI had the ability to deliver 3 million NIOSH certified N95 masks.

[232]   Whether Caridi would have been able to supply NIOSH certified N95 masks if he had continued to contract through Valentine was never actually established but the marketing materials suggest that Valentine's source had a NIOSH certified N95 mask available. As discussed above, however, Lee was never able to deliver NIOSH certified N95 masks to TOKI. The approximately 156,000 masks actually delivered to CHU were not NIOSH certified N95 masks. While the agreement reached on or about April 29, 2020 contemplated that Caridi would provide CHU with samples of NIOSH certified N95 masks for review, he failed to do so despite repeated requests from CHU to see the samples of "3Q" NIOSH certified masks that Caridi and Daniel Caridi indicated or implied were available in emails in late April and early May, 2020.

[233]   Accordingly, the representations made to CHU that TOKI was able to supply, and would deliver, 3 million NIOSH certified N95 masks were false regardless of any bona fide intention of Caridi or any reliance on any representations of Lee or Roncati.

[234]   I am satisfied therefore that CHU has demonstrated the first element of the claim of deceit.

*The Elements of Deceit: Reliance*

[235]   Caridi made these false representations with a view to inducing CHU to rely upon them by entering into the Contract and paying the full amount of the purchase price on March 27, 2020 as well as subsequently refraining from taking any action to terminate the Contract and recover its payment. I am also satisfied that CHU relied upon these representations in such manner.

[236]   With respect to the first two representations, CHU relied upon these false representations in entering into and executing the Contract. The representations made in the conference call among Gesufatto, Boustani and Caridi on the afternoon of March 26, 2020, and made by delivery of the Invoice, caused or induced CHU to pay the full amount of the purchase price of the 3 million masks to TOKI on March 27, 2020 in accordance with the terms of the Contract.

[237]   With respect to the third and fourth representations, in their telephone calls with Caridi on March 28 and March 29, 2020, Julien and Boustani communicated their specific concern on behalf of CHU for the delivery of NIOSH certified N95 masks. I find that, in the absence of Caridi's representations that TOKI was arranging for the delivery of masks that satisfied the specifications in the Contract, CHU would have taken steps to terminate the Contract and recover the monies paid to TOKI at that time. Accordingly, CHU has also established that it relied upon the further representations made to Julien and to Boustani in the telephone calls of March 28 and March 29, 2020, in refraining from terminating the Contract and taking steps to recover the monies paid to TOKI prior to the payment of funds by TOKI on March 30, 2020.

*The Elements of Deceit: The Requirement of Knowledge*

[238]   The principal issue in respect of CHU's claim in deceit based on the four misrepresentations regarding the ability to deliver 3 million NIOSH certified N95 masks is the issue of Caridi's knowledge – has CHU demonstrated the requisite level of knowledge regarding the falsity of these representations when they were made to establish CHU's claim in deceit?

[239]   As mentioned above, the knowledge requirement for the tort of deceit includes not only a false representation made knowingly or without a belief in its truth but also a false representation made "recklessly, careless whether it be true or false": *Bruno Appliance*, at para. 18, quoting *Derry v. Peek*. The issue in this case is whether Caridi made the representations "recklessly". In making this determination, I have applied the following principles and considered the following circumstances.

[240]   First, in analyzing whether Caridi acted recklessly in making, or causing TOKI to make, these representations, Caridi's state of mind must be determined at the time that the representations were made. In this case, the representations were made in a short window of time between March 26, 2020 and March 30, 2020.

[241]   Second, the issue of whether Caridi acted recklessly is entirely separate from whether the representations were actionable.  If Caridi acted in a reckless manner in making and causing TOKI to make the representations, he is potentially liable regardless of whether or not Lee's supplier(s) or manufacturer(s) delivered NIOSH certified N95 masks. If, contrary to the circumstances in this

case, Lee's suppliers had delivered such masks, the representations would not have been actionable notwithstanding that they were made recklessly. However, the delivery of NIOSH certified N95 masks would not have affected the determination that Caridi acted recklessly at the time the representations were made.

[242]   Third, the concept of recklessness requires a finding of fact regarding the state of a defendant's mind. In this regard, it is irrelevant however whether or not Caridi knew that he was acting recklessly or considered that he was acting recklessly. Similarly, the fact that he may have made it clear to Lee and Roncati that he required NIOSH certified N95 masks is not dispositive. His alleged reliance on Lee and Roncati is a factor to be considered in assessing whether he acted recklessly. It is not however a defence on its own to a finding of recklessness.

[243]   Fourth, whether or not the representations were made recklessly is, in part, dependent upon the circumstances in which the representations were made. In this case, the representations were made by Caridi/Toki to CHU. Caridi represented that TOKI was the party that had the necessary relationships with the manufacturer(s) or supplier(s) of the masks to be delivered and by implication had full knowledge of the specifications of the product to be delivered. He never advised Boustani or CHU that TOKI was buying the masks to be delivered to CHU from a third party that was itself not the manufacturer of the masks to be delivered, that is, that he was only a middleman in a transaction that had a number of other parties with whom he had no contact. In representing in effect that he was the only middleman between CHU and a manufacturer or supplier, Caridi consciously put himself in a position in which any failure to perform on the part of Lee and/or Roncati or their supplier(s) or manufacturer(s) became his failure to perform.

[244]   Fifth, in this case, the representations were unqualified in any manner regarding the NIOSH certification of the masks to be delivered. The Contract was entered into on the basis of the information contained in the Gesufatto March 26 Email and the Gesufatto Confirmation Email which contemplated a particular NIOSH certified N95 mask. There was no qualification that the masks to be supplied would be NIOSH certified N95 masks "to the best of Caridi's knowledge" or that he would use his best efforts to supply such masks. The Contract also did not contain a verification procedure at the time of delivery that, by its presence, would have suggested the possibility that the masks, as delivered, might not conform to CHU's requirements. This was excluded by the requirement of payment in full prior to shipping and delivery.

[245]   Caridi argues that his behaviour does not constitute recklessness because he acted in good faith in reliance on Lee. Caridi also says that he did not intend to lie to CHU. I have some sympathy for Caridi as I believe he is sincere. However, these statements do not fully capture his actions or the legal consequences of those actions. Given the particular circumstances of this case, I conclude that, in representing, and in causing TOKI to represent, that TOKI was able to deliver NIOSH certified N95 masks, Caridi acted recklessly, as that term is understood in the context of a claim in tort for deceit or civil fraud. This conclusion is based on the following analysis.

[246]   Caridi is an experienced businessman. He was well accustomed to taking risks. TOKI was established with that view in mind – the pursuit of non-ordinary course, generally speculative

transactions that carried a higher risk. Caridi involved Athletix and Lee, rather than Valentine, to protect TOKI from specific payment risks that concerned him. Against this backdrop, while it is literally correct that Caridi relied on Lee to deliver NIOSH certified N95 masks, he is not credible insofar as he suggests that his reliance was so absolute that he did not have any concern that Lee might not be able to deliver masks that satisfied CHU's specifications. I am satisfied that Caridi understood that this risk existed from the time of his first telephone call with Boustani and Gesufatto on March 26, 2020 and increased throughout the period to March 30, 2020.

[247]   Accordingly, if Caridi had been asked between March 26, 2020 and March 30, 2020 whether he honestly believed that TOKI would deliver NIOSH certified N95 masks, he would have had to say that there was a risk that they would deliver KN95 masks that were not NIOSH certified even if they were said to be NIOSH compliant. As discussed above, there is no evidence that Lee ever confirmed that he would specifically deliver NIOSH certified N95 masks, only that he would deliver masks that met Caridi's specifications. As addressed above, Roncati and Lee proceeded on the basis that the transaction with Caridi would involve masks that the Chinese manufacturer described as KN95 masks and that were alleged to conform to NIOSH standards but were not NIOSH certified N95 masks.

[248]   Therefore, on March 26, 2020, given the absence of an agreement with Lee/Roncati that specified NIOSH certified N95 masks, there was reason to doubt, even if an agreement were reached, that the masks would meet CHU's specifications. Caridi could not say that he knew whether or not Lee's supplier(s) or manufacturer(s) would deliver NIOSH certified N95 masks. The best that he could say was that he hoped that Lee understood his requirements and would deliver masks that satisfied CHU's precise specifications.

[249]   Further, by March 29, 2020, given the continued absence of any confirmation from Lee, the content of the Athletix Agreement, and the statement of KN95 masks in the Chinese export declaration form, among other things, there was a stronger basis for doubt to the point that it was probable that the masks to be delivered would not be NIOSH certified N95 masks but rather KN95 masks that Lee or his supplier(s) or manufacturer(s) alleged complied with NIOSH standards. Accordingly, by that date, if Caridi had been asked the same question, he would have had to respond that he did not honestly know whether or not TOKI would deliver masks that were specifically NIOSH certified N95 masks, rather than KN95 masks that were alleged to be manufactured to NIOSH standards.

[250]   However, notwithstanding such uncertainty regarding the likelihood of delivery of NIOSH certified N95 masks, Caridi was prepared to make, and cause TOKI to make, the representation that TOKI would deliver NIOSH certified N95 masks on March 26, 2020 and to repeat the representations to Julien and Boustani on March 28, 2020 and to Boustani on March 29, 2020. Part of the reason that he felt able to do so may have been Caridi's belief that he was entitled to the protection of the corporate shield. In part, this also reflected the fact that Caridi's overriding priority was to deliver the masks that Lee was arranging as quickly as possible. He had neither the time nor the inclination to assess the negative information that he was receiving in this period that suggested or indicated that such masks were not NIOSH certified N95 masks. However, I am

satisfied that the most important explanation is that, at the end of the day, Caridi believed that even if Lee's supplier(s) or manufacturer(s) were unable to deliver NIOSH certified N95 masks, they would be able to deliver respiratory masks that would be sufficient to satisfy CHU in the circumstances that CHU found itself.

[251]   It is not necessary to establish the precise reasons for this latter belief although, as discussed above, I think that it was, at least in part, a consequence of his self-described "confusion" or ignorance regarding the difference between NIOSH certified N95 masks and KN95 masks, which led him to minimize the significance of the difference for CHU. As a result, he believed that the differences between such masks would not matter to CHU given its urgent need for respiratory masks at the time. In these circumstances, Caridi considered that he could manage the situation even if the masks that Lee's supplier(s) or manufacturer(s) delivered were KN95 masks rather than NIOSH certified N95 masks.

[252]   However, it is sufficient for present purposes that, in proceeding in this manner, Caridi consciously disregarded the possibility that the representations that he made, and that he caused TOKI to make, were false. Caridi was indifferent to the reality that he had no basis for an honest belief that the representations were true, and therefore was indifferent as to whether the representations were true or false when they were made. Put another way, Caridi had enough knowledge to foresee a real possibility that the masks that Lee or his supplier(s) or manufacturer(s) delivered would not be NIOSH certified N95 masks and he consciously took that risk in making, or causing TOKI to make, the representations. As discussed above, such actions constitute "carelessness" and were therefore "reckless" for the purposes of CHU's claim for deceit or civil fraud.

[253]   In proceeding on this basis, whether he understood it or not, Caridi gambled on whether or not Lee's supplier(s) or manufacturer(s) would deliver the specified masks. In the usual transaction in which payment is made only after verification of the product, Caridi's approach would have been reasonable. There would have been a mechanism in place for rejecting the delivered masks thereby avoiding the representations becoming actionable even though they were false.  However, in the present case, there was no verification procedure, whether between CHU and TOKI in the Contract or between Caridi/TOKI and Roncati/Lee in the Athletix Agreement. Under Caridi's arrangements, Caridi/TOKI would profit if Lee's supplier(s) or manufacturer(s) delivered NIOSH certified N95 masks, but CHU would lose if they did not, given CHU's prepayment obligation under the Contract. If CHU had accepted the KN95 masks, Caridi's gamble would have paid off. Unfortunately, CHU did not accept the KN95 masks and Caridi must accept the consequences of the representations.

   *The Elements of Deceit: Demonstration of Loss or Damage*

[254]   The requirement for demonstration of loss or damage arising from reliance on the misrepresentations is established on the basis of the Receiver's evidence set out above. The Receiver's reports indicate that, while approximately 2 million KN95 masks were ultimately shipped to North America, of which approximately 156,000 were delivered to CHU on or prior to

April 13, 2020, these masks ultimately had nil value collectively. Of the amount of $13,693,522.50 paid by CHU to TOKI, only the amount of $2,500,000 was repaid by TOKI, although certain amounts have also been recovered from third parties in this action and a related action.

[255]    While Caridi has argued that this loss was attributable in part, if not in whole, to the actions of CHU, this has not been proven. In this regard, the following considerations are relevant.

[256]    First, the Receiver's evidence establishes that the masks in warehouses in the United States had no value by 2021. This conclusion is reinforced by the fact that neither Caridi nor Lee took up the Receiver's offer to acquire the masks to avoid a proposed liquidation sale.

[257]    Second, while Caridi/TOKI repossessed the approximately 156,000 KN95 masks that were delivered to CHU, no proceeds of sale were ever provided to CHU despite the arrangements agreed to on or about April 29, 2020. This suggests that the KN95 masks had no value as of that earlier date. This conclusion is also supported by the evidence that, after receipt of the Kobrynsky Email, Caridi/TOKI offered for sale the 400,000 KN95 masks that CHU was not prepared to receive as of April 14, 2020. There is no evidence of any sales proceeds for such masks, further suggesting that the shipment had no value at that time.

[258]    Third, Caridi's principal argument is that CHU should have terminated the Contract on or about April 14, 2020 at the time of the Kobrynsky Email. While Caridi's original purpose in asserting this position was as a ground for a counterclaim for subsequent losses allegedly incurred by TOKI in its other PPE transactions, I have considered this allegation in the context of potential mitigation of CHU's loss. In this regard the following considerations are relevant.

[259]    To the extent this argument is considered in the context of CHU's claim against TOKI for breach of contract (which is addressed below), Caridi is suggesting that CHU should have terminated the Contract prior to substantial execution thereof when it became clear that the masks to be delivered would be KN95 masks rather than NIOSH certified N95 masks.

[260]    Given the deliveries of KN95 masks rather than NIOSH certified N95 masks, CHU had the right as of April 14, 2020 to terminate the Contract on the grounds of anticipatory breach and to sue for breach of contract or to elect to affirm the Contract. In my view, however, CHU did not have any obligation to terminate the Contract on the grounds of anticipatory breach.

[261]    In the particular circumstances of this case, CHU had a "substantial and legitimate interest in looking to the performance of [the Contract]" as contemplated by Estey J. in *Asamera Oil Corporation Ltd. v. Sea Oil and General Corporation and Baud Corporation, N.V.*, [1979] 1 S.C.R. 633, at p. 668. A damage claim would not have addressed its urgent need for PPE. CHU's decision to test the masks that it had received to determine whether they could be useable in another context, albeit at a lower price to be negotiated as part of a settlement with Caridi/TOKI, was reasonable in the circumstances. Moreover, TOKI acquiesced in this action, even if on a misunderstanding of the purposes for which CHU was arranging for testing. Similarly, CHU's decision to reject future deliveries pending the results of the testing was reasonable and consistent

with any obligation to mitigate. That decision allowed TOKI to dispose of the masks in transit if it so chose and to replace them with other masks and thereby lessen or eliminate any loss associated with the Contract. It is not clear whether TOKI chose not to do so or was unable to do so. The evidence regarding the source of the 400,000 masks that TOKI offered for sale at this time is unclear.

[262]   In summary, I conclude that, under the law of contract, CHU had no obligation to declare a termination of the Contract on or about April 14, 2020. It was entitled to affirm the Contract and acted reasonably in doing so. To the extent that Caridi's argument is considered in the context of CHU's tort claim against TOKI and Caridi in deceit or civil fraud, the issue becomes one of causation. The question is whether it was reasonably foreseeable when the representations were made that CHU would affirm the Contract and reject future deliveries pending testing to determine whether the masks delivered on April 9 and April 13, 2020 had some value even if they were not NIOSH certified N95 masks, rather than immediately sue for damages.

[263]   I find that CHU's actions were entirely foreseeable for the reasons that they were also reasonable actions for an innocent party faced with a clear breach of a representation in the circumstances in which CHU learned of TOKI's failure to deliver NIOSH certified N95 masks. Given that a damage claim did not address the immediate need for PPE within Quebec at the time, it was foreseeable that CHU would suspend the Contract pending testing of the previously delivered masks to determine their value and utility. I would add that, in the present circumstances, I also see no reason why the measure of damages in contract and in tort would differ in the circumstances of this case.

[264]   It is not clear whether Caridi/TOKI also argue that CHU could have mitigated its loss on or about April 29, 2020 by terminating the Contract at that time after it learned that the masks delivered on April 9 and April 13, 2020 were of no value to it. However, as described above, the parties came to an arrangement on a path forward at that time which, by its terms, dealt with any obligation that CHU had at that time to mitigate its loss.

[265]   The arrangement contemplated, among other things, that Caridi/TOKI would furnish samples of NIOSH certified N95 masks, for which actual pictures were furnished, and, if found to be satisfactory as alleged by Caridi, would be delivered to CHU in partial satisfaction of the purchase price under the Contract. In these circumstances, there is no basis for Caridi's position that CHU should have mitigated its loss by termination of the Contract at this time. CHU did not do so in reliance on Caridi's representation that he could supply the NIOSH certified N95 masks shown in the pictures sent to CHU at that time. CHU requested such samples after April 29, 2020 on several occasions and reasonably deferred terminating the Contract until June 18, 2020 by which time it became clear that TOKI could not deliver the proposed masks. By this time CHU's loss had become the full amount of its payment under the Contract by virtue of TOKI's use of the funds as described above.

[266]   On the basis of the foregoing, I find that, as a result of TOKI's failure to deliver NIOSH certified N95 masks, CHU suffered a loss equal to the full amount of the purchase price paid to

TOKI less the $2 million paid pursuant to the arrangement agreed to on April 29, 2020, the Quebec sales tax reimbursement of $500,000, and the amounts paid by other parties in this action and a related action who have settled with CHU.

*Conclusion Regarding the CHU Claim of Deceit Based on Misrepresentations Made in the Context of the Formation of the Contract and Subsequently Prior to Payment by CHU*

[267]   Based on the foregoing, I find that CHU has a valid claim in deceit, or civil fraud, for the loss it suffered, being the purchase price paid to TOKI under the Contract, based on the four false representations of Caridi/TOKI regarding TOKI's ability to supply 3 million NIOSH certified N95 masks made between March 26, 2020 and March 30, 2020. As Caridi was acting in his capacity as a director and officer of TOKI in making, and causing TOKI to make, the misrepresentations, TOKI is liable for that loss. The issue of Caridi's personal liability in respect of this claim is addressed later in these Reasons.

**Alleged Misrepresentations Made Between March 30, 2020 and April 29, 2020**

[268]   There is limited documentation and testimony regarding the interactions between Boustani/Sigma Santé and Caridi/TOKI between March 30 and April 29, apart from the emails and telephone calls on April 28 and April 29, 2020 resulting in the arrangement between the parties that was reached on or about April 29, 2020. While CHU suggests that Caridi made further representations regarding TOKI's ability to deliver NIOSH certified N95 masks during this period, the evidence is otherwise.

[269]   Boustani suggests that, over the several days following his exchange with Caridi on March 29, 2020, he also expressed his concerns about additional references to "KN95" masks in emails and shipping documents in "numerous further conversations". Boustani also says he was told by Gesufatto and Caridi not to worry and that the masks being delivered were NIOSH certified N95 masks.

[270]   I have not accepted this evidence in the absence of the shipping documents and emails referred to by Boustani for the reasons set out above. In addition, any additional conversations during this period until delivery of the first shipments of masks on April 9 and April 13, 2020 were more likely to have addressed the timing of the shipments and to have postponed any further discussion of KN95 masks until receipt of the first shipment revealed whether there was a problem with the masks that were actually delivered.

[271]   Boustani and Caridi did exchange correspondence on April 4, 2020 in which Caridi sent Boustani the 3M document comparing the specifications of 3M N95 respiratory masks and KN95 masks, among others. His purpose in doing so was to convince Boustani that CHU should accept the KN95 masks for which Lee had arranged delivery as an adequate substitute on the basis that they were allegedly compliant with NIOSH standards even if they were not NIOSH certified. There is no suggestion of any further representation regarding delivery of NIOSH certified N95 masks

in this correspondence. Moreover, CHU did not act on Caridi's representation by accepting the KN95 masks. Boustani responded immediately saying that KN95 masks were not NIOSH certified and not approved by Health Canada.

[272]   In short, there is no evidence that, in his dealings with Boustani during the period from March 30, 2020 to April 29, 2020, Caridi further misrepresented that the KN95 masks being supplied would be NIOSH certified N95 masks. Rather, he represented that the masks to be supplied, and which arrived on April 9 and April 13, were KN95 masks manufactured to standards equivalent to NIOSH standards.

[273]   In the negotiations for the arrangement reached between CHU and TOKI, Caridi did represent that TOKI was able to deliver the "3Q" masks that appear, from the photographs provided to CHU in evidence, to be NIOSH certified N95 masks. However, TOKI did not provide any samples prior to the parties entering into the arrangement and CHU does not assert a claim in respect of this representation. Moreover, from the exchange of correspondence on April 4, 2020 at the latest, CHU understood that it could not rely on any further representations of Caridi to the effect that TOKI was able to supply NIOSH certified N95 masks without, at a minimum, proof in the form of actual samples. The representation associated with the "3Q" masks is dealt with further in the next section.

### *Misrepresentations Subsequent to the Arrangement Entered Into Between TOKI/Caridi and CHU on or about April 29, 2020*

[274]   In May and June 2020, Caridi made a number of representations regarding intended compliance with the arrangement reached with CHU on or about April 29, 2020. None of these representations were fulfilled. CHU alleges that these representations were false when made and therefore constitute further misrepresentations.

[275]   These representations fall into two categories – that TOKI would wire future payments and that TOKI had obtained NIOSH certified N95 masks that it could deliver to CHU to reduce its liability to CHU.

[276]   These additional allegations of misrepresentation do not assist in any way in the analysis of the alleged misrepresentations in respect of the formation of the Contract and CHU's payment of the purchase price, which are the basis of CHU's principal claim in this action. The allegations appear to have been added in this action by CHU for the purpose of "colour".

[277]   I have addressed these additional allegations only for completeness. I am not persuaded that any of these alleged misrepresentations are actionable for the following reasons.

[278]   These "representations" were in the nature of statements regarding intended performance of the arrangement reached on or about April 29, 2020. The fact that they were not fulfilled does not, by that fact alone, render the promises false representations. It is necessary to establish that each alleged misrepresentation was false at the time it was made. CHU has failed to do so in respect of any of these alleged misrepresentations.

[279]   With respect to the promises of additional payments, it is true that Caridi promised on several occasions that monies would be wired to CHU. However, Caridi had advised La Treille on April 28, 2020 that TOKI was not in a position to make any payments at the time because all of its cash was tied up in inventory. In the email exchanges with CHU on this matter, Caridi conditioned the promised wire transfers on the receipt of incoming wire transfers from unidentified third parties related to TOKI's sale of other PPE to such third parties. CHU has not demonstrated that any such incoming wire transfers were received such that TOKI was in a position to make the intended payments.

[280]   CHU's principal allegation appears to be that it relied on Caridi's representations regarding payment to forbear from taking enforcement proceedings. However, there is no evidence of any forbearance agreement between the parties, merely a business decision on CHU's part to seek an amicable solution. To the extent that CHU alleges that it acted unilaterally in forbearing from taking enforcement proceedings in reliance on these representations, any such unilateral forbearance would have been unreasonable given the knowledge that it possessed and TOKI's past delivery of KN95 masks rather than NIOSH certified N95 masks as promised. As mentioned, Caridi had already advised it that any payment by TOKI was dependent on the successful completion of other PPE sales to third parties.  If it did, in fact, unilaterally defer enforcement proceedings, that was a business decision that CHU took having regard to all the circumstances at the time. It does not support any claim against Caridi for deceit based on a false representation at this time.

[281]   In or about April 29, 2020, Caridi did represent that TOKI had obtained NIOSH certified N95 masks that it was able to deliver to CHU. Under the arrangement agreed to, as summarized in La Treille's email of May 1, 2020, Caridi was to provide CHU with samples of NIOSH certified N95 masks, which were expected to be "3Q" masks, for review by CHU by May 7. If acceptable, TOKI would deliver 1 million masks within 10 days of receiving a purchase order in reduction of the amount owing to CHU at a stipulated purchase price.

[282]   It appears from emails of Caridi and Daniel Caridi that, by late April, Lee was able to source the "3Q" masks, which were NIOSH certified N95 masks made in China**.** Caridi says that the TOKI payment of $400,000 to Ya Zhou identified by the Receiver was for such masks. However, for reasons that are not in the record, Caridi/TOKI never provided any sample masks for review by CHU and this aspect of the arrangement proceeded no further despite several demands by CHU and its counsel for delivery of the samples.

[283]   However, whether or not Caridi's representation was false at the time it was made, there is no evidence that CHU relied in any manner on this alleged misrepresentation. In addition, any such reliance would, in any event, have been unreasonable in view of the relationship by that date. By April 29, 2020, CHU had ample knowledge that Caridi/TOKI did not have access via its supplier to any NIOSH certified N95 masks that it could deliver to CHU. To the extent that CHU hoped that Caridi would be able to access such masks in the future, it was well aware that it was taking a chance in the hope that things might be different. It was not however reasonable to rely on the statements as factual representations. Nor is there any evidence that CHU did so.

### Caridi's Arguments

[284]   Caridi made four principal submissions as set out in his closing submissions which can be summarized as follows.

[285]   First, he says that at all times he acted in good faith without any intention to misrepresent TOKI's ability to deliver NIOSH certified N95 masks. In this regard, he says that he communicated CHU's requirements for NIOSH certified N95 masks to Lee and Roncati and was assured by Lee that Lee's supplier(s) or manufacturer(s) would meet that requirement. He says that he was let down by Lee in this respect when KN95 masks were delivered instead.

[286]   Second, as a related matter, Lee says he was transparent with CHU regarding the masks to be delivered. In particular, he says that he advised CHU as soon as he learned that the masks were coming from China and that the masks being delivered were KN95 masks.

[287]   Third, Caridi says that the freeze order placed on TOKI's accounts by Chase Bank had severe consequences for TOKI's and Lee's business of supplying PPE to CHU and other third parties and contributed to a certain extent to CHU's losses. He also suggests that CHU was responsible to a certain extent for the loss it suffered as a result of its failure to terminate the Contract in a timely manner after it became clear that the masks that TOKI was able to deliver were not NIOSH certified N95 masks.

[288]   Fourth, Caridi suggested that CHU's recourse to the IRRST Report breached the Contract by adding an additional term of acceptance, that CHU withheld deliveries of masks that met the specifications of the Contract, and that CHU relied on an improper test report to attempt to void the Contract which had the effect of interrupting his supply chain of masks.

[289]   Lastly, he says that the directors and officers of TOK Corp. were always aware of the CHU transaction and either formally or informally authorized TOKI's involvement in that transaction. As such, he says the corporate veil should be respected regarding his involvement.

[290]   I do not think that any of these arguments displace or exclude a finding of civil fraud or deceit against TOKI and Caridi personally for the following reasons.

[291]   First, for the reasons set out above, I have concluded that the actions upon which Caridi relies as a defence to CHU's claim do not exclude a finding of civil fraud or deceit against TOKI. As discussed, I have found that Caridi did not know whether or not TOKI was able to deliver NIOSH certified N95 masks when he made, or caused TOKI to make, the representations upon which CHU bases its claim. In other words, he did not know whether the representations were true or false when they were made. I have concluded that his actions in making the representations in such circumstances were reckless for the reasons set out above.

[292]   As a more general matter, Caridi's position is essentially that CHU should bear any loss resulting from Lee's inability to satisfy TOKI's requirements under the Contract. Although the decision in these Reasons is not based on a simple question of risk allocation, I would note that it

was Caridi, not CHU, who took the chance that Lee's supplier(s) or manufacturer(s) could not deliver the product that TOKI represented it could deliver. In these circumstances, Caridi/TOKI assumed the risk that TOKI could not deliver the product that CHU purchased and paid for under the Contract.

[293]   Second, while Caridi may have advised CHU as soon as he learned that the masks were coming from China, he did not advise CHU prior to March 30, 2020 that the masks would not be NIOSH certified N95 masks. When he first learned of the reference to KN95 masks on the Chinese export declaration form, he stated that the masks were actually NIOSH certified N95 masks. He did not acknowledge that the masks being delivered were KN95 masks until his email to Boustani on April 4, 2020. However, by that time the representations had been made and TOKI had accessed a substantial amount of the monies paid to it by CHU for the purchase of masks from or through Lee.

[294]   Third, with respect to the significance of the freeze order, CHU denies that its actions triggered the order. Even if they did, the freeze order has no relevance for this action for several reasons. Most importantly, the freeze order did not prevent TOKI's delivery of NIOSH certified N95 masks. There is no evidence that TOKI would have supplied CHU with such masks in the absence of the freeze order. In addition, the misrepresentations upon which the CHU claim is based occurred much earlier in time than the freeze order.

[295]   The real impact of the freeze order appears to be that it quite possibly adversely affected TOKI's business of supplying other PPE to CHU and other third parties and, according to Caridi, also of Lee's business of supplying PPE to TOKI and other parties. This is irrelevant for CHU's claim of civil fraud or deceit. The only significance of this interruption of TOKI's business for present purposes is that it may have affected TOKI's ability to engage in additional PPE transactions that might have generated profits with which to repay CHU. While this may thereby have affected CHU's ability to recover its losses from TOKI, it is not relevant for the merits of CHU's claim of civil fraud or deceit or for the quantification of its losses.

[296]   Fourth, I have considered Caridi's argument that CHU was responsible to a certain extent for the loss it suffered in the discussion above regarding the quantum of CHU's damages. For the reasons set out therein, I do not consider that CHU was obligated to terminate the Contract on April 14, 2020 rather than to proceed with the testing. I also do not accept that CHU imposed an additional term of acceptance under the Contract. CHU simply exercised its rights as an innocent party subject to anticipatory breach and took an action to which TOKI acquiesced. Given that the masks that TOKI delivered on April 9 and April 13, 2020 were not NIOSH certified N95 masks, it is not correct to suggest that CHU rejected deliveries of masks that met the specifications of the Contract.

[297]   Lastly, I address the issue of Caridi's personal liability, and his ability to rely upon TOKI's separate corporate existence, in the following section.

### **Analysis and Conclusions Regarding the Personal Liability of Caridi**

[298]   While I have found above that Caridi made several false representations which resulted in CHU's valid claim for deceit, Sigma Santé and CHU were, at all times, dealing with Caridi in his capacity as an officer and director of TOKI.

[299]   Caridi argues that CHU's claim is limited to a claim against TOKI – that is, that TOKI, not Caridi, made the misrepresentations to CHU and that Caridi is therefore entitled to assert the protection of the corporate shield in defence of CHU's claims against him personally. The plaintiff submits that the Court should pierce the corporate veil to find Caridi personally liable for the misrepresentations of TOKI - that it could supply NIOSH certified N95 masks - which induced CHU to enter into the Contract.

[300]   I do not think that the conditions exist in this case for a finding that the corporate veil should be lifted in order to fix Caridi with TOKI's liability in tort. On the other hand, I think that CHU's claim is miscast and that the real issue raised by CHU is whether Caridi's involvement in the CHU transaction gives rise to personal liability as an officer and director of TOKI. I am of the view that CHU has satisfied the requirements for such a finding. The following sets out my reasons for these conclusions.

[301]   The Court of Appeal set out the principles in regard to piercing the corporate veil in *642947 Ontario Limited v. Fleischer* (2001), 56 O.R. (3d) 417 (C.A), at paras. 67-69, as follows:

> … To pierce the corporate veil is to disregard the separate legal personality of a corporation, a fundamental principle of corporate law recognized in *Salomon v. Salomon & Co*., [1897] A.C. 22, [1895-9] All E.R. Rep. 33. Only exceptional cases -- cases where applying the Salomon principle would be "flagrantly" unjust -- warrant going behind the company and imposing personal liability. Thus, in *Clarkson Co. v. Zhelka*, 1967 CanLII 189 (ON SC), [1967] 2 O.R. 565 at p. 578, 64 D.L.R. (2d) 457 (H.C.J.), Thompson J. held that instances in which the corporate veil has been pierced "represent refusals to apply the logic of the Salomon case where it would be flagrantly opposed to justice". Similarly, Wilson J. observed in *Kosmopoulos v. Constitution Insurance Co*., 1987 CanLII 75 (SCC), [1987] 1 S.C.R. 2 at p. 10, 34 D.L.R. (4th) 208, that the law on when the corporate veil can be pierced "follows no consistent principle. The best that can be said is that the 'separate entities' principle is not enforced when it would yield a result 'too flagrantly opposed to justice, convenience or the interests of the Revenue': L.C.B. Gower, *Modern Company Law* (4th ed. 1979), at p. 112".

> Typically, the corporate veil is pierced when the company is incorporated for an illegal, fraudulent or improper purpose. But it can also be pierced if when incorporated "those in control expressly direct a wrongful thing to be done": *Clarkson Co. v. Zhelka* at p. 578. Sharpe J. set out a useful statement of the guiding principle in *Transamerica Life Insurance Co. of Canada v. Canada Life Assurance Co*. (1996), 1996 CanLII 7979 (ON SC), 28 O.R. (3d) 423 at pp. 433-34 (Gen. Div.), affd [1997] O.J. No. 3754 (C.A.): "the courts will disregard the separate legal

personality of a corporate entity where it is completely dominated and controlled and being used as a shield for fraudulent or improper conduct."

These authorities indicate that the decision to pierce the corporate veil will depend on the context. They also indicate that the separate legal personality of the corporation cannot be lightly set aside. Yet, however restrictive corporate law principles for piercing the corporate veil may be, in the context of an undertaking to the court, the trial judge's findings support going behind Sweet Dreams and imposing personal liability.

[302]  In the present case, it is clear that the corporate personality of TOKI was dominated by Caridi as the sole director, the chief executive officer and the sole representative of TOKI in respect of the Contract. However, there is no evidence that TOKI was a sham corporation incorporated for "an illegal, fraudulent or improper purpose." Nor was it "being used as a shield for fraudulent or improper conduct." Notwithstanding the finding that Caridi was reckless in making, and causing TOKI to make, the representations that gave rise to CHU's claim in deceit, there is no evidence that Caridi incorporated or used TOKI in respect of the CHU transaction or otherwise with such purpose in mind.

[303]  TOKI was created for a legitimate corporate purpose with the knowledge and awareness of the board of directors of TOK Corp. – to engage in non-ordinary course transactions which were generally speculative in nature, the profits of which would be shared with TOK Corp. TOKI had been operating as an independent corporate entity under Caridi's control and direction for some time prior to March 2020. It engaged in transactions, albeit much smaller than the CHU transaction, maintained its own corporate and financial records, had its own bank accounts and observed the necessary corporate formalities. As described above, after March 30, 2020, TOKI carried on the business of importing and selling PPE to a number of customers in addition to CHU.

[304]  The issue in respect of CHU's claim to pierce the corporate veil is whether the fraudulent misrepresentation of TOKI constitutes a "wrongful thing to be done", as contemplated in *Fleischer*, that would be sufficient to pierce the corporate veil. However, given the finding below, it is not necessary to address this issue and I therefore decline to do so.

[305]  In *ADGA Systems International Ltd. v. Valcom Ltd*. (1999), 43 O.R. (3d) 101 (C.A.), the Court of Appeal treated the liability of directors and officers for tortious conduct conducted on behalf of a corporation as an independent cause of action against an impugned director or officer that did not engage the corporate veil principle:

That beginning is found in the House of Lords' decision in *Salomon v. Salomon & Co. Ltd*., [1895-9] All E.R. 33 (H.L.), which established that a company, once legally incorporated, must be treated like any other independent person, with rights and liabilities appropriate to itself. From time to time, litigants have sought to lift this "corporate veil", by seeking to make principals of the corporation liable for the obligations of the corporation. However, where, as here, the plaintiff relies upon

establishing an independent cause of action against the principals of the company, the corporate veil is not threatened and the Salomon principle remains intact.

After detailing the mischief that would flow from permitting such claims to be made McCardie J. concluded [in *Said v. Butt*, [1920] 3 K.B. 497] at p. 506:

> I hold that if a servant acting bona fide within the scope of his authority procures or causes the breach of a contract between his employer and a third person, he does not thereby become liable to an action of tort at the suit of the person whose contract has thereby been broken. ... Nothing that I have said to-day is, I hope, inconsistent with the rule that a director or a servant who actually takes part in or actually authorizes such torts as assault, trespass to property, nuisance, or the like may be liable in damages as a joint participant in one of such recognized heads of tortious wrong.

The consistent line of authority in Canada holds simply that, in all events, officers, directors and employees of corporations are responsible for their tortious conduct even though that conduct was directed in a bona fide manner to the best interests of the company, always subject to the *Said v. Butt* exception.

These Canadian authorities at the appellate level confirm clearly that employees, officers and directors will be held personally liable for tortious conduct causing physical injury, property damage, or a nuisance even when their actions are pursuant to their duties to the corporation.

[306] In *ADGA Systems*, the Court of Appeal also approved the following statement of the circumstances in which directors can be personally liable articulated in *Normart Management Limited v. West Hill Redevelopment Company Limited et al.* (1998), 37 O.R. (3d) 97 (C.A.) at p. 102:

> It is well established that the directing minds of corporations cannot be held civilly liable for the actions of the corporations they control and direct unless there is some conduct on the part of those directing minds that is either tortious in itself or exhibits a separate identity or interest from that of the corporations such as to make the acts or conduct complained of those of the directing minds: see *Scotia McLeod Inc. v. Peoples Jewellers Ltd.* (1995), 1995 CanLII 1301 (ON CA), 26 O.R. (3d) 481 at p. 491, 129 D.L.R. (4th) 711 (C.A.).

[307] I conclude that, in this case, CHU is entitled to an order that Caridi is personally liable for the misrepresentations made by TOKI on both of the grounds identified in Normart.

[308] First, Caridi caused TOKI to make the fraudulent misrepresentation that induced CHU to enter into the Contract. While most of the decisions addressing the personal liability of directors involve either the tort of inducing a breach of contract or tortious conduct causing physical injury,

property damage or a nuisance, the case law does not preclude the extension of the principle to torts causing economic loss such as the tort of deceit or fraudulent misrepresentation in a contractual context. In this regard, I note that Koehnen J. reached a similar conclusion in *Crowder v. Canada Builds Company*, 2022 ONSC 6018, and that the Ontario Court of Appeal found an officer of a corporation liable for negligent misrepresentation in *NBD Bank, Canada v. Dofasco Inc.*, *et al.* (1999), 46 O.R. (3d) 514.

[309]   Second, and more importantly, the facts of this case fall squarely within the circumstances in which the conduct of the directing mind of a corporation exhibits a separate identity or interest from that of the corporation. In this case, Caridi acknowledged that, to the extent any profits were realized, they were to be divided, between himself personally and TOKI on a 50:50 basis. In these circumstances, Caridi was acting in a personal capacity, as well as in his capacity as the sole director and an officer of TOKI, when the fraudulent misrepresentations were made to CHU that induced it to enter into the Contract, to make full payment of the purchase price, and to refrain from terminating the Contract and taking action to recover the monies paid to TOKI prior to March 30, 2020.

[310]   Based on the foregoing, I conclude that Caridi is personally obligated to pay CHU the amount of Canadian currency sufficient to purchase the sum of $11,193,522.50 less the amounts paid by the other parties in this action and in a related action who have settled with CHU.

**The Plaintiff's Claim of Oppression**

[311]   As an alternative route to a finding of personal liability of Caridi, CHU argues that Caridi's actions constitute oppressive behaviour for the purposes of s. 241(2) of the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44, as amended (the "Act").

[312]   That provision reads as follows:

> (2) If, on an application under subsection (1), the court is satisfied that in respect of a corporation or any of its affiliates
>
> > (a) any act or omission of the corporation or any of its affiliates effects a result,
> >
> > (b) the business or affairs of the corporation or any of its affiliates are or have been carried on or conducted in a manner, or
> >
> > (c) the powers of the directors of the corporation or any of its affiliates are or have been exercised in a manner
>
> that is oppressive or unfairly prejudicial to or that unfairly disregards the interests of any security holder, creditor, director or officer, the court may make an order to rectify the matters complained of.

[313]  There are two requirements for a successful claim under this provision.  First, a complainant must identify expectations that have been violated by the conduct at issue and establish that such expectations were reasonably held.  Second, the complainant must demonstrate that these expectations were violated by corporate conduct that was oppressive or that unfairly prejudiced a security holder, creditor, director or officer, pursuant to s. 241(2): see *Wilson v. Alharayeri*, 2017 SCC 39, at para. 24. It is not disputed that a creditor may be a complainant for the purposes of s. 241.

[314]  CHU argues that it had a reasonable expectation that (1) TOKI would not be used as a vehicle for fraud; and (2) that TOKI would not dissipate its assets for no consideration, leaving it unable to realize upon assets to satisfy its debt to CHU. With respect to the second expectation, CHU says that it reasonably expected that TOKI's assets "would not be stripped from the corporation particularly for Caridi's personal advantage and the advantage of family members and other business associates" and suggests that Caridi's misuse and dissipation of corporate funds accelerated at a time when he was repeatedly told that CHU would not accept KN95 masks.

[315]  *Wilson* dealt specifically with the circumstances in which an order for compensation under s. 241(3) of the Act may properly lie against the directors of a corporation personally, as opposed to the corporation itself.  I adopt for this purpose the following summary of the applicable principles set out in *FNF Enterprises Inc. v. Wag and Train Inc*., 2023 ONCA 92, at para. 33:

> The Supreme Court held that personal liability may be imposed on a director for oppressive conduct if two criteria are met: (1) the director has the requisite degree of involvement in the oppressive conduct so that it is attributable to them; and (2) personal liability is fit in the circumstances. An order against a director personally will be fit where it is a fair way of dealing with the situation, the order goes no further than necessary to rectify the oppression, the order serves only to vindicate the reasonable expectations of the complainant, and other forms of statutory and common law relief are not more fitting in the circumstances: *Wilson*, at paras. 47-55

[316]  In this regard, as was noted in *FNF Enterprises* at para. 34, the Supreme Court identified at para. 49 in *Wilson* that the obtaining of a personal benefit by a director, or the misuse of a corporate power by a director, are situations in which it would typically be fair to impose personal liability on a director.

[317]  Although CHU's submissions do not clearly spell out this distinction, CHU's expression of the two very different expectations described above suggests two very different bases for a claim of oppression under s. 241 of the Act, which I will address in turn.

[318]  The first expectation – that TOKI would not be used for fraud – is based on a finding of fraudulent action on the part of Caridi using TOKI as the vehicle for such fraud. Such a claim, if established, would more typically be addressed in the context of an action seeking to pierce the corporate veil in order to ground personal liability of a director or shareholder having an interest

in the corporation.  In the present circumstances, such a claim would necessarily be based on the four misrepresentations inducing the payment of the Contract funds by CHU.

[319]  This claim of oppression is denied for two reasons.

[320]  First, this claim is co-extensive with the common law claim for fraud. For the reasons set out above, I have rejected CHU's argument that the Court should pierce the corporate veil to find Caridi personally liable for the misrepresentation of TOKI. That finding was based on the absence of any evidence that TOKI was incorporated for "an illegal, fraudulent or improper purpose." That finding is equally applicable in respect of this claim of oppression.

[321]  Second, insofar as CHU's oppression claim is a claim against Caridi personally in his capacity as a director or officer of TOKI, such claim engages the principle referred to in *Wilson,* at para. 53, that director liability under that provision cannot be a surrogate for other forms of statutory or common law relief.  In this case, the oppression claim is very clearly a surrogate for a common law action alleging personal liability of a director and officer on the basis of the principles in *AGDA Systems* and *Normart,* addressed above.

[322]   For these reasons, I conclude that CHU does not have a valid, alternative claim under s. 241 of the Act in respect of its alleged expectation that TOKI would not be used as a vehicle for fraud.

[323]  The second expectation – that TOKI would not dissipate its assets for no consideration leaving it unable to satisfy its debt to CHU – is the basis for a different claim of oppressive activity under s. 241.  For this purpose, CHU relies on the decision in *FNF Enterprises* and the following dicta of Perell J. in *Sigma v. Fluid Hose & Coupling Inc*., 2022 ONSC 4371, at para. 59:

> When a corporate officer depletes the assets of the corporation to render it judgment-proof or diverts assets for his or her benefit that could be used to pay a judgment, the court may use the oppression remedy to make the officer personally liable for the debt owed to the creditor.  Paying dividends or redeeming shares when a corporation is unable to pay its liabilities may constitute unfairly prejudicial conduct and unfairly disregards a creditor's interests.

[324]  This oppression claim is based on Caridi's alleged stripping of the assets of TOKI thereby preventing TOKI from repaying the outstanding amount of the Contract price in accordance with the arrangement reached on or about April 29, 2020 described above.

[325]  There are, however, several factual and legal problems with this version of the oppression claim.

[326]  First, this is not a case in which assets have been appropriated by Caridi in the manner that occurred in either *FNF Enterprises* or *Sigma*. Caridi did not use TOKI's money as his own or appropriate its business. Nor is there evidence that Caridi stripped value from TOKI to avoid payment of amounts known to be owing to CHU.

Page: 63

[327]   The Receiver's evidence indicates that, apart from the slightly less than $1.2 million paid to Caridi and Daniel Caridi, approximately $7.1 million was paid to various third parties in respect of the purchase of approximately 2.5 million masks as discussed above. Of the remaining amount, excluding the amounts paid to Caridi and his son, CHU has not established that Caridi appropriated any of these monies, or otherwise stripped TOKI of its assets, rather than used them for other PPE transactions engaged in by TOKI.

[328]   Further, while Caridi received a payment or payments totaling $1,105,072 out of the TOKI bank account, the evidence of Jessie Lin, an internal accountant at TOK Corp, was that a substantial portion of such payments was in satisfaction of amounts accrued on the books of TOKI and/or TOK Corp as owing to Caridi, principally for unpaid salary. Moreover, these payments were apparently subject to review by the accounting department of TOK Corp. CHU has not demonstrated otherwise, nor has CHU demonstrated that any other payments were simple misappropriations of TOKI funds by Caridi. While such payments may qualify as a preference under insolvency legislation, that is not, by itself a basis for a claim of oppression.

[329]   CHU says that there should be an additional amount included representing a payment from Lee for "services relating to logistics and FDA compliance relating to PPE" as described in paragraph 4 of the Roncati Affidavit, which Caridi confirmed in the course of the trial and for which the best evidence is the amount of $80,000.  However, the evidence is that any such payment was made in consideration of Caridi's logistical assistance in respect of the transport of PPE from China to the United States. CHU has offered no proof to the contrary.

[330]   Secondly, and more important, as Doherty J.A. observed in *J.S.M. Corporation (Ontario) Ltd. v. The Brick Furniture Warehouse Ltd*., 2008 ONCA 183, at para. 66, there is an important distinction to be drawn between a creditor who could, but did not, protect itself from a risk it assumed when it entered into an agreement with a corporation and a creditor who "finds his interest as a creditor compromised by unlawful and internal corporate maneuvers against which the creditor cannot effectively protect itself":

> … . the oppression remedy is not intended to give a creditor after-the-fact protection against risks that the creditor assumed when he entered into an agreement with a corporation.  The position of a creditor who can, but does not, protect itself against an eventuality from which he later seeks relief under the oppression remedy, is much different than the position of a creditor who finds his interest as a creditor compromised by unlawful and internal corporate manoeuvres against which the creditor cannot effectively protect itself.  In the latter case, there is much more room for relief under the oppression provisions than in the former case.

[331]   In this case, CHU falls in the former category. It agreed to make full payment of the Contract price up front without any security arrangements or other protections after minimal due diligence regarding TOKI/TOK Corp. That was its choice.  The fact that it believed that it faced an emergency does not have any legal significance.  It was in a position to protect itself in various ways which are more typically found in a transaction of this nature and magnitude but did not do

so. This is not a case in which CHU finds its interests as a creditor compromised by unlawful and internal corporate maneuvers against which it could not effectively protect itself.

[332]   Simply put, CHU's alleged expectation is unreasonable. CHU was prepared to accept the status of an unsecured creditor in respect of TOKI. It understood that TOKI was a corporation carrying on the business of the purchase and resale of PPE. In entering into the Contract, it accepted the risk that TOKI's business activities might not be profitable and the value of its assets might thereby be diminished.  It also accepted the risk of payments to related parties that must be addressed by insolvency legislation if objectionable. It cannot use these circumstances as a basis for an oppression claim.

[333]   Based on the foregoing, the CHU claim of oppression under s. 241(2) of the CBCA is denied in its entirety.

### The Plaintiff's Claim of Unjust Enrichment

[334]       CHU also alleges that Caridi has been unjustly enriched and seeks an order that he disgorge the amount received by him.

[335]   It is my understanding that CHU's claim on the basis of unjust enrichment is limited to the amounts actually received by Caridi in his personal capacity, rather than the entirety of the monies paid by CHU to TOKI pursuant to the Contract. As mentioned, the Receiver has determined that Caridi received a payment or payments totaling $1,105,072 out of the TOKI bank account. As discussed above, he also received approximately $80,000 from Lee or a company controlled by Lee for logistical services in connection with the transportation of PPE to North America. While CHU also refers to monies paid to Caridi's son Daniel, his son is not a defendant in this action. Accordingly, there is no basis for an order of unjust enrichment against him.

[336]   Unjust enrichment requires demonstration that: (1) the defendant has been enriched; (2) the plaintiff has suffered a corresponding deprivation; and (3) the absence of any juristic reason justifying the defendant's retention of that transfer of value: *Moore v. Sweet*, 2018 SCC 52, at para. 37.

[337]   As mentioned above, Lin testified that, of the total of $1,105,072 paid by TOKI or TOK Corp. to Caridi, a substantial portion was in satisfaction of amounts accrued on the books of TOKI and/or TOK Corp as owing to Caridi, principally for unpaid salary.  CHU has not demonstrated otherwise, nor has CHU demonstrated that any other payments were misappropriations of funds by Caridi.  In this regard, the payments were apparently subject to review by the accounting department of TOK Corp. which was and remains a public company.

[338]   With respect to the payment for logistical services, there is no evidence that the payment came from the monies paid by CHU to TOKI. Even if they were, however, the evidence is that any such payment was made in consideration of actual logistical assistance by Caridi in respect of the transport of PPE from China to the United States. CHU has offered no proof to the contrary.

[339]   Given the foregoing evidence regarding these payments to Caridi, I conclude that, even if the first two requirements for a claim of unjust enrichment could be established, Caridi has demonstrated a juridical reason for such payments that justify his retention of such amounts. Accordingly, the CHU claim for unjust enrichment is denied.

**The Plaintiff's Request for Imposition of a Constructive Trust and a Tracing Order**

[340]   The plaintiff also seeks an equitable tracing order to permit CHU to trace the monies paid by CHU to TOKI, and/or the proceeds thereof and any assets acquired using the CHU monies into the hands of Caridi, TOKI, its officers, directors, servants or agents, and entities or trusts controlled by them, with such monies, proceeds or assets constituting CHU's property held in trust pursuant to a constructive trust.

[341]   In support of this relief, the plaintiff cited the decision in *Bank of Montreal v. Sakara Wood Inc.,* 2023 ONSC 1570, at para. 20, in which, in granting a constructive trust over certain loan proceeds obtained through fraud, a tracing remedy to determine where the funds ended up, and a constructive trust over any traceable proceeds, Koehnen J. observed that "[s]uch remedies are common in cases of fraud in order to assist innocent parties to recover their losses: *Soulos v. Korkontzilas*, 1997 CanLII 346 (SCC), [1997] 2 S.C.R. 217 at para. 34 …".

[342]   However, the circumstances in this case are very different from those envisaged by Koehnen J. in *Soulos v. Korkontzilas*.

[343]   In the present circumstances, the Receiver was appointed pursuant to the order dated December 16, 2020 of Koehnen J. in the Mareva Injunctive Proceeding. Pursuant to that order, the Receiver has effectively conducted the tracing exercise sought by CHU and has provided four reports to the Court setting out the results.

[344]   The Receiver has determined that there is no fund to which any constructive trust could attach. Instead, the monies sent by CHU to TOKI have been dispersed in various directions. Most of the funds have been paid to third parties in respect of arm's length transactions between such third parties and TOKI or for services rendered by such third parties to TOKI. With the exception of monies paid to Caridi, there is no suggestion in the evidence that these third parties were joint tortfeasors together with Caridi in respect of any of the misrepresentations made to CHU that form the basis of CHU's claim for civil fraud or deceit.

[345]   With respect to the monies paid to Caridi and Bedford Capital, there is no need for a tracing order to identify the amount, date or recipient of such payments. CHU has all the information that it requires to assert any claims it may have against each of them to the extent it chooses to do so.

[346]   I therefore also see no grounds for a tracing order in respect of the monies paid to TOKI by CHU.

[347]   In the present circumstances, therefore, there would be no benefit to the order sought by CHU. This requested relief is therefore denied.

**The Plaintiff's Claim for Breach of Contract by Tree of Knowledge Inc.**

[348]   The principal issues in this action pertain to the plaintiff's tortious claim of civil fraud or deceit directed against TOKI and Caridi. However, the plaintiff also seeks judgment against TOKI for breach of the Contract.

[349]   The Contract called for the delivery of 3 million NIOSH certified N95 masks. TOKI delivered approximately 156,000 masks before CHU stated in the Kobrynsky Email that it would reject all further deliveries pending testing of the quality and utility of the masks that had been delivered. Ultimately, CHU terminated the Contract in La Treille's email to Caridi of April 29, 2020 without any further deliveries having been made.

[350]   The approximately 156,000 masks that were delivered were not NIOSH certified N95 masks. Caridi/TOKI have not demonstrated that they were ever in a position to supply 3 million masks that satisfied the specifications of the Contract. Accordingly, as of April 14, 2020, TOKI had breached the Contract and was not in a position to remedy the default.

[351]   The arrangement reached on or about April 29, 2020 and summarized in La Treille's email to Caridi of May 1, 2020, to which Caridi agreed, specifically contemplated future deliveries of NIOSH certified N95 masks. TOKI was also unable to comply with this feature of the arrangement. To the extent that the Contract was supplemented or amended by the arrangement, it is clear that TOKI also breached such arrangement, apart from the payment of $2 million.

[352]   Based on the foregoing, I conclude that TOKI breached the Contract. CHU paid the full amount of the purchase price under the Contract. TOKI failed to deliver the 3 million NIOSH certified N95 masks provided for under the Contract despite ample opportunity to do so. Based on the evidence of the Receiver, CHU's loss was equal to the full amount paid to TOKI less the amounts repaid to it by TOKI and the amounts paid to it by the other parties in this action and in a related action.

**The Request for an Order Under the *Bankruptcy and Insolvency Act***

[353]   Given the finding of personal liability of Caridi, CHU seeks an order that the judgment debt arising from the order giving effect to these Reasons for Judgment falls within sections 178(1)(d) and/or (e) of the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3, as amended.

[354]   These provisions read as follows:

> 178 (1) An order of discharge does not release the bankrupt from …
>
> (d) any debt or liability arising out of fraud, embezzlement, misappropriation or defalcation while acting in a fiduciary capacity or, in the Province of Quebec, as a trustee or administrator of the property of others;

(e) any debt or liability resulting from obtaining property or services by false pretences or fraudulent misrepresentation, other than a debt or liability that arises from an equity claim; …

[355]   Based on the determinations above made in respect of the CHU claim in deceit, the judgment amount owing by Caridi and TOKI constitutes a debt or liability resulting from the obtaining of property by a fraudulent misrepresentation. I am sympathetic to the argument that Caridi's recklessness in the present circumstances does not exhibit the moral turpitude associated with the actions addressed by sections 178(1)(d) and (e). However, the case law on the operation of these provisions does not apparently draw a distinction along these lines.

[356]   Accordingly, I find that CHU is entitled to an order that the judgment amount falls within s. 178(1)(e) of the *BIA*.

**Conclusion**

[357]   Based on the foregoing, Caridi is obligated to pay CHU the amount of Canadian currency sufficient to purchase the sum of $11,193,522.50 less the amounts paid by other parties in this action and in a related action who have settled with CHU.

[358]   If the parties are unable to agree on costs, they shall have twenty-one days from the date of release of these Reasons to submit costs submissions not exceeding five pages together with a costs outline in accordance with the *Rules of Civil Procedure*.

_____
Wilton-Siegel J.

**Released:** July 9, 2024

**CITATION:** Chu De Québec-Université Laval v. Tree of Knowledge International Corp., 2024
ONSC 3541
**COURT FILE NO.:** CV-20-00645223-00CL
**DATE:** 20240709

# ONTARIO

# SUPERIOR COURT OF JUSTICE

**BETWEEN:**

Chu De Québec-Université Laval

Plaintiff

**– and –**

Tree of Knowledge International Corp., Tree of
Knowledge Inc., Michael Caridi, Blu Stella Consulting
Group Inc., and Fabio Gesufatto

**Defendants**

## REASONS FOR JUDGMENT

Wilton-Siegel J.

**Released:** July 9, 2024