## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION | ) | 3:23-cv-1243 (SVN) |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL CARIDI, | ) | July 25, 2025 |
| *Defendant.* | ) | |

## <u>ORDER DENYING MOTION TO VACATE JUDGMENT</u>

Sarala V. Nagala, United States District Judge.

In this securities fraud action, Plaintiff United States Securities and Exchange Commission ("SEC") alleged that Defendant Michael Caridi made materially false and misleading statements to investors regarding a company of which Caridi was the chairman and chief executive, and aided and abetted the same, in violation of federal securities laws. *See generally* Am. Compl., ECF No. 16. A Consent Judgment was entered on January 2, 2025. *See* Order, ECF No. 65.

Pending before the Court is Caridi's motion to vacate the Consent Judgment. Def.'s Mot. to Vacate, ECF No. 66. Caridi alleges the SEC reneged on a promise to refrain from issuing a press release regarding the Consent Judgment and that the SEC coerced him to sign the Consent Judgment under duress. *Id.* The SEC opposes the motion; it denies ever making any promise to Caridi regarding press releases, argues that the "litigation release" it issued is not a press release, and contends that Caridi's circumstances fall short of the legal standard for duress. Pl.'s Mem. Opp. Mot. to Vacate, ECF No. 68 at 15–18.

Based on the language in the signed Consent Judgment and the documentation submitted by both parties, the Court finds there is insufficient evidence to conclude the SEC made a misrepresentation or engaged in fraud in connection with issuance of a release. Additionally,

although it is apparent that Caridi faced some difficult personal circumstances around the time he chose to settle this case, the Court finds he was not under duress, as the law defines it. For the reasons set forth below, Caridi's motion to vacate the Consent Judgment is DENIED.

## I.    FACTUAL BACKGROUND

### A.  The Consent Judgment

This controversy arises out of the SEC's allegations that Caridi committed securities fraud. In September 2023, the SEC filed suit against Caridi, alleging that he concealed from investors in Tree of Knowledge, Inc., where he was a former chairman and chief executive, that he had engaged in a failed business transaction with a Canadian hospital and misappropriated funds from that transaction. *See* ECF No. 16 ¶¶ 1, 11. The SEC alleges that Caridi's conduct violated, and aided and abetted violations of, Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), as well as Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. ECF No. 16 ¶¶ 95–101. The details of the alleged violations are set forth in the Court's decision on Caridi's motion to dismiss, with which the Court assumes familiarity. *SEC v. Caridi*, No. 3:23-cv-1243 (SVN), 2024 WL 4349015 (D. Conn. Sept. 30, 2024).

Following settlement negotiations, the parties informed the Court in October 2024 that they had reached an agreement in principle that would resolve the case, subject to approval by the SEC's five Commissioners. *See* Joint Mot. Requesting Sixty-Day Stay, ECF No. 59. The parties do not dispute that Caridi signed a Consent to Judgment ("Consent") on November 26, 2024. Without admitting or denying most of the SEC's allegations, Caridi agreed that he would be permanently enjoined from future violations of the Securities Exchange Act; that he would be barred from acting as an officer or director of a public company; that he would be permanently barred from participating in the offering of penny stocks; that he would pay disgorgement of $895,972 offset

in equal amount by any payments he made to satisfy a judgment awarded to the Canadian hospital in related private litigation; and that he would pay a civil penalty in the amount of $180,000 under a payment plan.  Mot. Approve Consent J., Ex. 1, ECF No. 64-2 ¶ 2.  The Consent also places restrictions on Caridi's speech:  Caridi is barred from publicly denying the allegations made in the SEC's amended complaint as well as from saying that he does not admit the allegations unless he also says he does not deny them.  *See id.* ¶ 12.  Importantly, the Consent contained the following provision:

> Defendant enters into this Consent voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the Commission or any member, officer, employee, agent, or representative of the Commission to induce Defendant to enter into this Consent.

*Id.* ¶ 7.

According to Christopher Colorado, the SEC attorney who is counsel of record for this case, after he sent the final draft of the Consent to Caridi on November 12, 2024, Caridi called Attorney Colorado personally to request time for Caridi's own attorney, who had represented him during the SEC investigation preceding the litigation, to review the document.  Decl. of Christopher Colorado, ECF No. 68-1 ¶ 19.  After  Attorney Colorado spoke with Caridi's attorney, Caridi then delivered a signed and notarized copy of the Consent, without any changes, to Attorney Colorado on November 26, 2024.  *Id.* ¶¶ 20–22.

On December 27, 2024, the SEC submitted an Unopposed Motion for Entry of Consent Judgment.  ECF No. 64.  The Court issued its final judgment, adopting the proposed order verbatim, on January 2, 2025.  *See* ECF No. 65.

B.  The Litigation Release

Caridi claims that the SEC issued a press release that contravened promises made during settlement negotiations, on which he relied when he agreed to the Consent.  *See generally* ECF

No. 66.  On January 8, 2025, the SEC issued "Litigation Release No. 26213" with the headline

"SEC Obtains Final Judgment Against Former Officer and Director For Fraudulent Statements in

Press Releases."  ECF No. 68 at 9; ECF No. 68-12 at 2–3.  In that document, the SEC summarizes

the allegations in its complaint and the terms of the final judgment, noting that Mr. Caridi

consented to those terms "[w]ithout admitting or denying the allegations in the SEC's complaint."

ECF No. 68-12 at 2–3.

But Caridi alleges that Attorney Colorado had "explicitly reassured" him that no "press

release" would be issued.  ECF No. 66 at 2.  As evidence to support this assertion, Caridi points to

an email he sent to Attorney Colorado on October 14, 2024, stating:

> I left you a voicemail, a few additional points, one on $180,000.  I would
> need one year to pay it out in quarterly payments.  Also just confirming no
> press releases on the settlement and SEC or I would not have any comment
> if press sis [sic] reach out to you.

*Id.* at 4; ECF No. 69-3 at 1.

The SEC disagrees there was any such promise.  According to the SEC, Caridi merely

*proposed* that he and the SEC would not speak to the press and that the SEC would refrain from

issuing a press release.  ECF No. 68 at 7; *see also* ECF No. 68-1 ¶¶ 10–12.  As evidence, Attorney

Colorado provides a transcript of a voicemail he received from Caridi on October 14, 2024, which

appears to be the voicemail Caridi referenced in his email quoted above:

> Chris, good morning, Michael Caridi.  A couple things, just, *the no press
> release should be added to that*.  Then, on the 180, a payout over—quarterly
> basis, for one year, if you could add that, I'll need that just to put it together.
> Alright so, the first one, due the first quarter, and then the three quarters in
> equal increments of $45,000.  ***Let me know if that's acceptable and then
> we could wrap this up.***  Thanks, I appreciate it.

ECF No. 68-1 ¶ 11 (first emphasis added).

Attorney Colorado represents that the following morning, on a phone call with Caridi, Attorney Colorado explicitly *rejected* Caridi's proposal concerning a press release. *See id.* ¶ 13 ("I told him that, in my experience, the SEC does not issue press releases in cases that are the same size of this case, but that SEC staff could not agree to recommend that the SEC limit its future public statements, whether to the press or otherwise."); *id.* ¶ 16 ("I never promised Caridi verbally or in writing to recommend that the SEC would limit its public statements concerning the settlement. To the contrary, I told Caridi that the SEC could not be limited in its public statements and that the settlement documents would be made public.").

In further support of the SEC's position, Attorney Colorado represents that he sent a counterproposal with terms different than the ones Caridi had requested in his voicemail and that Caridi agreed to that counterproposal. ECF No. 68-1 ¶ 15. Specifically, on the afternoon of October 15, 2024, Attorney Colorado sent Caridi an email proposing an "upfront penalty payment of $80,000 followed by 4 payments of $25,000" and payment of the full civil penalty and disgorgement amount within 360 days, as opposed to the quarterly payments and one-year timeline that Caridi had proposed in his voicemail and email. ECF No. 68-5. The emailed counterproposal does not discuss the topic of future public statements by the SEC. *Id.* Shortly thereafter, Caridi responded via email, "Good to go !!" *Id.* Attorney Colorado also represents that he spoke with Caridi's attorney by phone after sending the final draft of the Consent but before Caridi signed it, and that, during that conversation, Caridi's attorney did not raise the issue of press releases. ECF No. 68-1 at ¶¶ 20–21.

Furthermore, the SEC maintains that even if there was a promise not to issue a press release, such a promise was not violated because a press release is distinguishable from a litigation release. ECF No. 68 at 12; ECF No. 68-1 ¶¶ 28–33. The SEC also argues that the litigation release merely

summarized information that was already in the public record and therefore was immaterial to Caridi's claimed interest in keeping the details of the settlement from the public eye.  ECF No. 68 at 19.

In his reply brief, Caridi denies that his proposal regarding public statements was ever rejected.  ECF No. 69 at 4 ("At no point did the SEC ever affirmatively or unequivocally convey or inform me that my request for a lack of press release or like published 'Release' was not possible or would not happen; rather, [the SEC's] affirmative statements and conduct reasonably conveyed the opposite impression.") (citing the SEC account of the October 15 phone conversation).

### C.  Claims of Duress

Caridi also claims that the judgment should be vacated because he was under duress when he signed the Consent.  ECF No. 66 at 4.  He contends that during settlement negotiations "the SEC stated that disgorgement would not be pursued but later subpoenaed [his] sons, both age 27, . . . as well as their banks," which "pressured [him] into accepting" the Consent to avoid "devastating financial consequences for his son's new business."  *Id.* at 3–4.  Caridi also notes that his wife suffered a stroke during the course of the litigation and that he "faced foreclosure on his personal residence, which was used as collateral for a real estate project."  *Id.* at 4.

## II.    LEGAL STANDARD

### A.  Vacatur of Judgments Under Rule 60(b)

Although Caridi does not invoke any specific rule in his motion to vacate the Consent Judgment, the Court construes the motion, filed *pro se*, as arising under Rules 60(b) of the Federal Rules of Civil Procedure.  Under that Rule, the court "may relieve a party . . . from a final judgment, order, or proceeding" for enumerated reasons, including in relevant part, because of "(1) mistake, inadvertence, surprise, or excusable neglect"; (3) "fraud . . . , misrepresentation, or misconduct by

an opposing party"; or (6) for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(1), (3), (6). "Rule 60(b) is 'a mechanism for extraordinary judicial relief invoked only if the moving party demonstrates exceptional circumstances.'" *Feurtado v. City of New York*, 671 Fed. App'x. 6 (2d Cir. 2016) (summary order) (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (internal quotation marks omitted)). "[R]elief under the rule is discretionary" and the movant must provide "highly convincing material" in support of the request for relief. *Leeber Realty LLC v. Trustco Bank*, No. 17-cv-2934 (KMK), 2019 WL 498253, at *3 (S.D.N.Y. Feb. 8, 2019) (quoting *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 126 (2d Cir. 2009) and then *United States v. Cirami*, 563 F.2d 26, 33 (2d Cir. 1977)). *Pro se* litigants are not exempt from these standards. *Ojo v. United States*, No. 15-cv-6089 (ARR) (LB), 2024 WL 3535415, at *1 (E.D.N.Y. July 25, 2024).

The particular subsections of Rule 60(b) relevant to this motion are discussed further below.

### B. Vacatur of Consent Judgments

"Where a party wishes to disturb a consent judgment, the already-high Rule 60(b) standard is even harder to reach." *SEC v. Xia*, No. 21-cv-5350 (PKC) (JAM), 2025 WL 1332018, at *4 (E.D.N.Y. May 7, 2025) (cleaned up). This stricter approach is warranted because consent decrees "are to be construed 'basically as a contract.'" *SEC v. Alexander*, No. 06-cv-3844 (NGG) (RER), 2013 WL 5774152, at *3 (E.D.N.Y. Oct. 24, 2013) (quoting *United States v. ITT Cont'l Banking Co.*, 420 U.S. 223, 238 (1975)). Consent decrees with the federal government, therefore, are treated in accordance with the federal common law of contracts. *See FTC v. Harris Originals of N.Y., Inc.*, No. 22-cv-4260 (GRB) (ST), 2024 WL 4225483, at *6 (E.D.N.Y. Sept. 16, 2024); *see also United States v. Bolton*, 496 F. Supp. 3d 146, 153 (D.D.C. 2020). Courts within this circuit

have drawn on the Restatement of Contracts to aid contractual interpretation in these scenarios. *See Reid v. IBM Corp.*, No. 95 Civ. 1755 (MBM), 1997 WL 357969, at *6 n.3 (S.D.N.Y. June 26, 1997).

## III.    DISCUSSION

Although Caridi's arguments for vacatur align most closely with Rule 60(b)(3), pertaining to fraud, and Rule 60(b)(6), the catch-all provision, Caridi also cites Rule 60(b)(1), relating to mistake, inadvertence, surprise, or excusable neglect, in his reply brief.[1] *See* ECF No. 69 at 2. The Court addresses each argument in turn and holds that Caridi is not entitled to the relief he requests under any of these provisions.

### A.  Rule 60(b)(1)

Cases in which vacatur of a judgment is appropriate due to mistake, inadvertence, surprise, or excusable neglect "characteristically involve mistakes that amount to a fumble." *Mandala v. NTT Data, Inc.*, 88 F.4th 353, 360 (2d Cir. 2023). Although the Court would be within its discretion not to address Caridi's Rule 60(b)(1) argument because it was first raised in his reply brief, it fails on the merits in any event.

Caridi does not squarely posit what alleged mistake in this case justifies vacatur. In fact, by moving under Rule 60(b)(3), he argues that the SEC deceived him intentionally—not by mistake. But even if his motion is construed liberally to suggest that he mistakenly signed the Consent without fully understanding that it did not preclude the SEC from issuing a litigation release, vacatur would not be warranted. In the Consent Caridi signed, which his lawyer reviewed, Caridi expressly agreed that no "promises, or inducements of any kind have been made by the Commission or any member, officer, agent, or representative of the Commission to induce [Caridi]

---

[1] Caridi also mistakenly references Rule 60(b)(2) in his reply brief as the provision allowing vacatur of a judgment due to fraud. *See* ECF No. 69 at 2. The fraud provision is actually Rule 60(b)(3).

to enter into this Consent." ECF No. 68-8 ¶ 7. This broad language disclaims that the SEC had made Caridi any promises— including an alleged promise not to issue a press release. In the face of this clear contractual provision, it is difficult to understand how Caridi claims he made an honest mistake in signing the Consent. Vacatur under Rule 60(b)(1) is therefore unwarranted.

B. Rule 60(b)(3)

Caridi styles his motion as arising under four legal theories: violation of good faith and fair dealing, promissory estoppel, "[r]eckless and [n]egligent conduct," and "fraudulent inducement." *See* ECF No. 68 at 5–6. The Court interprets Caridi's four primary theories as arising under Rule 60(b)(3), as they generally sound in fraud, and holds vacatur is not necessary under this Rule.

Motions to vacate a final judgment under Rule 60(b)(3) may not be granted absent "clear and convincing evidence" of fraud, misrepresentation, or misconduct by another party. *See Bell v. Carlson*, No. 19-3641, 2021 WL 4022726, at *1 (2d Cir. Sept. 3, 2021) (summary order) (citing *Fleming v. N.Y. Univ.*, 865 F.2d 478, 484 (2d Cir. 1989)); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 260 (2d Cir. 2021) ("Clear and convincing evidence is evidence that satisfies the factfinder that it is highly probable that what is claimed actually happened and it is evidence that is neither equivocal nor open to opposing presumptions.").

Although a movant does not need to show that fraud, misrepresentation, or misconduct would have necessarily affected the outcome of a case, the movant is still required to show the other party's behavior substantially interfered with the movant's ability to fully and fairly present his case. *TAL Props. of Pomona, LLC v. Vill. of Pomona*, No. 17-cv-2928 (CS), 2019 WL 3287983, at *8 (S.D.N.Y. July 22, 2019)). When the basis for a Rule 60(b)(3) motion is misrepresentation, that misrepresentation must be material. *See Krasniqi v. A Better Way Wholesale Autos, Inc.*, No. 18-cv-58 (VLB), 2018 WL 11462399, at *6 (D. Conn. Dec. 13, 2018);

*Horphag Rsch. Ltd. v. Henkel Corp.*, No. 00-cv-438 (MBM), 2004 WL 117601, at *3 (S.D.N.Y. Jan. 26, 2004).

Caridi's motion fails under Rule 60(b)(3) because the Court does not find clear and convincing evidence that the SEC made a misrepresentation.  Furthermore, even if there was a misrepresentation, the Court finds there is no clear and convincing evidence that it was fraudulent or material or that Caridi was induced by such a promise.

### 1.  No Misrepresentation Was Made

First, Caridi has not shown, by clear and convincing evidence, that the Consent Judgment should be vacated on the basis of a misrepresentation by the SEC.  Caridi is unable to show, let alone demonstrate by clear and convincing evidence, that his no-press-release condition was anything more than a proposal of his that the SEC rejected.

The record demonstrates that Caridi requested, in a voicemail and follow-up email, that the SEC not issue a press release concerning his case.  *See* ECF No. 69-3 at 1; ECF No. 68-1 ¶ 11. But the Court does not agree with Caridi's claim that the email he sent to Attorney Colorado "confirm[s] the understanding that no press release would be issued."  ECF No. 66 at 1–2.  While it is true that the text of the email is couched in confirmatory language—"just confirming no press releases"—in context, it seems far more likely than not that Caridi was *asking* the SEC to confirm that it would not issue press releases.  In the voicemail that preceded the email, Caridi stated that the no-press-release provision "should be added" and concluded by asking Attorney Colorado whether those terms were acceptable.  *See* ECF No. 68-1 ¶ 11.

But Attorney Colorado declares that he and Caridi then spoke about the no-press-release request the next day, and that he explicitly rejected Caridi's proposal because SEC staff "could not agree to recommend that the SEC limit its future public statements, whether to the press or

otherwise." *Id.* ¶ 13. The voicemail and email, which preceded the phone call, are not enough to withstand the credible countervailing representation by Attorney Colorado that he rejected Caridi's proposal over the phone. And Attorney Colorado's account is corroborated by his subsequent email, in which the SEC incorporated only one of Caridi's two requests—the change in payment schedule, but not the no-press-release provision—and that Caridi agreed to the terms of the Consent with an enthusiastic response: "Good to go !!" ECF No. 68-5 at 2.

Furthermore, the Consent indicates that no promises were made outside of the written agreement. ECF No. 64-2 ¶ 7. Although Caridi is correct that the Consent does not "indicate or authorize the issuance of the SEC's Release," ECF No. 69 at 4, it is also true—and beyond dispute—that nothing in the Consent prevents the SEC from making public statements, such as a press release or litigation release. Moreover, the Consent indicates Caridi's decision to enter into the agreement was not dependent on any other promises and was made voluntarily. ECF No. 64-2 ¶ 7. Such a provision, on its own, is not dispositive. *See Woodling v. Garrett Corp.*, 813 F.2d 543, 554 (2d Cir. 1987) (holding that contractual language indicating the plaintiff had "not been influenced to any extent whatsoever in making and signing . . . by any representations or inducements whatsoever" did not bar her from recovering on grounds of material oral misrepresentations). Nonetheless, in contract law, "the most important consideration when determining how the parties intended to be bound" is the text itself. *Murphy v. Inst. of Int'l Educ.*, 32 F.4th 146, 152 (2d Cir. 2022). And here, the plain language of the Consent serves to further emphasize what Attorney Colorado verbally told Caridi: that the SEC made no promises regarding future public statements.

### 2.  *Even if There Was a Misrepresentation, It Would Have Been Immaterial*

Even if the Court were to suppose there was a misrepresentation, there is no clear and convincing evidence that a promise not to issue a press or litigation release summarizing the public Consent Judgment would have made a substantial difference in Caridi's litigation strategy or to his decision to sign the Consent.  Caridi does not explain why assurances the SEC would not issue a press release were important to him at the time of negotiating the Consent language, given that the documents in this case were already a matter of public record.  *See generally* ECF No. 65. Even after the fact, all Caridi relies on are conclusory assertions that the litigation release has caused him reputational and emotional harm and a loss of unspecified business opportunities.  *See* ECF No. 66 at 2, 5; ECF No. 66-1 ¶ 5.  Aside from his word, Caridi has not put forward any evidence that that allegedly definitive assurances about press releases "formed the primary basis" for his decision to sign the Consent, ECF No. 66 at 4.  Therefore, any misrepresentation would have been immaterial.

### 3.  *Even if There Was a Misrepresentation, It Would Not Have Been Fraudulent*

Next, Caridi's claim that the SEC "misrepresent[ed] its intentions regarding the issuance of a press release," and thereby "fraudulently induced" him to sign the Consent also does not prevail.  ECF No. 66 at 6.  To demonstrate a fraudulent misrepresentation, Mr. Caridi would need to show that Attorney Colorado intended to mislead him into believing that there would be no press release with the intention of inducing him to agree to the Consent.  Caridi has failed to establish as much by clear and convincing evidence.

Caridi's briefing demonstrates that, perhaps understandably, he did not know the difference between a press release and a litigation release at the time.  The SEC, on the other hand, has different policies and regulations relating to each type of release, ECF No. 68-1, ¶¶ 28–33,

suggesting that Attorney Colorado or others at the SEC may have viewed them as completely different.  Nonetheless, there is no evidence Attorney Colorado attempted to hoodwink Caridi by representing that there would be no *press* release, while knowing full well that as a technical matter a *litigation* release would be forthcoming.  Caridi simply fails to carry his heavy burden.

C.  Rule 60(b)(6)

Finally, there are no extraordinary circumstances that would warrant vacating the Consent Judgment under Rule 60(b)(6).

"Relief under Rule 60(b)(6) requires extraordinary circumstances" not covered in Rule 60(b)(1)–(5).  *See BLOM Bank SAL v. Honickman*, 605 U.S. ___, 2025 WL 1583305, at *4–5 (2025).  "This very strict interpretation of Rule 60(b) is essential if the finality of judgments is to be preserved."  *Id.* at *5 (quoting *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005)).  Moreover, the invocation of Rule 60(b)(6) is not warranted when the request for relief stems from the movant's own choices, *see id.* (citing *Ackerman v. United States*, 340 U.S. 193, 198 (1950)), nor is it warranted when the movant is unable to show that leaving the final judgment in place will cause "extreme and undue hardship," *Meltzer Inv. GmbH v. Chipotle Mexican Grill, Inc.*, 970 F.3d 133, 143 (2d Cir. 2020).

1.  *Duress*

Caridi's primary Rule 60(b)(6) theory is that he was forced to sign the Consent while under duress.  *See Playboy Enters. Int'l, Inc. v. On Line Ent., Inc.*, No. CV-00-6618 (DGT), 2004 WL 626807, at *10 (E.D.N.Y. Mar. 29, 2004), as amended (Apr. 1, 2004) (construing defendants' duress argument as a Rule 60(b)(6) argument).  Under the federal common law of contracts, "duress occurs when 'a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative.'"  *See 9178-6103 Quibec Inc. v.*

*Unitrans-Pra Co.*, No. 09-cv-144 (MDG), 2018 WL 5084820, at *5–6 (citing Restatement (Second) of Contracts § 175); *see also Kovian v. Fulton Cnty. Nat'l Bank & Tr. Co.*, 857 F. Supp. 1032, 1037 (N.D.N.Y. 1994) ("Under the federal common law . . . plaintiffs must establish . . . (1) plaintiffs involuntarily accepted defendants' terms; (2) circumstances permitted no alternative to acceptance of defendants' terms; and (3) the circumstances were the result of coercive acts by defendants."). "Duress may not be found merely from the existence of a difficult bargaining position or the pressure of financial circumstances," but rather requires a demonstration of "wrongful and oppressive conduct that precluded . . . the exercise of . . . free will." *McIntosh v. Consol. Edison*, No. 96-cv-3624 (HB), 1999 WL 151102, at *2 (S.D.N.Y. Mar. 19, 1999) (denying motion to set aside settlement agreement).

Thus, to prevail on a duress theory, Caridi would need to show there was wrongful conduct that prevented him from exercising free will. Here, there was no wrongful conduct. Caridi's claim is that the SEC put him under duress by subpoenaing his sons. But taking of discovery is a legal right available to plaintiffs, and there is nothing to suggest the subpoenas were issued in a wrongful or unlawful manner. To the extent he is advancing a claim of economic duress, Caridi's argument fails because he has not demonstrated the extent of his financial challenges—and, more generally, he fails to explain how any such challenges prevented the exercise of his free will. *See* ECF No. 66-1 ¶ 7. As to the exercise of free will, Caridi always had the option available to press further in negotiations or to go to trial. But instead, he chose to sign a Consent Judgment. To be sure, Caridi was in a difficult position. But facing intrusive discovery requests and being short on funds as a result of litigation are standard occurrences that would apply in many white-collar government investigations. These are not "extraordinary circumstances" within the meaning of Rule 60(b)(6). Therefore, Caridi's duress argument, and his request for vacatur under Rule 60(b)(6), fails.

2. *Caridi's Other Theories*

Finally, the other legal theories Caridi invokes—violation of the covenant of good faith and fair dealing, *see* ECF No. 66 at 5, and promissory estoppel, *see id.* at 5–6—also do not justify vacatur.  The covenant of good faith and fair dealing, implied in every contract, generally requires "that neither party do anything that will injure the right of the other to receive the benefits of the agreement."  *See Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 97 (2d Cir. 2019) (quoting *Renaissance Mgmt. Co. v. Conn. Hous. Fin. Auth.*, 281 Conn. 227, 240 (2007)).  Caridi's argument that the SEC's litigation release violated that covenant, *see* ECF No. 66 at 5, rests on the assumption that he entered into an agreement with the SEC that barred future statements by the SEC.  But, as explained above, the Consent did not confer such a right.[2]  And more fundamentally, the Court has no reason to believe based on the record before it that the SEC or its agents acted in bad faith at any point.[3]

Caridi's promissory estoppel argument also fails.  To prevail on a theory of promissory estoppel, Caridi would need to show, among other things, that the SEC made a promise to refrain from issuing a press release.[4]  Again, the evidence before the Court does not support that position.

---

[2] Caridi also argues that "[g]overnment agencies are bound by the principles of good faith and fair dealing when engaging in contractual negotiations."  ECF No. 66 at 5.  But this argument fails because acting in bad faith during negotiation is not encompassed in the duty of good faith and fair dealing, *see* Restatement (Second) of Contracts § 205, cmt. c (A.L.I. 1981).

[3] Courts have also recognized "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance" as bad-faith actions.  *See* Restatement (Second) of Contracts, § 205 cmt. d (A.L.I. 1981).  The Court sees nothing in the record indicating that any of these circumstances would apply here.

[4] More precisely, a promisee must show that the promisor should reasonably have expected his promise to induce the promisee to act, that the promise actually did induce action by the promisee, and that enforcement of the promise is the only way to avoid injustice.  *See Sullivan-Mestecky v. Verizon Comms., Inc.*, 961 F.3d 91, 99 (2d Cir. 2020) (quoting Restatement (Second) of Contracts § 90(1) (A.L.I. 1981)).  Caridi has not met any of these showings.

## IV.    CONCLUSION

For these reasons, Defendant's motion to vacate the judgment is DENIED.

**SO ORDERED** at Hartford, Connecticut, this 25th day of July, 2025.

 _/s/ Sarala V. Nagala_____
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE